1 VANESSA HOLTON (111613)
General Counsel
2 ROBERT G. RETANA (148677)
Deputy General Counsel
3 JAMES J. CHANG (287008)
Assistant General Counsel
4 THE STATE BAR OF CALIFORNIA
OFFICE OF GENERAL COUNSEL
5 180 Howard Street
San Francisco, CA 94105-1639
6 Telephone: (415) 538-2381
Fax: (415) 538-2321
7 james.chang@calbar.ca.gov

8 Attorneys for Defendants
Board of Trustees of the State Bar of California and
9 Leah Wilson

10                    **UNITED STATES DISTRICT COURT**

11                    **CENTRAL DISTRICT OF CALIFORNIA**

12

13 MICHAEL BERNARD POTERE,                    Case No.   2:21-cv-05208-JAK-JC

14          Plaintiff,                        **REQUEST FOR JUDICIAL NOTICE IN
                                             SUPPORT OF STATE BAR
15 v.                                        DEFENDANTS' MOTION TO DISMISS
                                             COMPLAINT**
16 THE BOARD OF TRUSTEES OF THE
STATE BAR OF CALIFORNIA; LEAH              DATE:              October 12, 2021
17 WILSON, EXECUTIVE DIRECTOR OF            TIME:              9:30 a.m.
THE STATE BAR OF CALIFORNIA,               COURTROOM:         750
18                                          MAGISTRATE JUDGE: Jacqueline Chooljian
Defendants.
19

20

21

22

23

24

25

26

27

28

---

Request for Judicial Notice in Support of  Motion to Dismiss Complaint        2:21-cv-05208-JAK-JC

## REQUEST FOR JUDICAL NOTICE

Pursuant to Federal Rule of Evidence 201, Defendants Board of Trustees of the State Bar of California and Leah Wilson hereby request that the Court take judicial notice of the following attached official records of the courts of the United States and of the State of California:

1. **Exhibit 1**: *United States v. Potere*, C.D. Cal. Case No. 2:17-cr-00446-JFW-1, Doc. 44 [Plea Agreement].

2. **Exhibit 2**:  *United States v. Potere*, C.D. Cal. Case No. 2:17-cr-00446-JFW-1, Doc. 49 [Minute Order Accepting Plea Agreement].

3. **Exhibit 3**:  *United States v. Potere*, C.D. Cal. Case No. 2:17-cr-00446-JFW-1, Doc. 49 [Judgment and Commitment Order].

4. **Exhibit 4**:  *United States v. Potere*, C.D. Cal. Case No. 2:17-cr-00446-JFW-1, Doc. 77 [Transcript of October 18, 2017 Plea Agreement Hearing].

5. **Exhibit 5**:  *In the Matter of the Conviction of Michael Bernard Potere*, California State Bar Court Case No. 17-C-03795, Transmittal of Records of Conviction of Attorney (attachments omitted).

6. **Exhibit 6**:  *In the Matter of the Conviction of Michael Bernard Potere,* California State Bar Court Case No. 17-C-03795-CV, October 28, 2019 Hearing Department Decision and Order of Involuntary Inactive Enrollment.

7. **Exhibit 7**:  *In the Matter of the Conviction of Michael Bernard Potere,* California State Bar Court Case No. 17-C-03795-CV, October 16, 2020 Review Department Opinion and Order.

8. **Exhibit 8**:  *Potere on Discipline,* California Supreme Court Case No. S266618, Petition for Review (appendices omitted).

9. **Exhibit 9:**  *Potere on Discipline,* California Supreme Court Case No. S266618, Order Denying Petition for Review and Imposing Discipline.

Dated: August 20, 2021

Respectfully submitted,

VANESSA L. HOLTON
General Counsel
ROBERT G. RETANA
Deputy General Counsel

OFFICE OF GENERAL COUNSEL
THE STATE BAR OF CALIFORNIA

By:/s/  *James J. Chang*
   James J. Chang
   Assistant General Counsel

   Attorneys for Defendants
   Board of Trustees of the State Bar of California;
   and Leah Wilson

Request for Judicial Notice in Support of Motion to Dismiss Complaint                    2:21-cv-05208-JAK-JC

# EXHIBIT 1

SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Deputy Chief, Violent & Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0698
    Facsimile: (213) 894-3713
    E-mail:    jeff.mitchell@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 17-446(A)-JFW |
| Plaintiff, | <u>PLEA AGREEMENT</u> |
| v. | |
| MICHAEL POTERE, | |
| Defendant. | |

1.    This constitutes the plea agreement between Michael Potere ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case. This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.    Defendant agrees to:

    a.    Not contest facts agreed to in this agreement.

    b.    Abide by all agreements regarding sentencing contained in this agreement.

c. Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

d. Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

e. Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

f. Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

g. Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a single-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Unauthorized Access to a Computer to Obtain Information, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(A).

<u>THE USAO'S OBLIGATIONS</u>

3. The USAO agrees to:

a. Not contest facts agreed to in this agreement.

b. Abide by all agreements regarding sentencing contained in this agreement.

c. At the time of sentencing, move to dismiss the underlying indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider any

dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

        d.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

## NATURE OF THE OFFENSE

4.   Defendant understands that for defendant to be guilty of the crime charged in the single-count information, that is, Accessing a Computer Without Authorization to Obtain Information, in violation of Title 18, United States Code, Sections 1030(a)(2)(C), (c)(2)(A), the following must be true:

     a. Defendant intentionally accessed without authorization a computer; and

     b. By accessing without authorization a computer, defendant obtained information from a computer that was used in or affected commerce or communication between one state and another state, or between a state of the United States and a foreign country.

## PENALTIES

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Sections 1030(a)(2)(C), (c)(2)(A), is: one year imprisonment or a five-year period of probation; a one-year period of supervised release; a fine of $100,000 or twice the gross gain or gross loss

3

resulting from the offense, whichever is greatest; and a mandatory special assessment of $25.

6.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

8.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the

Sentencing Guidelines factors set forth in paragraph 10 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Beginning in 2015 and continuing to June 2017, defendant worked as an associate attorney at an international law firm (referred to herein as "DLF"). On or about April 15, 2017, and again on or about May 14, 2017, defendant intentionally accessed a DLF computer without authorization and downloaded confidential information from the DLF computer that he was not authorized to download and obtain. Specifically, defendant downloaded and obtained (1) DLF quarterly financial reports; (2) documents describing how DLF determines its billing rates for clients and specific factors relied on to arrive at those rates; (3) a list of clients and the dollar amounts charged to those clients; (4) documents describing how DLF partners should approach clients who have outstanding and overdue balances; (5) documents describing issues to be discussed at meetings for DLF partners; (6) documents describing voting for "Full Interest Partner Candidates"; (7) confidential reviews of associate attorneys; and (8) detailed analysis describing recruitment of lateral attorneys, and offers to those attorneys (the "Confidential Documents").

On May 17, 2017, defendant spoke to DLF partners and demanded $210,000 and a piece of artwork, among other items, from DLF in exchange for the return of the Confidential Documents. Defendant repeatedly stated that if DLF did not meet his demands he intended to email the Confidential Documents to a legal blog website.

At the time defendant downloaded and obtained the Confidential Documents from the DLF computer, defendant knew that he was not authorized to search for, download, or obtain the Confidential Documents.  The DLF computer was used in and affecting interstate and foreign commerce and communication.

SENTENCING FACTORS

9.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

10.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

Base Offense Level:              6            [U.S.S.G. § 2X5.2]
Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

11.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

12.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing

6

Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

13.  Defendant understands that by pleading guilty, defendant gives up the following rights:

a.  The right to persist in a plea of not guilty.

b.  The right to a speedy and public trial by jury.

c.  The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial. Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.  The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.  The right to confront and cross-examine witnesses against defendant.

f.  The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.  The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.  Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

7

<u>WAIVER OF APPEAL OF CONVICTION</u>

14.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

15.   Defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, provided it is within the statutory maximum; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

16.   Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction.

17.   This agreement does not affect in any way the right of the USAO to appeal the sentence imposed by the Court.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

18. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

19. Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

20. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

21. Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant

United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

22. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action

10

against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND PROBATION OFFICE NOT PARTIES</u>

23. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

24. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 10 are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

25. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions

different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

26. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//

//

//

1                    PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2           27.   The parties agree that this agreement will be considered

3    part of the record of defendant's guilty plea hearing as if the

4    entire agreement had been read into the record of the proceeding.

5    AGREED AND ACCEPTED

6    UNITED STATES ATTORNEY'S OFFICE
     FOR THE CENTRAL DISTRICT OF
7    CALIFORNIA

8    SANDRA R. BROWN
     Acting United States Attorney
9

10   _____          10/18/17
                                               _____
     JEFF MITCHELL                             Date
11   Assistant United States Attorney

12                                                 10/19/17
     _____          _____
     MICHAEL POTERE                            Date
13   Defendant

14                                                 10/18/17
     _____          _____
     ASAL AKHONDZADEH                          Date
15   Attorney for Defendant
     Michael Potere
16

17

18   //

19   //

20   //

21

22

23

24

25

26

27

28

                                13

1        CERTIFICATION OF DEFENDANT

2           I have read this agreement in its entirety.  I have had enough

3    time to review and consider this agreement, and I have carefully and

4    thoroughly discussed every part of it with my attorney.  I understand

5    the terms of this agreement, and I voluntarily agree to those terms.

6    I have discussed the evidence with my attorney, and my attorney has

7    advised me of my rights, of possible pretrial motions that might be

8    filed, of possible defenses that might be asserted either prior to or

9    at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10   of relevant Sentencing Guidelines provisions, and of the consequences

11   of entering into this agreement.  No promises, inducements, or

12   representations of any kind have been made to me other than those

13   contained in this agreement.  No one has threatened or forced me in

14   any way to enter into this agreement.  I am satisfied with the

15   representation of my attorney in this matter, and I am pleading

16   guilty because I am guilty of the charges and wish to take advantage

17   of the promises set forth in this agreement, and not for any other

18   reason.

19   _____          10/18/17
                                             Date
20   MICHAEL POTERE
     Defendant
21

22   //

23   //

24   //

25

26

27

28

                              14

1

CERTIFICATION OF DEFENDANT'S ATTORNEY

2   I am Michael Potere's attorney.  I have carefully and thoroughly
3   discussed every part of this agreement with my client.  Further, I
4   have fully advised my client of his rights, of possible pretrial
5   motions that might be filed, of possible defenses that might be
6   asserted either prior to or at trial, of the sentencing factors set
7   forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
8   provisions, and of the consequences of entering into this agreement.
9   To my knowledge: no promises, inducements, or representations of any
10  kind have been made to my client other than those contained in this
11  agreement; no one has threatened or forced my client in any way to
12  enter into this agreement; my client's decision to enter into this
13  agreement is an informed and voluntary one; and the factual basis set
14  forth in this agreement is sufficient to support my client's entry of
15  a guilty plea pursuant to this agreement.

16

17  ASAL AKHONDZADEH                              10/18/17
    Attorney for Defendant                        Date
18  Michael Potere

19

20

21

22

23

24

25

26

27

28

15

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>MICHAEL POTERE,<br><br>            Defendant. | CR No. 17-446(A)-JFW<br><br>F I R S T<br><br>S U P E R S E D I N G<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1030(a)(2)(C),<br>(c)(2)(A): Unauthorized Access to<br>a Computer to Obtain Information]<br><br>**[Class A Misdemeanor]** |

The United States Attorney charges:

[18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(A)]

On or about May 14, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant MICHAEL POTERE intentionally accessed without authorization a computer, namely, a server hosting an e-mail account of victim D.L.F., and thereby obtained information from a protected computer, as that term

//

//

//

is defined in Title 18, United States Code, Section 1030(e)(2), namely, the contents of confidential documents belonging to victim D.L.F.

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

JUSTIN RHOADES
Assistant United States Attorney
Chief, Violent & Organized Crime
  Section

JEFF MITCHELL
Assistant United States Attorney
Deputy Chief, Violent & Organized
  Crime Section

# EXHIBIT 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL

Case No.   **CR 17-446(A)-JFW**                          Dated: October 18, 2017
=====================================================================
PRESENT:   HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

Shannon Reilly                        Myra Ponce                      Jeff P. Mitchell
Courtroom Deputy                  Court Reporter                Asst. U.S. Attorney

                                   Interpreter: None

=====================================================================
U.S.A. vs (Dfts listed below)                    Attorneys for Defendants

1)    Michael Potere                      1)    Asal Akhondzadeh, DFPD
       present on bond                             present appointed

## PROCEEDINGS:    ARRAIGNMENT, GUILTY PLEA, AND SETTING OF SENTENCING DATE

Case called and counsel make their appearance.

The defendant is arraigned on the Single-Count First Superseding Information filed on October 18, 2017.

Defendant is sworn.

Plea agreement filed on October 18, 2017 is incorporated and made part of the proceeding.

The defendant enters a plea of Guilty to the Single-Count First Superseding Information.

The Court questions the defendant regarding the plea of Guilty and finds a factual and legal basis for the plea.  The Court finds that the defendant, Michael Potere, has entered his plea freely and voluntarily, with a full understanding of the charges against him and the consequences of his plea. The Court finds that defendant understands his constitutional and statutory rights and wishes to waive them.  Accordingly, the plea is accepted and entered.

The Court refers the defendant to the Probation Office for the preparation of a pre-sentence report and continues the matter to **January 22, 2018 a.m., at 11:00 a.m. for sentencing**.  The Status Conference on October 19, 2017 and the Jury Trial on November 14, 2017 are hereby vacated.

cc:      PSA, USPO, USM

*Counsel are notified that Federal Rule of Criminal Procedure 32 requires the parties to notify the Probation Officer, and each other, of any objections to the Presentence Report within fourteen (14) days of receipt.  Alternatively, counsel may file such objections not later than twenty-one (21) days before Sentencing.  The Court construes "objections" to include departure arguments.  Any party intending to move for a continuance of the Sentencing shall, not later than noon on the Monday preceding the Sentencing, notify opposing counsel and the Courtroom Deputy.  Strict compliance with the above is mandatory because untimely filings interfere with the Court's preparation for Sentencing.  Failure to meet these deadlines is grounds for sanctions.*

                                                         Initials of Deputy Clerk   sr
                                                                   0/25

# EXHIBIT 3

JS-3/ent

# United States District Court
## Central District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA** vs. | **Docket No.**    CR 17-446(A)-JFW |
| **Defendant**    Michael Potere [66063-112] | **Social Security No.**   3   4   4   1 |
| akas:   None | (Last 4 digits) |

## JUDGMENT AND PROBATION/COMMITMENT ORDER

In the presence of the attorney for the government, the defendant appeared in person on this date.

| MONTH | DAY | YEAR |
|---|---|---|
| **January** | **22** | **2018** |

| | |
|---|---|
| **COUNSEL** | **Asal Akhondzadeh, DFPD** |
| | (Name of Counsel) |
| **PLEA** | [x] **GUILTY,** and the court being satisfied that there is a factual basis for the plea.    [ ] **NOLO CONTENDERE**    [ ] **NOT GUILTY** |

| | |
|---|---|
| **FINDING** | There being a finding of **GUILTY,** defendant has been convicted as charged of the offense(s) of: Unauthorized Access to a Computer to Obtain Information in violation of 18 U.S.C. §§ 1030 (a) (2) ( C), ( c) (2) (A) as charged in the Single-Count First Superseding Information filed on October 18, 2017 [Class A Misdemeanor] |

| | |
|---|---|
| **JUDGMENT AND PROB/ COMM ORDER** | The Court asked whether there was any reason why judgment should not be pronounced. Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: |

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Michael Bernard Potere, is hereby committed on Count 1 of the First Superseding Information to the custody of the Bureau of Prisons for a term of 5 months.

The Court recommends that the Bureau of Prisons conduct a mental health evaluation of the defendant and provide all necessary treatment.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of one year under the following terms and conditions:

1. The defendant shall comply with the rules and regulations of the United States Probation Office and General Order 05-02.

2. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from custody and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the Probation Officer.

3. The defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath and/or sweat patch testing, as directed by the Probation Officer. The defendant shall abstain from using alcohol and illicit drugs, and from abusing prescription medications during the period of supervision.

USA vs.   Michael Potere [66063-112]                    Docket No.:   **CR 17-446(A)-JFW**

---

4.     As directed by the Probation Officer, the defendant shall pay all or part of the costs of the Court-ordered treatment to the aftercare contractors during the period of community supervision.  The defendant shall provide payment and proof of payment as directed by the Probation Officer.  If the defendant has no ability to pay, no payment shall be required.

5.     During the period of community supervision, the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment.

6.     The defendant shall cooperate in the collection of a DNA sample from the defendant.

7.     The defendant shall participate in mental health treatment, which may include evaluation and counseling, until discharged from the treatment by the treatment provider, with the approval of the Probation Officer.

8.     The defendant shall submit his or her person, property, house, residence, vehicle, papers, computers [as defined in 18 U.S.C. § 1030(e)(1)], cell phones, other electronic communications or data storage devices or media, office, or other areas under the offender's control, to a search conducted by a United States Probation Officer or law enforcement officer.  Failure to submit to a search may be grounds for revocation.  Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

The Court authorizes the Probation Officer to disclose the Presentence Report, and/or any previous mental health evaluations or reports, to the treatment provider. The treatment provider may provide information (excluding the Presentence report), to State or local social service agencies (such as the State of California, Department of Social Service), for the purpose of the client's rehabilitation.

The Court authorizes the Probation Office to disclose the Presentence Report to the substance abuse treatment provider to facilitate the defendant's treatment for narcotic addiction or drug dependency. Further redisclosure of the Presentence Report by the treatment provider is prohibited without the consent of the sentencing judge.

It is further ordered that the defendant surrender himself to the institution designated by the Bureau of Prisons at or before **12 noon, on February 28, 2018.** In the absence of such designation, the defendant shall report on or before the same date and time, to the United States Marshal located at the Roybal Federal Building, 255 East Temple Street, Los Angeles, California 90012.

It is ordered that the defendant shall pay to the United States a special assessment of $25, which is due immediately. Any unpaid balance shall be due during the period of imprisonment, at the rate of not less than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

Pursuant to Guideline § 5E1.2(a), all fines are waived as the Court finds that the defendant has established that he is unable to pay and is not likely to become able to pay any fine.

Court recommends that the defendant be placed in a facility located in Massachusetts or New England area.

Defendant informed of right to appeal.

---

USA vs.   Michael Potere [66063-112]                     Docket No.:   **CR 17-446(A)-JFW**

On the Government's Motion, the Court orders the Underlying Indictment filed on July 18, 2017.

Bond exonerated upon self surrender.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

January 22, 2018
Date                                                                U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

Kiry Gray, Clerk Clerk, U.S. District Court

January 22, 2018                              By    Shannon Reilly /s/
Filed Date                                                  Deputy Clerk

USA vs.   Michael Potere [66063-112]                    Docket No.:   **CR 17-446(A)-JFW**

---

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

## STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, _for felony cases only_: not possess a firearm, destructive device, or any other dangerous weapon.

---

USA vs.   Michael Potere [66063-112]                    Docket No.:   **CR 17-446(A)-JFW**

☐ The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

### STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution, however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
    Private victims (individual and corporate),
    Providers of compensation to private victims,
    The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

### SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure; and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

### RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

USA vs.   Michael Potere [66063-112]                    Docket No.:   **CR 17-446(A)-JFW**

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

_____                    By _____

Date                                          Deputy Marshal

### CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

Clerk, U.S. District Court

_____                    By _____

Filed Date                                      Deputy Clerk

### FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed) _____          _____
              Defendant                                              Date

        _____          _____
              U. S. Probation Officer/Designated Witness              Date

# EXHIBIT 4

```
 1                UNITED STATES DISTRICT COURT

 2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

 3          HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

 4

 5   UNITED STATES OF AMERICA,        )
                                      )
 6                   Plaintiff,       )
                                      )
 7        vs.                         )   Case No. CR 17-446 JFW
                                      )
 8   MICHAEL POTERE,                  )
                                      )
 9                   Defendant.       )
                                      )

10

11             REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        PLEA OF GUILTY
12              WEDNESDAY, OCTOBER 18, 2017
                          2:56 P.M.
13               LOS ANGELES, CALIFORNIA

14

15

16

17

18

19

20

21

22

23      MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
                FEDERAL OFFICIAL COURT REPORTER
24               350 WEST 1ST STREET, ROOM 4455
                 LOS ANGELES, CALIFORNIA  90012
25                       (213) 894-2305
```

1          **APPEARANCES OF COUNSEL:**

2

3  **FOR THE PLAINTIFF:**

4      NICOLA T. HANNA
       United States Attorney
5      BY:  JEFF MITCHELL
            Assistant United States Attorney
6      United States Courthouse
       312 North Spring Street
7      Los Angeles, California  90012

8

9  **FOR THE DEFENDANT:**

10     HILARY LEE POTASHNER
       Federal Public Defender
11     BY:  ASAL AKHONDZADEH
            Deputy Federal Public Defender
12     Central District of California
       321 East Second Street
13     Los Angeles, California  90012

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1                 WEDNESDAY, OCTOBER 18, 2017; 2:56 P.M.

 2                      LOS ANGELES, CALIFORNIA

 3                             -oOo-

 4            THE COURTROOM DEPUTY:  Calling CR 17-446 JFW,

 5   United States of America vs. Michael Potere.

 6            Counsel, please state your appearance.

 7            MR. MITCHELL:  Good afternoon, Your Honor.

 8   Jeff Mitchell on behalf of the United States.

 9            MS. AKHONDZADEH:  Good afternoon, Your Honor.

10   Asal Akhondzadeh on behalf of Mr. Potere who is present.

11            THE DEFENDANT:  Good afternoon.

12            THE COURT:  All right.  Good afternoon to all.

13            This matter is on the Court's calendar for an entry

14   of a plea of guilty to a First Superseding Information that was

15   filed on October 18th and appears as Docket No. 44.  That plea

16   of guilty is being offered pursuant to a plea agreement that

17   was also filed on October 18th, 2017, and appears as

18   Docket No. 44.

19            The plea agreement -- provision of the plea

20   agreement, paragraph 2G, refers to the defendant giving up the

21   right to be indicted -- right to indictment by a grand jury.

22   But since the information only charges a misdemeanor, I don't

23   think a waiver of indictment is necessary.

24            Do you agree?

25            MR. MITCHELL:  I do agree, Your Honor.
```

1          THE COURT:  Do you?

2          MS. AKHONDZADEH:  We agree as well, Your Honor.

3          THE COURT:  All right.  So what I intend to do,

4   first, is to arraign the defendant on the First Superseding

5   Information, and then I will take his plea pursuant to the plea

6   agreement.

7          So let me ask the defendant to state your true and

8   correct name.

9          THE DEFENDANT:  Michael Bernard Potere.

10          THE COURT:  And I want to advise you that you're in

11   the United States District Court for the Central District of

12   California and that a First Superseding Information has been

13   filed against you in this Court charging you with violating the

14   laws of the United States.

15          Have you received a copy of the First Superseding

16   Information?

17          THE DEFENDANT:  Yes, I have, Your Honor.

18          THE COURT:  Do you want the First Superseding

19   Information read to you, or do you waive reading of the First

20   Superseding Information?

21          THE DEFENDANT:  I waive the reading, Your Honor.

22          THE COURT:  All right.  I have provided counsel with

23   a copy of the statement of defendant's constitutional rights

24   that was filed on July 20th of 2017 and which appears as

25   Docket No. 26.

5

1              And I want to confirm with the defendant, I want to

2       ask the defendant specifically, did you read and sign a

3       statement of your constitutional rights during your arraignment

4       in this case before the magistrate judge and did that

5       magistrate judge explain to you your constitutional rights?

6              THE DEFENDANT:  Yes to both, Your Honor.

7              THE COURT:  And you have that Docket No. 26 before

8       you?

9              THE DEFENDANT:  Yes, I do, Your Honor.

10             THE COURT:  And is that your signature?

11             THE DEFENDANT:  Yes, it is.

12             THE COURT:  All right.  Do you want me to read those

13      constitutional rights to you again, or do you waive reading of

14      those rights?

15             THE DEFENDANT:  I waive the reading, Your Honor.

16             THE COURT:  All right.  Counsel, do you join in your

17      client's waivers?

18             MS. AKHONDZADEH:  I do, Your Honor.

19             THE COURT:  All right.  That concludes the

20      arraignment of the defendant on the First Superseding

21      Information.  I will now proceed to take his guilty plea,

22      unless counsel think that I need to ask any other questions in

23      connection with the arraignment.

24             MR. MITCHELL:  No, Your Honor.

25             MS. AKHONDZADEH:  No, Your Honor.

1    THE COURT:  All right.  Counsel, do you object to

2    the prosecutor rather than the Court advising your client of

3    the elements of the offense, the penalties for the offense to

4    which your client offers his plea of guilty, the provisions of

5    the plea agreement relating to your client's waiver of his

6    right to appeal, and the constitutional rights that your client

7    will be giving up by pleading guilty today?

8    MS. AKHONDZADEH:  No objection to that, Your Honor.

9    THE COURT:  All right.  I want to advise the

10   defendant that before I accept your plea of guilty --

11   Mr. Mitchell, do you have something you want to

12   address?

13   MR. MITCHELL:  No, Your Honor.  I was going to read

14   the --

15   THE COURT:  Okay.  Before I accept your plea of

16   guilty, I must satisfy myself that you've been fully informed

17   of your rights and that you fully understand both your rights

18   and the nature of this proceeding.

19   In order to do so, I'm going to ask you a series of

20   questions, and you'll be advised of certain rights.  If at any

21   point in time you do not understand a question I've asked or a

22   statement that's been made, please tell me.  I'll try to make

23   it clearer for you.

24   Also, at any point in time, if you want to stop and

25   have a conversation with your attorney, just let me know and

1     I'll allow you to do so.

2          Do you understand that?

3          THE DEFENDANT:  Yes, I do, Your Honor.

4          THE COURT:  All right.  I'm going to ask the

5     courtroom deputy to place the defendant under oath.

6          THE COURTROOM DEPUTY:  Please raise your right hand.

7          Do you solemnly swear to answer truthfully the

8     questions the Court will ask you, so help you God?

9          THE DEFENDANT:  Yes, I do.

10         THE COURT:  All right.  Do you understand that

11     you're now under oath and if you answer any of my questions

12     falsely, your answers may be used against you later in another

13     prosecution for perjury or for the making of a false statement?

14         THE DEFENDANT:  Yes, I do understand.

15         THE COURT:  What is your true and correct full name?

16         THE DEFENDANT:  Michael Bernard Potere.

17         THE COURT:  And how old are you?

18         THE DEFENDANT:  I'm 32 years old.

19         THE COURT:  How many years of school have you

20     completed?

21         THE DEFENDANT:  College, a master's degree, and a

22     juris doctorate.  So eight years of graduate and college.

23         THE COURT:  Are you a United States citizen?

24         THE DEFENDANT:  Yes, I am, Your Honor.

25         THE COURT:  Have you taken any medication, drugs, or

1 alcohol within the last 72 hours?

2          THE DEFENDANT:  I had some beers last night,

3 Your Honor.

4          THE COURT:  Is there anything about the fact that

5 you may have consumed some beers last night that prevents you

6 from understanding the proceedings today?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  All right.  Do you suffer from any

9 mental condition that would prevent you from understanding

10 fully the charge against you or the consequence of any guilty

11 plea you may enter to the charge?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  Is there any reason at all why we can't

14 go forward this afternoon in taking your plea of guilty?

15          THE DEFENDANT:  No, Your Honor.

16          THE COURT:  Counsel, have you had the opportunity to

17 speak with your client immediately prior to this proceeding?

18          MS. AKHONDZADEH:  I have, Your Honor.

19          THE COURT:  Do you have any reason to believe your

20 client is not competent to enter his guilty plea at this time?

21          MS. AKHONDZADEH:  No, Your Honor.

22          THE COURT:  Is it your opinion your client is in

23 full possession of his faculties?

24          MS. AKHONDZADEH:  It is, Your Honor.

25          THE COURT:  Now, in the First Superseding

```
 1   Information, you've been charged with a Class A misdemeanor,

 2   and the violation is of Title 18, United States Code,

 3   Section 1030(a)(2)(C), unauthorized access to a computer to

 4   obtain information.

 5            I'm going to ask the prosecutor to tell us what the

 6   elements of this charge are.

 7            MR. MITCHELL:  Yes, Your Honor.

 8            In order for the defendant to be guilty of the crime

 9   charged under the single count information, that is, accessing

10   a computer without authorization to obtain information, in

11   violation of 18 U.S.C. 1030(a)(2)(C), (c)(2)(A), the following

12   must be true:

13            A.  Defendant intentionally accessed without

14   authorization a computer; and

15            B.  By accessing without authorization a computer,

16   defendant obtained information from a computer that was used in

17   or affected commerce or communication between one state and

18   another state or between a state of the United States and a

19   foreign country.

20            THE COURT:  All right.  Have you -- do you

21   understand the nature of the charge?

22            THE DEFENDANT:  Yes, I do, Your Honor.

23            THE COURT:  Has your attorney discussed with you

24   each of the elements of the offense?

25            THE DEFENDANT:  She has, Your Honor.
```

1          THE COURT:  Do you have any questions about the
2    charge?
3          THE DEFENDANT:  No, Your Honor.
4          THE COURT:  All right.  Now, you have a number of
5    constitutional rights that you'll be giving up if you plead
6    guilty today.  And I'm going to ask the prosecutor to advise
7    you of your constitutional rights.
8          MR. MITCHELL:  By pleading guilty, defendant is
9    giving up the following rights:
10         A.  The right to persist in a plea of not guilty;
11         B.  The right to a speedy and public trial by jury;
12         C.  The right to be represented by counsel and, if
13   necessary, have the Court appoint counsel at trial.  Defendant
14   understands, however, that defendant retains the right to be
15   represented by counsel and, if necessary, have the Court
16   appoint counsel at every other stage of the proceeding;
17         D.  The right to be presumed innocent and to have
18   the burden of proof placed on the Government to prove defendant
19   guilty beyond a reasonable doubt;
20         E.  The right to confront and cross-examine
21   witnesses against defendant;
22         F.  The right to testify and to present evidence in
23   opposition to the charges, including the right to compel the
24   attendance of witnesses to testify;
25         G.  The right not to be compelled to testify.  And

1  if defendant chose not to testify or present evidence, to have

2  that choice not be used against him;

3         H.  Any and all rights to pursue any affirmative

4  defenses, Fourth Amendment or Fifth Amendment claims, and other

5  pretrial motions that have been filed or could be filed.

6         THE COURT:  All right.  Have you discussed each of

7  these rights with your attorney?

8         THE DEFENDANT:  Yes, I have, Your Honor.

9         THE COURT:  You understand that you have these

10  rights and if you enter a plea of guilty and I accept your

11  plea, you'll be giving up the right to a trial and the other

12  rights the prosecutor just described to you?

13         THE DEFENDANT:  Yes, I do understand.

14         THE COURT:  You give up each of these rights?

15         THE DEFENDANT:  Yes, I do, Your Honor.

16         THE COURT:  Counsel, are you satisfied your client's

17  waivers are knowingly and voluntarily made and do you join in

18  and concur in each of your client's waivers?

19         MS. AKHONDZADEH:  I do, Your Honor.

20         THE COURT:  Now, as we discussed earlier, you've

21  been charged with a violation of 18 United States Code,

22  Section 1030(a)(c) -- (a)(2)(C), unauthorized access to a

23  computer to obtain information, which is a misdemeanor.  Have

24  you been advised of the maximum penalty provided by law for the

25  offense to which you now offer your plea of guilty?

1     THE DEFENDANT:  Yes, I have, Your Honor.

2     THE COURT:  I'll ask the prosecutor to tell us what

3 the statutory maximum punishment is for this offense, including

4 all -- including the authorized term of supervised release, all

5 applicable fines and special assessments.

6     MR. MITCHELL:  The statutory maximum sentence that

7 the Court can impose for a violation of 18 U.S.C.,

8 Sections 1030(a)(2)(C), (c)(2)(A), is one-year imprisonment or

9 a five-year period of probation, a one-year period of

10 supervised release, a fine of $100,000 or twice the gross gain

11 or gross loss resulting from the offense, whichever is

12 greatest, and a mandatory special assessment of $25.

13     THE COURT:  All right.  I'm looking at the plea

14 agreement.  So the penalty is one-year imprisonment or a

15 five-year period of probation, and then there is another

16 provision, a one-year period of supervised -- one-year period

17 of supervised release?

18     MR. MITCHELL:  Yes, Your Honor.  If the Court

19 imposes imprisonment, then the supervised release provision

20 would kick in.  If the Court orders probation, there would be

21 no supervised release.

22     THE COURT:  But is it -- and it's not a mandatory

23 period of probation.  It's just the maximum is a five-year

24 period of probation.

25     MR. MITCHELL:  That is correct, Your Honor.

1    THE COURT:  Okay.  All right.  Is that your

2    understanding of the potential sentence?

3    THE DEFENDANT:  Yes, it is, Your Honor.

4    THE COURT:  All right.  Do you understand there's no

5    parole and if I do sentence you to prison, you'll not be

6    released on parole?

7    THE DEFENDANT:  Yes, I do.

8    THE COURT:  And if I do sentence you to prison and

9    upon your release, you'll be on supervised release from any

10   prison sentence.  And if you violate the terms and conditions

11   of your supervised release, you could be given additional time

12   in prison.  Do you understand that?

13   THE DEFENDANT:  Yes, I do understand, Your Honor.

14   THE COURT:  Now, you'll be sentenced under the

15   Sentencing Reform Act of 1984.  However, I want to advise you

16   that I'm not required to impose a sentence within the range

17   established by the United States Sentencing Guidelines.  The

18   Guidelines are now merely advisory, and I'm free to exercise my

19   discretion to impose any sentence I deem appropriate up to the

20   maximum sentence set by statute for the crime of conviction.

21   Do you understand that?

22   THE DEFENDANT:  Yes, I do, Your Honor.

23   THE COURT:  Do you understand that in determining

24   your sentence, I will calculate and consider the applicable

25   Sentencing Guideline range, any possible upward or downward

1   departures authorized under the Guidelines, and certain other

2   statutory sentencing factors set forth in Title 18,

3   United States Code, Section 3553(a)?  Do you understand that?

4           THE DEFENDANT:  Yes, I do, Your Honor.

5           THE COURT:  Have you discussed the Guidelines and

6   other factors that I will consider in determining your sentence

7   with your attorney?

8           THE DEFENDANT:  Yes, I have, Your Honor.

9           THE COURT:  Has your attorney explained how the

10  Sentencing Guidelines and other factors will be used to

11  determine your sentence?

12          THE DEFENDANT:  Yes, she has, Your Honor.

13          THE COURT:  You understand that I will not be able

14  to determine the applicable Sentencing Guideline range or the

15  actual sentence for your case until a presentence report has

16  been prepared by the probation department and you and the

17  Government have had an opportunity to review the presentence

18  report and file any objections you may have to the report?  Do

19  you understand that?

20          THE DEFENDANT:  Yes, I do, Your Honor.

21          THE COURT:  Do you also understand that for all of

22  these reasons, neither your attorney nor I can tell you what

23  your sentence will be?

24          THE DEFENDANT:  Yes, I do understand that.

25          THE COURT:  You understand that if I impose a

```
 1    sentence that's more severe than you anticipate, you will not
 2    be able to withdraw your guilty plea?
 3                THE DEFENDANT:  Yes, I understand.
 4                THE COURT:  Now, a plea agreement has been filed in
 5    this case.  Have you read the plea agreement and discussed all
 6    of the terms of the -- of your plea agreement with your
 7    attorney?
 8                THE DEFENDANT:  Yes, I have, Your Honor.
 9                THE COURT:  And did you sign the plea agreement?
10                THE DEFENDANT:  Yes, I did, Your Honor.
11                THE COURT:  Do you understand the plea agreement and
12    all of its terms?
13                THE DEFENDANT:  Yes, I do, Your Honor.
14                THE COURT:  Now, paragraphs 14 and 15 of your plea
15    agreement contain a waiver of your right to appeal.  I'm going
16    to ask Mr. Mitchell to read into the record the provisions of
17    each of those paragraphs, and I'm going to ask you some
18    questions about them.
19                MR. MITCHELL:  As described in paragraph 14, with
20    the exception of an appeal based on a claim that his guilty
21    plea was involuntary, defendant is waiving, giving up any right
22    to appeal his conviction.
23                As described in paragraph 15, defendant is waiving
24    his right to appeal all of the following:
25                A.  The procedures and calculations used to
```

1  determine and impose any portion of the sentence;

2          B.  Determine imprisonment imposed by the Court,

3  provided it is within the statutory maximum;

4          C.  The fine imposed by the Court, provided it is

5  within the statutory maximum;

6          D.  The term of probation or supervised release

7  imposed by the Court -- again, provided it is within the

8  statutory maximum; and

9          E.  The following conditions of probation or

10  supervised release imposed by the Court, conditions set forth

11  in General Orders 318, 01-05, and/or 05-02 of this Court, the

12  drug testing conditions mandated by 18 U.S.C,

13  Sections 3563(a)(5) and 3583(d), and the alcohol and drug use

14  conditions authorized by 18 U.S.C. 3563(b)(7).

15          THE COURT:  All right.  Do you understand that by

16  entering into this plea agreement and pleading guilty, you've

17  agreed to give up your right to appeal in accordance with the

18  terms of your plea agreement?

19          THE DEFENDANT:  Yes, I understand, Your Honor.

20          THE COURT:  Did you discuss waiving your right to

21  appeal with your attorney?

22          THE DEFENDANT:  Yes, I did.

23          THE COURT:  Based on that conversation and then

24  having considered the matter, do you wish to give up your right

25  to appeal on the terms and conditions set forth in your plea

1  agreement?

2  THE DEFENDANT: Yes, I do, Your Honor.

3  THE COURT: Counsel, are you satisfied your client's

4  waiver of his right to appeal is knowingly and voluntarily

5  made, and do you join in and concur in your client's decision

6  to waive his right to appeal?

7  MS. AKHONDZADEH: I do, Your Honor.

8  THE COURT: Now, have any promises, representations,

9  or guarantees been made to you in exchange for your plea of

10  guilty, other than those that may appear in your plea

11  agreement?

12  THE DEFENDANT: No, Your Honor.

13  THE COURT: Has anyone made -- has anyone made any

14  threats or used any force against you or any member of your

15  family in order to get you to plead guilty today?

16  THE DEFENDANT: No, Your Honor.

17  THE COURT: Are you pleading guilty voluntarily and

18  of your own free will?

19  THE DEFENDANT: Yes, I am, Your Honor.

20  THE COURT: Other than what's contained in your

21  written plea agreement and other than a general discussion with

22  your attorney of the Sentencing Guidelines and other factors

23  that I will consider in determining your sentence, has anyone

24  made you any promise of leniency, a particular sentence,

25  probation, or any other inducement of any kind in order to get

1    you to plead guilty?

2            THE DEFENDANT:  No, Your Honor.

3            THE COURT:  Have you been told by anyone what

4    specific sentence the Court will impose in the event I accept

5    your guilty plea?

6            THE DEFENDANT:  No, Your Honor.

7            THE COURT:  Now, I'm going to ask the prosecutor to

8    make an offer of proof as to what facts the Government would

9    prove on the First Superseding Information if this case went to

10   trial.  And I'm going to ask you to listen very carefully

11   because I'm going to ask you questions about what the

12   prosecutor says in his offer of proof.

13           MR. MITCHELL:  If this matter went to trial, the

14   Government would prove the following facts beyond a reasonable

15   doubt:

16           Beginning in 2015 and continuing to June 2017,

17   defendant worked as an associate attorney at an international

18   law firm referred to herein as DLF.

19           On or about April 15th, 2017, and again on or about

20   May 14th, 2017, defendant intentionally accessed a DLF computer

21   without authorization and downloaded confidential information

22   from the DLF computer that he was not authorized to download

23   and obtain.

24           Specifically, defendant downloaded and obtained:

25           1.  DLF quarterly financial reports;

1          2.  Documents describing how DLF determines its

2  billing rates for clients and specific factors relied on to

3  arrive at those rates;

4          3.  A list of clients and the dollar amounts charged

5  to those clients;

6          4.  Documents describing how DLF partners should

7  approach clients who have outstanding and overdue balances;

8          5.  Documents describing issues to be discussed at

9  meetings for DLF partners;

10          6.  Documents describing voting for full interest

11  partner candidates;

12          7.  Confidential reviews of associate attorneys; and

13          8.  Detailed analysis describing recruitment of

14  lateral attorneys and offers to those attorneys, referred to

15  herein as the confidential documents.

16          On May 17th, 2017, defendant spoke to DLF partners

17  and demanded $210,000 and a piece of artwork, among other

18  items, from DLF in exchange for the return of the confidential

19  documents.  Defendant repeatedly stated that if DLF did not

20  meet his demands, he intended to e-mail the confidential

21  documents to a legal blog Web site.

22          At the time defendant downloaded and obtained the

23  confidential documents from the DLF computer, defendant knew

24  that he was not authorized to search for, download, or obtain

25  the confidential documents.

```
 1              Finally, the Government would prove that the DLF
 2   computer was used in and affected interstate and foreign
 3   commerce and communication.
 4              THE COURT:  All right.  Did you understand
 5   everything the prosecutor said in his offer of proof?
 6              THE DEFENDANT:  Yes, I did, Your Honor.
 7              THE COURT:  Is everything that he said about you,
 8   your conduct, and intent true and correct?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Did you do what the prosecutor said in
11   his offer of proof?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Are you pleading guilty because you, in
14   fact, did the acts charged in the First Superseding
15   Information?
16              THE DEFENDANT:  Yes, I am.
17              THE COURT:  Are you pleading guilty because you're,
18   in fact, guilty?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  Counsel, have you reviewed the facts of
21   this case and all of the discovery that was provided to you by
22   the Government?
23              MS. AKHONDZADEH:  I have, Your Honor.
24              THE COURT:  Have you reviewed the facts of the case
25   and the discovery with your client?
```

1      MS. AKHONDZADEH:  Yes, Your Honor.

2      THE COURT:  Have you advised your client concerning

3  the legality or admissibility of any statements or confessions

4  or other evidence the Government has against him?

5      MS. AKHONDZADEH:  I have, Your Honor.

6      THE COURT:  Is your client pleading guilty because

7  of any illegally obtained evidence in the possession of the

8  Government that you're aware of?

9      MS. AKHONDZADEH:  No, Your Honor.

10      THE COURT:  Have you explored with your client any

11  possible defenses he may have?

12      MS. AKHONDZADEH:  I have, Your Honor, yes.

13      THE COURT:  You believe there is a factual basis for

14  the plea your client is entering?

15      MS. AKHONDZADEH:  I do, yes.

16      THE COURT:  Excuse me.

17      Do you believe the plea is being made freely and

18  voluntarily, with a full understanding of the charge and the

19  consequence of the plea?

20      MS. AKHONDZADEH:  I do, yes, Your Honor.

21      THE COURT:  Now, the plea agreement indicates that

22  it was signed on October 18th, 2017, by you and your client.

23  Is that correct?

24      MS. AKHONDZADEH:  That's correct, Your Honor, yes.

25      THE COURT:  And did your client sign the plea

1   agreement in your presence?

2            MS. AKHONDZADEH:  He did, Your Honor.

3            THE COURT:  Did you discuss the contents of the plea

4   agreement with your client prior to his signing it?

5            MS. AKHONDZADEH:  I did, Your Honor.

6            THE COURT:  Have there been any promises,

7   representations, or guarantees made to either you or your

8   client, other than what's expressly contained in the written

9   plea agreement, in exchange for your client's plea of guilty?

10           MS. AKHONDZADEH:  There have not, Your Honor.

11           THE COURT:  Other than what's contained in the

12  written plea agreement and other than a general discussion with

13  your client of the Sentencing Guidelines and other factors that

14  I will consider in determining his sentence, have you made any

15  indication -- any indication to your client of what specific

16  sentence the Court would impose or conveyed to your client any

17  promise of a particular sentence in the event I accept his plea

18  of guilty?

19           MS. AKHONDZADEH:  No, Your Honor.

20           THE COURT:  Excuse me just a minute.

21           In your judgment, is it in your client's best

22  interest and the interest of justice for me to accept his plea

23  of guilty?

24           MS. AKHONDZADEH:  Yes, Your Honor.

25           THE COURT:  Do you know of any reason why the Court

1    should not accept his plea?

2              MS. AKHONDZADEH:  No, Your Honor.

3              THE COURT:  Do you join in the waiver of jury trial

4    and concur in the plea?

5              MS. AKHONDZADEH:  I do, Your Honor.

6              THE COURT:  Mr. Mitchell, other than what's

7    expressly contained in the written plea agreement, has the

8    Government made any other promises, representations, or

9    guarantees, either to the defendant or his counsel, in exchange

10   for his plea of guilty?

11             MR. MITCHELL:  No, Your Honor.

12             THE COURT:  All right.  I'm going to ask the

13   defendant some concluding questions.

14             Are you fully satisfied with the advice and

15   representation your lawyer's provided you in this matter?

16             THE DEFENDANT:  Yes, very much, Your Honor.

17             THE COURT:  Do you feel that she has fully

18   considered any defense you may have to the charge?

19             THE DEFENDANT:  Yes, I do, Your Honor.

20             THE COURT:  Do you believe she's fully advised you

21   concerning this matter?

22             THE DEFENDANT:  Yes.

23             THE COURT:  You feel you've had enough time to

24   discuss your case with your attorney?

25             THE DEFENDANT:  Yes, I do, Your Honor.

1        THE COURT:  Do you know of any reason why the Court

2   should not accept your guilty plea?

3        THE DEFENDANT:  No, I do not, Your Honor.

4        THE COURT:  Do you understand that all that's left

5   in your case, in the event I accept your plea of guilty, will

6   be the imposition of sentence which may include imprisonment

7   under the federal guidelines?

8        THE DEFENDANT:  I do understand, Your Honor.

9        THE COURT:  Having in mind all that we've discussed

10  regarding your plea of guilty, the rights you'll be giving up,

11  the maximum sentence you might receive, is it still your desire

12  to enter a plea of guilty?

13        THE DEFENDANT:  Yes, it is, Your Honor.

14        THE COURT:  How do you now plead to the single count

15  First Superseding Information filed on October 18th, 2017,

16  guilty or not guilty?

17        THE DEFENDANT:  Guilty.

18        THE COURT:  All right.  I'm going to make certain

19  findings.  If you don't understand what I say or disagree with

20  what I say, please ask your attorney to interrupt me.

21        The Court having questioned the defendant and his

22  counsel on his offered plea of guilty to the First Superseding

23  Information; the defendant and his counsel having advised the

24  Court that they have conferred concerning the offered plea of

25  guilty and all aspects of the charge against the defendant and

1  any defenses he may have; the Court having observed the

2  defendant's intelligence, demeanor, and attitude while

3  answering questions; and the Court having observed that the

4  defendant does not appear to be under the influence of any

5  medicine, drug, or other substance or factor which might affect

6  his actions or judgment in any manner, the Court finds there is

7  a factual basis for the plea.  The Court finds the defendant

8  has entered his plea freely and voluntarily, with a full

9  understanding of the charges against him and the consequences

10  of his plea.  The Court finds the defendant understands his

11  constitutional and statutory rights and wishes to waive those

12  rights.  Accordingly, the defendant's plea of guilty to the

13  First Superseding Information is accepted and entered.

14          Now, the clerk's going to give you a date for

15  sentencing, and I direct you to appear on that date and time

16  without further order of the Court.

17          THE COURTROOM DEPUTY:  I was going to do January 8th

18  because of all the holidays, but we are jam-packed on that

19  date.  So do you want me to just set it --

20          THE COURT:  It should be easy.  It's a misdemeanor.

21          THE COURTROOM DEPUTY:  January 8th, 20 --

22          THE COURT:  No.  Do it the next week.  If -- we have

23  a lot of stuff on that day?

24          THE COURTROOM DEPUTY:  Yeah.  It's pretty smashed,

25  but then we've got another holiday so -- January 22nd, 2018, at

```
1   8:30 a.m.
2           THE COURT:  Is that acceptable to counsel's
3   calendars, January 22nd?
4           MR. MITCHELL:  Your Honor, I have two matters at
5   8:30 before Judge Fischer but --
6           THE COURT:  So if we put it on at 11:00.
7           MR. MITCHELL:  I would be available, yes.
8           THE COURT:  Are you going to be traveling -- you're
9   back living with your mom in Boston?
10          THE DEFENDANT:  That's correct, Your Honor.  I will
11  be traveling, as will members of my family.
12          THE COURT:  So is 11:00 o'clock on the 22nd
13  acceptable?
14          MS. AKHONDZADEH:  Yes, Your Honor.
15          THE DEFENDANT:  Yes, Your Honor.
16          THE COURT:  Both you and your client?
17          THE DEFENDANT:  Yes, Your Honor.  And thank you.
18          MS. AKHONDZADEH:  Yes, Your Honor.
19          THE COURT:  All right.  So that will be the date and
20  time for sentencing.
21          The trial date and any status conference dates that
22  we have or any other dates that we have set in this case will
23  be vacated.  And I appreciate counsel's efforts in resolving
24  this case and putting it on calendar this morning -- or this
25  afternoon.
```

```
1              Unless there's anything else, we'll be in recess.

2              MS. AKHONDZADEH:  Thank you, Your Honor.

3              MR. MITCHELL:  Nothing further.  Thank you,

4    Your Honor.

5              THE COURT:  All right.  Thank you.

6              THE DEFENDANT:  Thank you, Your Honor.

7              (Proceedings concluded 3:23 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3   COUNTY OF LOS ANGELES    )
                             )
4   STATE OF CALIFORNIA      )

5

6            I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT

7   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17            DATED THIS 24TH DAY OF MARCH, 2018.

18

19

20            /S/ MYRA L. PONCE
    _____
21            MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                FEDERAL OFFICIAL COURT REPORTER
22

23

24

25
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 5

THE STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL
KEVIN B. TAYLOR, No. 151715
180 Howard Street
San Francisco, California 94105-1639
Telephone: (415) 538-2000

**ORIGINAL**
**FILED**

MAR 2 0 2018

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

### IN THE STATE BAR COURT OF THE STATE BAR OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE<br>CONVICTION OF:<br><br>**MICHAEL BERNARD POTERE,**<br>**No. 302569**<br><br><br>A Member of the State Bar | ) Case No.   17-C-03795<br>)<br>) Transmittal of Records of Conviction of Attorney (Bus. & Prof.<br>) Code §§ 6101-6102; Cal. Rules of Court, rule 9.5 et seq.)<br>)<br>) [ ]   Felony;<br>) [ ]   Crime(s) involved moral turpitude;<br>) [ ]   Probable cause to believe the crime(s) involved moral<br>)           turpitude;<br>) [ X ]  Crime(s) which may or may not involve moral turpitude or<br>)           other misconduct warranting discipline;<br>) [ X ]  Transmittal of Notice of Finality of Conviction. |

To the CLERK OF THE STATE BAR COURT:

1. Transmittal of records.

[ X ]   A.   Pursuant to the provisions of Business and Professions Code, section 6101-6102 and California
Rules of Court, rule 9.5 et seq., the Office of Chief Trial Counsel transmits a certified copy of the
record of convictions of the following member of the State Bar and for such consideration and
action as the Court deems appropriate:

[ ]   B.   Notice of Appeal

[ X ]   C.   Evidence of Finality of Conviction (Docket)

[ ]   D.   Other

    Name of Member:   Michael Bernard Potere

    Date member admitted to practice law in California:   February 18, 2015

    Member's Address of Record:   18 Inis Circle

                               West Newton, MA 02465-2408

2. Date and court of conviction; offense(s).

The record of conviction reflects that the above-named member of the State Bar was convicted as follows:

    Date of entry of conviction:   October 18, 2017

    Convicting court:   United States District Court - Central District of California

    Case number(s):   17-CR-00446

Crime(s) of which convicted and classification(s): <u>Violation of 18 U.S.C.§§ 1030(a)(2)(C), (c)(2)(A),</u>
<u>Unauthorized access to a computer to obtain information, one count, a misdemeanor that may or may not</u>
<u>involve moral turpitude.</u>

[  ]  3.  Compliance with Rule 9.20.  (Applicable only if checked.)

We bring to the Court's attention that, should the Court enter an order of interim suspension herein, the Court
may wish to require the above-named member to comply with the provisions of rule 9.20, California Rules of
Court, paragraph (a), within 30 days of the effective date of any such order; and to file the affidavit with the
Clerk of the State Bar Court provided for in paragraph (c) of rule 9.20 within 40 days of the effective date of
said order, showing the member's compliance with the provisions of rule 9.20.

[ X ]  4.  Other information to assist the State Bar Court

The referred criminal matter is final, evidenced by the fact that no notice of appeal was filed within 14 days
after the entry of judgment on January 22, 2018.  (FRAP, rule 4(b)1; docket certified on February 28, 2018.)

<u>DOCUMENTS TRANSMITTED:</u>

Certified copy of First Superseding Information
Certified copy of Plea Agreement
Certified copy of Judgment and Probation/Commitment Order
Certified copy of Docket

THE STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL

DATED:  March 20, 2018                    BY: _____
                                               Kevin B. Taylor
                                               Senior Trial Counsel

A copy of this transmittal and its
Attachments have been sent to:

        Michael Bernard Potere          Courtesy copy to:
        18 Inis Circle                  Michael Potere, Reg. No. 66063-112
        West Newton, MA 02465-2408      FMC Devens
                                        Federal Medical Center
                                        Satellite Camp
                                        P.O. Box 879
                                        Ayer, MA 01432

RECEIVED

MAR 2 0 2018

STATE BAR COURT CLERK'S OFFICE
SAN FRANCISCO

## DECLARATION OF SERVICE BY CERTIFIED MAIL

**CASE NUMBER: 17-C-03795**

I, the undersigned, over the age of eighteen (18) years, whose business address and place of employment is the State Bar of California, 180 Howard Street, San Francisco, California 94105, declare that I am not a party to the within action; that I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service; that in the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day; that I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit; and that in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County of San Francisco, on the date shown below, a true copy of the within

**TRANSMITTAL OF RECORDS OF CONVICTION OF ATTORNEY, including:**

**Certified copy of First Superseding Information**
**Certified copy of Plea Agreement**
**Certified copy of Judgment and Probation/Commitment Order**
**Certified copy of Docket**

in a sealed envelope placed for collection and mailing as certified mail, return receipt requested, Article No.: 9414 7266 9904 2112 6619 07, at San Francisco, on the date shown below, addressed to:

**Michael Bernard Potere**
**18 Inis Cir**
**West Newton, MA 02465-2408**

**Michael Potere, Reg. No. 66063-112**
**FMC Devens**
**Federal Medical Center**
**Satellite Camp**
**P.O. Box 879**
**Ayer, MA 01432**
*Courtesy copy via regular mail*

in an inter-office mail facility regularly maintained by the State Bar of California addressed to:

**N/A**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at San Francisco, California, on the date shown below.

DATED: March 20, 2018

Signed: _____

Ina M. Strehle
Declarant

-1-

# EXHIBIT 6

# PUBLIC MATTER

**FILED**

**OCT 2 8 2019** P·B·

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

### STATE BAR COURT OF CALIFORNIA

### HEARING DEPARTMENT - LOS ANGELES

| | | |
|---|---|---|
| In the Matter of | ) | Case No. 17-C-03795-CV |
| | ) | |
| MICHAEL BERNARD POTERE, | ) | DECISION AND ORDER OF |
| | ) | INVOLUNTARY INACTIVE |
| State Bar No. 302569. | ) | ENROLLMENT |
| | ) | |

## Introduction[1]

This conviction referral matter is based on Respondent Michael Bernard Potere's federal misdemeanor conviction for Unauthorized Access to a Computer to Obtain Information, in violation of Title 18 United States Code section 1030(a)(2)(C)(c)(2)(A).

Upon finality of the conviction, the Review Department referred the case to the Hearing Department for a hearing and decision on the issue of whether the facts and circumstances surrounding the conviction involved moral turpitude (§§ 6101, 6102) or other misconduct warranting discipline and, if so, for a recommendation as to the discipline to be imposed.  (Cal. Rules of Court, rule 9.10(a); Rules Proc. of State Bar, rule 5.340, et seq.)

Based on clear and convincing evidence, this court finds that the facts and circumstances surrounding Respondent's misdemeanor conviction involved moral turpitude.  Thus, after considering the facts and circumstances surrounding Respondent's conviction, the relevant case

---

[1] Except where otherwise indicated, all references to rules are to the State Bar Rules of Professional Conduct that were operative until October 31, 2018, and all statutory references are to the California Business and Professions Code.

law, as well as the aggravating and mitigating circumstances, the court recommends that Respondent be disbarred.

## Significant Procedural History

### Review Department Referral Order

On April 19, 2018, the Review Department filed an order referring this matter to the Hearing Department for a hearing and decision recommending the discipline to be imposed. On April 23, 2018, this court filed and served on Respondent a Notice of Hearing on Conviction (NOH). (Rules Proc. of State Bar, rule 5.345(A).) On November 2, 2018, Respondent filed his response to the NOH.

After four continuances were granted at Respondent's request, the hearing was held on July 18, 2019; July 19, 2019; and July 30, 2019. The matter was submitted for decision at the conclusion of the hearing on July 30, 2019, and the parties filed their closing argument briefs on August 13, 2019.

## Findings of Fact and Conclusions of Law

Respondent was admitted to the practice of law in California on February 18, 2015, and has been a licensed attorney of the State Bar of California at all times since that date.

### Misdemeanor Conviction

On June 20, 2017, the United States Attorney's Office (USAO) filed a complaint in the Central District of California (Case no. 1:17-cr-00446-JFW-1) alleging a violation of Title 18 United States Code section 1951(a) (Extortion and Attempted Extortion Affecting Interstate Commerce). Respondent was arrested on June 22, 2017. On June 23, 2017, Respondent was arraigned, was advised of the charges, and waived his right to a preliminary hearing.

On July 18, 2017, Respondent was indicted on two violations of federal law, Title 18 United States Code sections 1951(a) and 875(d) (Transmitting Threatening Communications

with Intent to Extort).  On July 20, 2017, Respondent was arraigned on the indictment.  The case

was assigned to the Honorable John F. Walter, United States District Judge for the Central

District of California (Judge Walter).

On October 18, 2017, the USAO filed a First Superseding Information charging a Class

A misdemeanor violation of 18 United States Code section 1030(a)(2)(C)/(c)(2)(A)

(Unauthorized Access to a Computer to Obtain Information), and a corresponding plea

agreement.  In the plea agreement, Respondent pleaded guilty to the single-count charged in the

Information.  Respondent's guilty plea was taken on October 18, 2017.

Respondent was sentenced on January 22, 2018, to five months imprisonment.  Upon the

USAO's motion, Judge Walter dismissed the underlying indictment.  Respondent completed his

term of custody on July 25, 2018, and was placed on one-year supervised release.  Respondent's

period of supervised release was completed on July 25, 2019.

**Facts and Circumstances Surrounding Respondent's Conviction**

Because the Review Department has held that the crime of which Respondent was

convicted does not inherently involve moral turpitude, this court:

> [M]ust review the circumstances surrounding Respondent's convictions to
> determine whether they in fact involved moral turpitude or other misconduct
> warranting discipline.  In reviewing the circumstances surrounding Respondent's
> convictions, "[the court is] not restricted to examining the elements of the
> crime[s], but rather may look to the whole course of [Respondent's] conduct
> which reflects upon his fitness to practice law.  [Citations.]"  [Citation.]  That is
> because it is the misconduct underlying Respondent's conviction, as opposed to
> the conviction itself, that warrants discipline.  [Citation.]

(*In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 935.)

Of course, when determining whether the facts and circumstances surrounding

Respondent's conviction involved moral turpitude or other misconduct warranting discipline, the

court resolves all reasonable doubts in Respondent's favor so that, "if equally reasonable

inferences may be drawn from a proven fact, the inference which leads to a conclusion of

innocence rather than guilt will be accepted.  [Citation.]"  (*Bushman v. State Bar* (1974) 11
Cal.3d 558, 563.)

### *Facts Establishing Criminal Conduct and Moral Turpitude*

Beginning in 2015 and continuing through June 2017, Respondent was employed as an
associate attorney at Dentons, an international law firm.  Dentons assigned Respondent to work
in its litigation division.  Joel Siegel (Siegel) was a Senior Partner and Managing Director of
Dentons. Respondent and Siegel worked together on two matters.

Michael Duvall (Duvall) was a partner at Dentons and had worked for Dentons or one of
its predecessors since 2008.  Duvall was also Respondent's "Practice Advisor," which is similar
to a mentor pursuant to a mentorship program within the firm.

Felix Woo was a partner at Dentons' Los Angeles office and had been employed with
Dentons for 18 years.  Woo met Respondent in 2015.  Woo was Respondent's first "Practice
Advisor."  In late 2015 or early 2016, Duvall became Respondent's mentor.  Woo later became
the "Associate Review Committee Director" and was the individual responsible for talking to
Respondent about his progress reviews.

Edward "Eddie" Reich (Reich) worked in Dentons' New York office.  Reich had worked
for Dentons or one of its predecessors since 2000.  Reich was the firm's general counsel for two
years, but prior to that, was deputy general counsel for nine years.  Employees of Dentons
contacted Reich when there were issues with firm personnel and clients.

Susan Mitchell (Mitchell) had worked for McKenna Law Firm since 1981 until Dentons
acquired it in 2015.  She was a partner at Dentons and worked in the litigation and government
contracts department.  At times, she worked as general counsel on specific matters.

Upon his hire, Respondent received Dentons' policies and procedures manual. Respondent signed a statement acknowledging that he received and understood the policy. During trial, Respondent testified that he had not read the manual.

Siegel first met Respondent when Respondent interviewed with Dentons. In 2015, during their work together on a client matter, Dentons gave Respondent access to Siegel's emails so that Respondent could use information in Siegel's emails to prepare discovery responses. This access allowed Respondent, through a portal on his own desktop computer, to directly access Siegel's emails so he could read and forward them. Between August and October 2015, Siegel wanted Respondent to have access to all of the client's documents to enable Respondent to produce a high quality work product in a short period of time. Siegel granted Respondent access to Siegel's emails for this limited purpose.

The project Respondent and Siegel worked on together ended in June 2016. Thereafter, Respondent should not have had access to Siegel's emails, but neither Dentons nor Siegel took actions to restrict it. Nonetheless, Respondent was well aware that the limited purpose for which he had been granted access was completed and permission to access Siegel's emails expired.

Respondent was struggling at Dentons, and Duvall spoke with him repeatedly about his work performance. In March 2017, Respondent gave notice to Duvall that he was leaving the firm to pursue a graduate degree in political science, and asked to continue to work for Dentons until his graduate program began in the fall of 2017. On March 28, 2017, Dentons refused Respondent's request and informed Respondent his last day would be June 1, 2017. This decision was based on Respondent's poor performance review in January 2017.

On April 7, 2017, in preparation for his exit from the firm, Respondent received an email from Dentons stating amongst other pertinent information:

2. Client Files
All physical and electronic files should be preserved. Under no circumstances should any file be discarded, deleted or removed from Firm systems.
…

5. Firm Property and Confidential Information
You may not take any Firm property or confidential information with you. All client files, reference materials, manuals, library books, computer, phone, and other office equipment and supplies belonging to the Firm should be left in your office.  On the day of your departure, you should return your Firm-provided Blackberry or iPhone, laptop, home access kit, office or building access card, office keys, and any other firm property.  Personal information on these devices will be deleted.

On April 15, 2017, and May 14, 2017, Respondent accessed Siegel's email account without authorization and searched for, downloaded, and printed confidential and sensitive documents from Siegel's email account. These documents included:

- Dentons' quarterly financial reports;

- Documents describing how Dentons determined its billing rates for clients and specific factors relied on to arrive at those rates;

- A list of clients and the dollar amounts those clients were charged;

- Documents describing how Dentons' partners should approach clients who have outstanding and overdue balances;

- Documents describing issues to be discussed at meetings for Dentons' partners;

- Documents describing voting for "Full Interest Partner Candidates";

- Confidential reviews of associate attorneys; and

- Detailed analysis describing recruitment of lateral attorneys and offers to those attorneys (collectively "Confidential Documents").

Respondent violated Dentons' policies by accessing and downloading confidential and sensitive documents from Siegel's email account for reasons not related to a case that he was authorized to work on.  While searching through Siegel's emails, Respondent found and downloaded an email from the previous year, which was dated May 20, 2016.  The email was from Siegel to Respondent's mentors, Duvall and Woo, wherein Siegel alleged that Respondent

was taking a vacation in the middle of an important briefing schedule for a case.  Respondent was enraged at what he considered to be an unwarranted defamatory accusation.

Respondent found the documents in Siegel's emails by first searching for his own name, and after discovering the email referenced above, he later hatched a plan and searched for "confidential" and "compensation," and then saved those emails and attachments.  The documents Respondent found with the terms "confidential" or "compensation" within them were not documents to which Respondent, as a junior associate attorney for Dentons, would ordinarily have access.

Respondent saved the documents by transferring them to his Dentons' laptop and uploaded them on Dropbox.  On May 15, 2017, Respondent requested a meeting with Duvall and Woo.  All three individuals met the next day on May 16, 2017.  Respondent entered the meeting with Duvall and Woo carrying two bottles of wine, which were gifts to thank them for working with him during his time at Dentons.

In addition to the wine, Respondent had three manila folders.  Respondent told Duvall and Woo that Siegel had given Respondent access to Siegel's computer while Respondent worked on a matter for Siegel.  Respondent told Duvall and Woo that he looked through Siegel's emails and found an email dated May 20, 2016, to Duvall and Woo from Siegel, that upset Respondent.  Respondent claimed Siegel defamed Respondent's character.  Respondent stated that after he found the May 20, 2016 email, he searched for other emails in Siegel's account.  Respondent indicated he downloaded and printed out the emails.

Woo advised Respondent that if Siegel gave Respondent access to his e-mail for a specific reason, the access was only for that purpose and only for the authorized period of time.  Woo further informed Respondent that any additional access to Siegel's email account was not authorized.  Respondent informed Duvall and Woo that he found evidence of a potential gender

discrimination lawsuit against Dentons.  During the meeting Respondent refused to provide

copies of the documents in the manila folders because he wanted a confidentiality agreement

from Dentons before disclosing the documents to Dentons.  Respondent informed Duvall and

Woo that the purpose of the meeting was to advise them of his plan to bring a defamation action

against Dentons and that the statute of limitations for Respondent's defamation claim would

expire on May 19, 2017.

Duvall and Woo forwarded the information relayed by Respondent to Siegel and

Dentons' management.  On May 16, 2017, Duvall and Woo emailed Reich concerning an urgent

matter.  After receiving the email, Reich called Woo and Woo explained that Respondent had

taken confidential documents from Siegel and Respondent threatened gender discrimination and

defamation claims against Dentons.  Respondent would not divulge the details of the documents

he possessed.  Respondent also wanted a confidentiality agreement and a tolling agreement for

his defamation claim.

On May 16, 2017, Reich contacted Respondent to set up a conference call.  Respondent

emailed Reich and stated,

> [C]an you please confirm in writing that our conversations, writings, and
> document exchanges will be considered **stricly**[*sic*] **confidential settlement
> communications,** and specifically that nothing I say, write, or produce to you or
> Dentons will be used against me in any way in any civil or criminal proceeding in
> any state or federal court, and that the same conversations, writings, and/or
> productions will be shared among Dentons attorneys, employees, and/or staff only
> on a strictly need-to-know basis?  If the above is agreed upon without reservation
> or qualification, I will not feel compelled to ask, for example, if individuals other
> than yourself are present on or listening to our calls.

Following an exchange of emails Respondent stated, "[I] am willing to have this initial

conversation, but may be unable to provide specific details without the presence of an agreement

of total confidentiality."

On May 17, 2017, Duvall and Reich had a teleconference with Respondent.  During the call Respondent discussed the defamation and gender discrimination case that he threatened to file.  Respondent refused to confirm or deny that he had any of Dentons' documents, but demanded $210,000, life insurance for six years, health insurance for the next couple of months, and a piece of artwork.  The artwork Respondent demanded depicted a Malibu hillside on fire. Respondent claimed the artwork represented his legal career.  Respondent referenced AbovetheLaw.com or "Above the Law"[2] and threatened to release confidential and sensitive documents to the website.  Reich warned Respondent of possible professional and criminal charges associated with his actions.  Respondent replied that he did not "care about being a lawyer."

Providing the Confidential Documents to Above the Law would have been embarrassing to Dentons and would have affected its reputation in the legal community.  It could have affected Dentons' relationships with its clients and Dentons' revenue.  Moreover, release of the documents could have exposed the firm to legal claims.

Following the call, Reich contacted Mitchell about the possibility that Respondent could have taken possession of confidential proprietary documents belonging to Dentons.  On May 18, 2017, Respondent participated in a call with Reich and Mitchell.  During the call Respondent repeatedly referred to "hypothetical documents."  Mitchell believed that Respondent was referring to Dentons' internal confidential financial documents that would contain salaries of partners and associates, profit margins, balance sheets and revenue statements.  Mitchell believed that the information in these documents would be damaging to Dentons if they were released to the public.  Mitchell further believed Respondent obtained the documents through his

---

[2] Above the Law is a website that covers and publishes articles, almost exclusively, about legal matters, recent court decisions, law firms, and law schools.

unauthorized access to Siegel's emails and that these documents were not related to Respondent's defamation lawsuit.

During the call, Reich, Mitchell, and Respondent discussed extending the statute of limitations issue for another week. Reich explained to Respondent that there might be criminal consequences and ethical issues for Respondent keeping the "hypothetical documents." Respondent said that he had thought through the consequences of holding onto the "hypothetical documents." Reich explained that there was no benefit to keeping the documents, and that Respondent could demand the documents through the discovery process if and when he filed the threatened lawsuits. Respondent stated he did not feel comfortable talking further without a confidentiality agreement in place.

Respondent warned Mitchell and Reich that "hypothetically," if documents existed, there was a computer with an electronic timer and an email would automatically be sent if something happened to him. There was also a paper copy of the documents to be filed in court. Following the call, Respondent and Reich exchanged emails concerning the extension of the statute of limitations for the defamation case.

Reich could not estimate the enormity of the devastating impact to Dentons if Respondent released confidential firm documents. Reich believed Respondent had access to employee salaries, firm profit margins, firm billing rates and firm financial documents. According to Reich, these documents were equivalent to trade secrets, and he would not want his competitors to see them.

On or about May 19, 2017, Dentons contacted the FBI. On May 24, 2017 Reich and Respondent exchanged emails concerning meeting in person to discuss Respondent's demands.

On May 25, 2017, at approximately 4:00 p.m., a prearranged meeting between Reich, Mitchell, and Respondent took place in Dentons' conference room in Los Angeles. Respondent

had his personal laptop with him during the meeting. The FBI made audio and video recordings of the meeting.

During the May 25, 2017, meeting, Respondent stated the following:

- Respondent received access to Siegel's email account when they worked together;

- In April 2017, Respondent searched Siegel's emails and found an email about Respondent that Respondent considered defamatory;

- After reading the email, Respondent searched for confidential firm documents and other emails in Siegel's account and downloaded them;

- Respondent drafted complaints for a defamation lawsuit regarding the statements made about him and a gender discrimination lawsuit on behalf of other attorneys at the firm;

- Respondent acknowledged that he would not be a member of the class because it did not apply to him and he did not yet have clients for the class action case;

- Respondent demanded $210,000, a specific piece of artwork from Dentons' Los Angeles office, health insurance for that summer, and life insurance during graduate school (six years);

- Respondent claimed to have an email set to release the confidential information on an auto-timer. If Respondent did not enter a code within a set period of time the confidential documents would automatically be released to Above the Law;

- Respondent also provided a sealed packet containing the documents and lawsuits to a friend with instructions to file the lawsuits and send the documents to Above the Law if something happened to Respondent;

- Respondent understood that releasing the documents would cause substantial harm to Dentons. He was willing to inflict harm on the firm because in his mind he "was harmed substantially" by Siegel's email that he believed had "trashed [his] entire career."

- Asked to specify what the firm was paying for, Respondent replied "everything goes away, and everything I have, whatever I have, is destroyed." There would be no lawsuits or publicity;

- Respondent stated that if the firm insulted him by not meeting his demands, he had nothing to lose and the only question was "just how much damage can I do?"

- Respondent stated that people his age were always getting "screwed" and that he might have a chance to "screw back."

Respondent also threatened that if Dentons did not deliver on his demands, he was going to "double down on the negative." When Reich asked what that meant, Respondent stated that if he had documents and released them publicly, the firm might pursue criminal charges. He went on to say that he feared neither criminal prosecution because "people who rape other people do not get jail time" nor disciplinary action because he did not intend to practice law. Respondent acknowledged that his graduate school acceptance might be revoked and that was his "worst case scenario" but he calculated that it would be worth it.

Reich gave Respondent the opportunity to return the documents, but Respondent stated he was not comfortable giving up leverage that ensured his safety. Reich asked if the leverage was for safety or for "screwing the firm." Respondent replied that if Dentons did not settle then the leverage changes from "safety" to "at least Siegel will be embarrassed." In a similar vein, Reich explained that the firm's view of Respondent's demands was not simply that he would file a lawsuit but rather "this is, if you don't pay me, I'm gonna file a claim – but I'm also gonna damage you guys in the marketplace by releasing highly sensitive documents. Right?" Respondent replied, "It's a way to look at it," and shortly thereafter continued saying if he was "fairly paid, everything goes away. If I'm screwed over again, well then, they . . . why should I protect people who went out of their way to hurt me?"

Respondent made comments clearly indicating his disdain for Siegel and his willingness to hurt the entire firm in order to make Siegel suffer for sending the one email to Respondent's mentors regarding his performance that Respondent considered to be defamatory and destructive to his entire career. Respondent said that he did not want to release the confidential information that would hurt the firm, but when Reich interjected "but you will if we don't pay you?" Respondent replied "yeah."

Later, during the May 25, 2017 meeting, Respondent claimed that he placed copies of all of the documents he took from Dentons on a flash drive provided to him by Reich and Mitchell at the meeting and returned the flash drive to Reich and Mitchell. A number of folders and subfolders were on the drive containing Joel Siegel's emails, Dentons' confidential financial data, emails sent to Respondent by Dentons when he was an associate, Respondent's defamation complaint, and the exhibits for the complaint.

Following the May 25, 2017 meeting, Respondent emailed Reich and Mitchell and stated, "I am sending this e-mail as a confirmation of our agreement that the totality of our meeting today is confidential as part of our ongoing settlement negotiations, including information regarding whether or not I provided you with electronic and physical documents. This confidentiality extends to Dentons and its agents with whom this information is shared."

Between May 29, 2017, and May 31, 2017, Respondent and Mitchell exchanged emails concerning his healthcare and paychecks. On June 7, 2017, Reich emailed Respondent and asked about participating in a teleconference with himself and Mitchell. Respondent agreed.

On June 6, 2017, FBI Agents Hamer and Sterle reviewed the flash drive. The drive contained various documents, including a draft copy of Respondent's defamation complaint; Siegel's May 20, 2016 email in which he was critical of Respondent; a screenshot of Respondent's email account, which included access to Siegel's inbox; and the Confidential Documents.

On June 8, 2017, the FBI monitored a telephone call between Respondent, Reich, and Mitchell. Reich told Respondent that the firm had agreed to his demands. They agreed to meet with Respondent on June 19, 2017, to exchange the documents for payment. Reich made it clear that by paying Respondent, the firm would be relieved of its concern that Respondent would publicize the documents, to which Respondent replied "absolutely." Reich asked for assurances

-13-

that all documents would be returned.  Respondent agreed to allow Dentons IT to review his laptop, Dropbox, and email accounts, and advised Reich that he took several precautions to guard the documents.  Respondent stated that his computer was encrypted and protected by a fingerprint password.  Reich then advised Respondent that their discussions were not a collaborative negotiation, but given Respondent's demands, the firm "didn't have much of a choice."

Following the phone call, Reich and Respondent exchanged emails concerning a settlement agreement.  Respondent, Reich, and Siegel executed an extension to the statute of limitations for Respondent's defamation case.

On June 12, 2017, Siegel reviewed documents Respondent downloaded and provided to Reich via flash drive on May 25, 2017.  These documents included Dentons' associate salaries and compensation models; the method Dentons' management used to establish its legal fees to clients; and client payment histories.  The release of these documents would embarrass Dentons and its clients, hurt Dentons competitively in the marketplace, and upset clients.  Siegel concluded that Respondent's public release of the documents could cause an incredible amount of damage to Dentons financially and harm its reputation.  Siegel noted that, if released, the information would cause extreme harm to Dentons and its' clients by revealing the amount Dentons' Los Angeles Office billed clients from 2014 through 2016.  Siegel classified these documents as "trade secrets" and if the documents were released to the public, the confidentiality and trust between Dentons and its clients would be broken.  Siegel further believed that some of their clients would end their working relationship with Dentons.  The loss of top clients would greatly harm Dentons' Los Angeles Office, resulting in many employees losing their jobs due to the reduction in revenue.  In addition to Denton's confidential documents, Siegel was concerned

that Respondent had access to his personal financial and banking information contained in various emails.[3]

On June 15, 2017, Respondent emailed Reich and Mitchell.  He also asked about the settlement agreement, check, and the "Malibu photograph."

On June 16, 2017, Mitchell emailed Respondent about being available for a meeting on June 22, the extension of the statute of limitations for the defamation matter, and delivering the artwork.  On June 19, 2017, Mitchell emailed Respondent a revised version of the statute of limitations agreement.  Respondent replied with a signed version.

On June 19, 2017, Dentons delivered the artwork to Respondent.  The FBI later recovered the receipt for the artwork signed by Respondent.

On June 21, 2017, less than 24 hours before the scheduled meeting, Mitchell provided Respondent with a draft of the release agreement, wherein Dentons agreed to provide Respondent with his demands in exchange for the confidential documents.  Respondent replied that, "there appears to have been a misunderstanding of the nature of the agreement, and I have revised it to more accurately reflect that this is a settlement of my claims for defamation and gender discrimination."  Respondent attached a revised agreement wherein the settlement was for the defamation and gender discrimination claims and classified Respondent as "Plaintiff" and Dentons as "Defendant."  Dentons did not reply.  On the same date, Mitchell provided Respondent with documents, that, upon signature, would certify that neither Respondent nor the friend to whom he had given the confidential documents for safekeeping had "maintained, retained, or stored" copies of the confidential documents.

---

[3] During the disciplinary hearing in this case, Reich testified to the harm Respondent caused the firm.  Although Dentons tried to avoid it, the press discovered Respondent's wrongdoing and published a number of articles about his crime; Dentons hired outside counsel and an individual to conduct a forensic exam of its' computer systems; and Dentons discovered that Respondent purchased a firearm, requiring the firm to hire outside security protection.

On June 22, 2017, Respondent met with Reich at Dentons. The FBI monitored and recorded the meeting. Respondent provided two envelopes and a flash drive to Reich, which represented the documents he gave to his friend for safekeeping should anything happen to him. Thereafter, Respondent and Reich discussed the release agreement. Reich objected to Respondent's modification of the agreement to classify it as a settlement agreement between a plaintiff and a defendant. Reich clarified that Dentons was not settling a defamation and gender claim. Reich did not believe there was merit to those claims. Reich made clear that Dentons was paying Respondent $210,000 based on Respondent's threats to go to the press with the documents he downloaded. Reich and Respondent signed the original agreement and Respondent signed the certification.

At the beginning of the meeting, Reich placed on the table check number 1400134, dated June 21, 2017, payable to Michael B. Potere, in the amount of $213,650.49. At the end of the meeting, Reich signaled to the FBI, and the FBI entered the meeting room and arrested Respondent.

While in custody, the FBI conducted a recorded post-Miranda interview where the FBI agents explained to Respondent that, if convicted, his sentence would be determined by reference to the sentencing guidelines and that the resulting sentence would be calculated based upon the amount of loss. The FBI explained that if the confidential information was made public by an automatic email as Respondent had represented to Reich, and caused Dentons a "$10 million dollars loss," for example, then Respondent would be sentenced based upon that amount of loss. In response, Respondent confessed that, even though he signed the certification that all copies of the documents had been deleted, he had a thumb drive at his apartment that also contained copies of the documents. He also explained that copies would remain on Dropbox for 30 days after being deleted and would remain accessible until purged by Dropbox.

As part of the FBI's investigation, Respondent's residence was searched. During the search the FBI retrieved the artwork Respondent requested from Dentons.

The FBI interviewed Respondent's friend on June 22, 2017. Respondent's friend informed the FBI that Respondent gave her manila envelopes to hold for him. When he gave them to her, he told her not to open or look at them. Respondent informed her he would ask for the folders back at some point. A week prior to the FBI interview, Respondent contacted his friend and said he would collect the envelope and was sending her a document to sign. Respondent later emailed the Dentons' agreement, and she signed it.

*Change of Plea – Agreement and Hearing*

Respondent agreed to plead guilty to the misdemeanor charge of the unauthorized access to a computer. On page five of the plea agreement, at line 23, it reads: "***On May 17, 2017, defendant spoke to DLF partners and demanded $210,000, and a piece of artwork, among other items, from DLF in exchange for the return of the Confidential Documents. Defendant repeatedly stated that if DLF did not meet his demands he intended to email the Confidential Documents to a legal blog website.***" (Emphasis added.) Respondent knowingly and voluntarily, and with the advice of counsel, signed the plea agreement containing the aforementioned language on October 18, 2017.

On the same date Respondent's guilty plea was entered. After the government's offer of proof, in which the AUSA read the quoted language in the preceding paragraph from the plea agreement, Respondent stated that he understood everything that the prosecutor said. When Judge Walter asked "Is everything that he said about you, your conduct, and intent true and correct?" Respondent answered "yes." When Judge Walter asked "did you do what the prosecutor said in his offer of proof?" Respondent again answered "yes." Respondent knowingly

and voluntarily and with the advice of counsel answered truthfully and admitted to the factual basis as set forth by the AUSA on the record.

### Sentencing

During the sentencing hearing, Judge Walter made several findings regarding Respondent's credibility.

Judge Walter stated, "First of all, it appears to me that the defendant certainly was aware of his anger management issues well prior to these events. I am also, quite frankly, shocked at the nature and circumstances of this offense. This wasn't a simple spur of the moment aberration where your client [Respondent] decided that he was going to commit this crime. This happened over an extended period of time. And, quite frankly, I find his [sentencing statement] letter, portions of it where he tries to justify and – I view this as being an effort to justify his conduct as really not only arrogant but also offensive in terms of his statement that what he was attempting to do in gathering this information or these documents was, first, he started out in an innocent search to determine why his performance review had not been as he apparently thought that it should have been."

Judge Walter continued, "In his letter, he describes what he had attempted to accomplish by obtaining this information is that it was to allow him to participate in an aggressive meeting to negotiate his termination package which is absolutely absurd.
How could he expect me to believe that this was just simply an aggressive negotiation strategy and that's why he obtained this information?" The judge noted that "[w]hat is incredible about [Respondent's claim that he was not extorting the firm, just engaged in aggressive settlement negotiations] is Dentons' partner told him, if you have a claim for defamation, file a claim. But don't go down this path of trying to extort the law firm." Respondent did not heed the warning.

Judge Walter also stated, "I do not find his explanation credible, and I conclude his conduct was more consistent with his anger management issues." Respondent's conduct amounted to "nothing more than his efforts to extort the law firm into paying him a substantial sum of money for which he had absolutely no entitlement to." Judge Walter viewed Respondent's explanation about his actions "as arrogant and pure fantasy, nothing more than his continued refusal to accept and recognize full responsibility for his serious criminal conduct," and "[t]he characterization of his actions as aggressive negotiation strategy is not only delusional, it's simply unbelievable."

With regard to Respondent's remorse, Judge Walter stated, "And now he attempts to walk back from those statements in his letter which, as I indicated, I find incredibly arrogant and, not only that, just simply not believable." Having determined that he had been treated unfairly and defamed, "he was going to extort them out of 200 some thousand dollars and a piece of artwork. It's a perfectly rational process. It just happens to be criminal." The judge found Respondent's expression of regret as "less than sincere and his real regret is that Dentons called the FBI and that he got caught and is now facing a substantial time in prison."

Judge Walter noted that even after Respondent had in essence been warned by one of the partners that he was engaging in extortion and it was criminal conduct, "[h]e made his incredibly outrageous demands on the firm," and found that his lack of concern for consequences of his criminal conduct "are just evidence that was carefully thought out, malicious conduct on the part of your client [Respondent], which, in my view, deserves a prison sentence." Thereafter, Judge Walter imposed a prison sentence of five months.

**Conclusions of Law**

**Conclusive Evidence of Guilt**

Under section 6101, subdivisions (a) and (e), "an attorney's conviction of a crime

pursuant to a plea of guilty is 'conclusive evidence of guilt of the crime' for the purpose of

disciplinary proceedings. [Citations.]" (*In re* Gross (1983) 33 Cal.3d 561, 567.)  In other words,

Respondent is conclusively presumed, by the record of his conviction, to have committed all of

the acts necessary to constitute the crime of which he was convicted (i.e., Unauthorized Access

to a Computer to Obtain Information).  (§ 6101, subd. (a); *Chadwick v. State Bar* (1989) 49

Cal.3d 103, 110.)

The issue before the court is whether the facts and circumstances surrounding

Respondent's conviction involved moral turpitude or other misconduct warranting discipline.

The parties have stipulated that the conviction involves moral turpitude, and this court agrees.

Although Respondent acknowledged that his crime involved moral turpitude, he

maintains that it was a result of depression and that he acted out of an honest and fair belief that

he deserved to be compensated for a partner's email commenting on his performance.

Respondent believes that email defamed him and destroyed his entire career.  As he said to

Reich, he did not want to hurt the firm, but he would "unless I get what I'm entitled to."  He

claims his intent was not to hurt Dentons by publicly disclosing confidential documents.  Like

Judge Walter, this court rejects these contentions.

The term moral turpitude is defined broadly.  (*Baker v. State Bar* (1989) 49 Cal.3d 804,

815, fn. 3.)  An act of moral turpitude is any "act of baseness, vileness or depravity in the

private and social duties which a man owes to his fellowmen, or to society in general, contrary

to the accepted and customary rule of right and duty between man and man. [Citation.]" (*In re*

*Craig* (1938) 12 Cal.2d 93, 97.)  It has also been described as any crime or misconduct without

excuse (*In re Hallinan* (1954) 43 Cal.2d 243, 251) or any dishonest or immoral act. Crimes which necessarily involve an intent to defraud, or dishonesty for personal gain, such as perjury (*In re Kristovich* (1976) 18 Cal.3d 468, 472), grand theft (*In re Basinger* (1988) 45 Cal.3d 1348, 1358) and embezzlement (*In re Ford* (1988) 44 Cal.3d 810, 813) involve moral turpitude.

As the Supreme Court stated in *In re Lesansky* (2001) 25 Cal.4th 11, 16:

> [W]e can provide this guidance: Criminal conduct not committed in the practice of law or against a client reveals moral turpitude if it shows a deficiency in any character trait necessary for the practice of law (such as trustworthiness, honesty, fairness, candor, and fidelity to fiduciary duties) or if it involves such a serious breach of a duty owed to another or to society, or such a flagrant disrespect for the law or for societal norms, that knowledge of the attorney's conduct would be likely to undermine public confidence in and respect for the legal profession.

Here, Respondent's conviction for Unauthorized Access to a Computer to Obtain Information does not inherently involve moral turpitude. But, "[i]n examining the circumstances giving rise to an offense, [this court is] not restricted to examining the elements of the crime, but rather may look to the whole course of an attorney's conduct which reflects upon his fitness to practice law." (*In re Hurwitz* (1976) 17 Cal.3d 562, 567.)

Indeed, Respondent's overall misconduct demonstrates a complete disregard for honesty. Respondent attempted to obtain $200,000 from Dentons by threatening the firm with the public release of sensitive proprietary information, trade secrets, and confidential client information. The facts and circumstances surrounding Respondent's conviction reveal that Respondent intentionally tried to extort money from Dentons. (See, e.g., *Barton v. State Bar* (1935) 2 Cal.2d 294, 297 [attorney who threatened to report to prosecutor that oil company was involved in illegal product adulteration unless company settled with attorney's clients "constituted an attempt to extort money as crime is defined" in the Penal Code].) In addition, Respondent lied when he certified that he had not retained or stored any of the documents he downloaded. Respondent admitted to the FBI that he still had copies of the documents on a

flash drive and on Dropbox. Respondent's crime revealed a manifest dishonesty and total disregard of the moral obligations incumbent upon him as a member of the legal profession. Accordingly, this court concludes that the facts and circumstances surrounding Respondent's conviction for the unauthorized access to a computer to obtain information involved moral turpitude. (*In re Lesansky, supra,* 25 Cal.4th 11, 16 [criminal conduct outside practice of law reveals moral turpitude if it involves dishonesty].)

## Aggravation[4]

OCTC bears the burden of proving aggravating circumstances by clear and convincing evidence. (Std. 1.5) The court finds two aggravating factors in this case.

### No Intentional Misconduct/Bad Faith/Dishonesty (Std. 1.5(d).)

The court does not consider Respondent's dishonesty as an aggravating circumstance because Respondent's dishonesty was considered in determining that the facts and circumstances surrounding Respondent's conviction involved moral turpitude. (See *In the Matter of Duxbury* (Review Dept. 1999) 4 Cal. State Bar Ct. Rptr. 61, 68 [improper to consider factual findings in aggravation already used to determine culpability].)

### Significant Harm to Client/Public/Administration of Justice (Std. 1.5(j).)

Respondent's crime caused significant harm to Siegel. Not only did Respondent have access to the firm's proprietary and confidential client information, but Respondent had access to Siegel's personal information. During the relevant time period, Siegel was purchasing a new home so his private financial and banking information was contained in his emails. Siegel felt violated when he learned that Respondent searched his emails. Siegel was very concerned about the harm Respondent could cause with his personal information, forcing Siegel to change the passwords to all of his financial accounts.

---

[4] All references to standards (Std.) are to the Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct.

Moreover, Respondent's crime caused significant harm to Dentons.  The press reported on Respondent's wrongdoing, which caused great disruption in the firm.  The clients had to be reassured that everything was fine, but Respondent's actions shone a bad light on the firm. Dentons had to have a forensic exam performed on its' computers and IT systems to ascertain exactly what information Respondent downloaded.  Within the first few days of Respondent's misconduct, Dentons had to hire outside counsel.

Finally, after Respondent's unlawful access to Dentons' computer systems, Dentons brought in a chief security officer to address the security risk.  Dentons learned that Respondent had purchased a firearm, which raised the security threat to a higher level.  Dentons had to take additional precautionary measures to protect those in its employ by retaining a former law enforcement official to advise them and hired outside security officers to protect the office.  The harm that Respondent caused is a significant aggravating factor.

**Indifference Toward Rectification (Std. 1.5(k).)**

Respondent lacks insight into the wrongfulness of his misconduct.  Respondent continues to maintain that his actions amounted to an aggressive negotiation strategy rather than extortion. Like Judge Walter, the court finds Respondent's depiction of the circumstances surrounding his conviction as "not only delusional, it's simply unbelievable."  Likewise, this court finds Respondent's expression of regret to be "less than sincere," and views Respondent's "explanation as arrogant and pure fantasy, nothing more than his continued refusal to accept and recognize full responsibility for his serious criminal conduct."

During Respondent's testimony during these disciplinary proceedings, Respondent refused to admit that he lied to Dentons and he repeatedly used the term "bluff."  Instead, Respondent labeled Siegel a "liar" who defamed him, and expressed anger at the firm for lying to him when they recorded phone calls and meetings with him.  Respondent casts himself as the

-23-

victim and justifies his conduct as a "David and Goliath" battle against big law.  Respondent

refuses to recognize that his actions amounted to a pure quid pro quo extortion scheme.

Respondent's lack of insight is a significant aggravating factor.

**Mitigation**

Respondent bears the burden of proving mitigating circumstances by clear and

convincing evidence.  (Std. 1.6(e).)  The court finds two mitigating factors.

### No Mitigation for Lack of a Prior Record

Respondent is afforded no mitigating credit for his lack of a prior discipline record.

Respondent was admitted to the practice of law in California on February 18, 2015, yet

Respondent began illegally accessing Siegel's emails on April 15, 2017.  Two years of

discipline-free practice is not entitled to any mitigation.  (*In the Matter of Hertz* (Review

Dept.1991) 1 Cal. State Bar Ct. Rptr. 456, 473 [four year practice insufficient for mitigation]; see

also Std. 1.6(a) [mitigation given in absence of prior record of discipline over many years of

practice coupled with present misconduct not likely to recur].)

### No Mitigation for Extreme Emotional Difficulties (Std. 1.6(d).)

Respondent provided evidence that he previously sought treatment for depression and a

moderate alcohol use disorder.  Before Respondent committed his crime, he had two counseling

sessions in 2012, received sixteen psychotherapy sessions in 2016, and received additional

psychotherapy sessions in 2017.  In addition, Respondent provided a psychiatric evaluation

performed on January 7, 2019, by Stephen H. Dinwiddie, M.D., Professor of Psychiatry,

Northwestern University Feinberg School of Medicine, Director of Division of Law and

Psychiatry, Vice-Chair for Clinical Affairs.  Dr. Dinwiddie was an impartial expert who

performed an independent psychiatric evaluation of Respondent at the request of the Illinois

Attorney Registration and Disciplinary Commission.[5]  In the evaluation, Dr. Dinwiddie answered

the following question, "*Is there a causal connection between any mental illness and the*

*misconduct in question*?"  (Emphasis in original.)  Dr. Dinwiddie responded, "No causal

connection between Mr. Poter's mood disorder, alcohol use disorder, or Attention

Deficit/Hyperactivity Disorder is identified."  Thus, the court does not afford any mitigation for

Respondent's mental difficulties because he failed to provide any evidence from an expert

establishing that his depression was directly responsible for his crime, and no proof that he no

longer suffers from such difficulties or is able to manage his problems.  (cf. *In the Matter of*

*Respondent F* (Review Dept. 1992) 2 Cal. State Bar Ct. Rptr. 17, 29 [mitigation credit given for

extreme emotional or physical problems when expert establishes such problems were directly

responsible for misconduct]; see also *In the Matter of Song* (Review Dept. 2013) 5 Cal. State Bar

Ct. Rptr. 273, 281[extreme emotional difficulties constitute mitigating circumstance if clear and

convincing evidence establishes that attorney no longer suffers from such difficulties].)

### Good Character (Std. 1.6(f).)

Respondent presented good character letters from thirteen declaratory witnesses.  Eight

letters were from attorneys.  Because judges and attorneys have a "strong interest in maintaining

the honest administration of justice" (*In the Matter of Brown* (Review Dept. 1993) 2 Cal. State

Bar Ct. Rptr. 309, 319), "[t]estimony of members of the bar . . . is entitled to great

consideration." (*Tardiff v. State Bar* (1980) 27 Cal.3d 395, 403.)  The attorneys described

Respondent as a "good, kind, honorable and honest person" who is "remorseful" for his crime.

Respondent was also portrayed as a "bright . . . generous soul" and a "responsible and dedicated

lawyer."

---

[5] The report was conducted pursuant to a disciplinary proceeding in Illinois regarding the same conviction underlying this case.

Not all of the witnesses indicated that they knew the full extent of Respondent's misconduct as required by standard 1.6(f). Moreover, the character letters were written in December 2017 before Respondent's sentencing in the underlying criminal matter, and the letters make no mention of the State Bar disciplinary proceedings. Finally, various witnesses failed to indicate whether Respondent's crime changed their opinion of Respondent. (See *In re Ford* (1988) 44 Cal.3d 810, 818.) Based on the foregoing and in the face of Respondent's lack of insight, the court affords Respondent limited mitigating credit for his good character.

**Pretrial Stipulation**

By entering into a stipulation, Respondent has acknowledged his misconduct and that his conviction involved moral turpitude. He is entitled to moderate mitigation for acknowledging and accepting some responsibility for his misconduct and saving the State Bar significant resources and time. (*Silva-Vidor v. State Bar* (1989) 49 Cal.3d 1071, 1079 [where mitigative credit was given for entering into a stipulation as to facts and culpability]; *In the Matter of Spaith* (Review Dept. 1996) 3 Cal. State Bar Ct. Rptr. 511, 521 [where the attorney's stipulation to facts and culpability was held to be a mitigating circumstance].)

Overall, the weight of Respondent's aggravating factors are far greater than the weight of Respondent's mitigating circumstances.

## Discussion

The purpose of State Bar disciplinary proceedings is not to punish the attorney, but to protect the public, to preserve public confidence in the profession, and to maintain the highest possible professional standards for attorneys. (*Chadwick v. State Bar, supra*, 49 Cal.3d. at p. 111; *Cooper v. State Bar* (1987) 43 Cal.3d. 1016, 1025; Std. 1.1.)

In determining the level of discipline, the court looks first to the standards for guidance. (*Drociak v. State Bar* (1991) 52 Cal.3d. 1085, 1090; *In the Matter of Koehler* (Review Dept.

1991) 1 Cal. State Bar Ct. Rptr. 615, 628.)  The Supreme Court gives the standards "great weight" and will reject a recommendation consistent with the standards only where the court entertains "grave doubts" as to its propriety.  (*In re Silverton* (2005) 36 Cal.4th 81, 91-92; *In re Naney* (1990) 51 Cal.3d 186, 190.)  Although the standards are not mandatory, they may be deviated from when there is a compelling, well-defined reason to do so.  (*Bates v. State Bar* (1990) 51 Cal.3d 1056, 1061, fn. 2; *Aronin v. State Bar* (1990) 52 Cal.3d 276, 291.)  In addition to the standards, the court looks to decisional law to determine the appropriate sanction for attorney wrongdoing.  (*In the Matter of Taylor* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 563, 580.)

Standards 1.7 and 2.15(c) are applicable to this case.  Standards 1.7(b) and (c) provide that if aggravating or mitigating circumstances are found, they should be considered alone and in balance with any other aggravating or mitigating factors.  Standard 2.15(c) provides that "the presumed sanction for final conviction of a misdemeanor involving moral turpitude" is disbarment or actual suspension.

OCTC argues that Respondent's criminal conviction warrants disbarment.  Respondent, on the other hand, contends that the discipline in this case merits a lesser sanction than disbarment.  "In a conviction referral, discipline is imposed according to the gravity of the crime and the circumstances of the case.  [Citation.]  In examining such circumstances, the court may look beyond the specific elements of a crime to the whole course of an attorney's conduct as it reflects upon the attorney's fitness to practice law.  [Citations.]"  (*In the Matter of Katz* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 502, 510.)  "That Respondent's offense did not inherently involve moral turpitude does not immunize him from the appropriate discipline for the serious misconduct surrounding his conviction.  No intent to lower professional standards is evident in the procedures allowing for referral to the State Bar Court for hearing of attorney convictions not

inherently involving moral turpitude.  [Citation.]"  (*In the Matter of Oheb, supra,* 4 Cal. State Bar Ct. Rptr. 920, 942.)

Here, Respondent's misconduct is not limited to an unauthorized access to a computer offense.  He is culpable of moral turpitude based on the facts and circumstances surrounding that conviction which evidences extortion.  Criminal acts of dishonesty committed for financial gain involve moral turpitude, and they often warrant the ultimate discipline – disbarment – when performed by attorneys in a personal or professional capacity.  (*In re Prantil* (1989) 48 Cal.3d 227, 234 [grand theft and forgery]; *In re Bogart* (1973) 9 Cal.3d 743, 748-749 [forgery by uttering a forged and stolen check].)

In addition, the Supreme Court has disbarred an attorney who was not convicted of a crime, but whose conduct constituted an attempt to extort money.  (*Barton v. State Bar*, *supra*, 2 Cal.2d 294.)  In *Barton*, the attorney engaged in dishonesty and acts involving moral turpitude.  Barton was retained by an employee and a customer of a garage, who alleged that the garage was colluding with a gasoline company to sell gasoline under a false brand name or "dumping."  Barton's clients did not expect any money, but only wanted the dumping practice to cease.  Barton threatened opposing counsel with a referral of the case to the district attorney and stated that he did not want to file suit, but would consider a settlement.  He falsely claimed that one of his clients had lodged with him a complaint for damages to be filed and prosecuted and that his client's had been damaged in the sum of $2,000 to $3,000.  Counsel also informed opposing counsel that he had affidavits from six individuals that had found definite proof of dumping, but this statement was false.  The Supreme Court was in accord with the local administrative committee's findings that Barton's conduct not only violated his oath and duties as an attorney and involved moral turpitude, but his conduct "constituted an attempt to extort money as defined in … the Penal Code."  (*Barton v. State Bar*, *supra*, 2 Cal.2d 294, 297.)  Barton had two prior

discipline records.  The Supreme Court found that there were no "extenuating circumstances" in the case and that Barton's plan "was boldly conceived and persistently pursued until reported to the police."  (*Ibid.*)  The Court concluded that Barton "had conclusively shown that he was unfitted for the practice of his profession."  (*Id.*)

Similarly, although Respondent was not convicted of extortion, the facts and circumstances surrounding his conviction constituted an attempt to extort money from Dentons.  Respondent also pursued his extortion plot until he was thwarted by the FBI.  The attorney in *Barton* had two prior discipline records, but Respondent committed extremely serious misconduct merely two years after becoming a licensed attorney.

Respondent cited various cases to support his contention that disbarment is not warranted in this case, but he discusses two cases at length – *In re Nadrich* (1988) 44 Cal.3d 271, and *Segretti v. State Bar* (1976) 15 Cal.3d 878.  In *In re Nadrich*, the attorney became addicted to Percodan over a two-year period during which his doctors prescribed that drug to relieve pain from multiple injuries he sustained in an automobile accident.  Nadrich began using illegal narcotics to satisfy his addiction after his doctors stopped prescribing Percodan, but failed to offer him treatment for his addiction.  (*Id.* at pp. 274, 243.)  Nadrich had practiced law about three years before his illegal drug use began.  Although the crimes to which Nadrich pleaded guilty were undeniably serious (possession of a controlled substance with intent to distribute it, and using interstate commerce to distribute a controlled substance), the Supreme Court noted that he "withdrew from the active practice of law prior to committing his criminal acts," and that his offenses were unrelated to his practice of law.  (*Id.* at pp. 277, 243.)  In addition, Nadrich "did not sell drugs because of a simple desire for personal enrichment.  [Citations.]  Rather, he did so because his addiction, the sudden unavailability of Percodan, and his withdrawal from legal practice combined to create an overwhelming financial pressure.  [Citations.]"  (*Id.* at p. 276.)

Respondent's emotional difficulties and rehabilitation efforts were also deemed mitigating. Nadrich received a five-year stayed suspension and a one-year actual suspension.

The court does not find Respondent's comparison to *In re Nadrich*, *supra*, persuasive. Respondent's conviction involved dishonesty and making threats for personal financial gain. There was no moral turpitude found in *Nadrich*. Nadrich may have been given mitigating credit for his lack of a prior disciplinary record during his brief period of practice, but this court afforded no such credit under the circumstances in this case. Finally, Respondent failed to prove any nexus between Respondent's misconduct and his emotional difficulties; there has been no showing regarding Respondent's rehabilitation; and Respondent lacks insight into his **wrongdoing.**

In *Segretti v. State Bar*, *supra*, 15 Cal.3d 878, the attorney was suspended from the practice of law for two years after he was convicted of publication or distribution of political statements and conspiracy to publish or distribute political statements. Segretti, without any authorization by the Citizens for Muskie Committee, wrote and directed the distribution on the committee's letterhead a letter falsely imputing sexual improprieties to two senators who were presidential candidates. Segretti also wrote and directed the distribution on one senator's stationery, without his consent, a news release alleging that another presidential candidate had been committed to a mental institution and was still under psychiatric care. Segretti knew the allegations were false when he wrote them. The Supreme Court determined that Segretti repeatedly committed acts of deceit designed to subvert the free electoral process, and even if credence were given to Segretti's dubious claim that he did not intend the recipients to believe certain allegations, he admittedly intended them to be deceived as to the material's source. Respondent's misconduct was mitigated by the lack of a discipline record during four years of practice, Respondent's age (30) at the time of his misconduct, his belief that he was working

-30-

under the umbrella of the White House, the misconduct was not committed in his capacity as an attorney, Respondent's recognition of wrongdoing and cooperation with the investigative process, and "suffering the ignominy of a criminal conviction, (and) [serving] time in a (federal) penal institution." (*Id.* at pp. 888-889.)

As discussed above, under the circumstances of this case, Respondent's brief period of the practice of law before his misconduct is not mitigating. Moreover, Respondent lacks insight into the wrongfulness of his actions, which causes concern that Respondent will repeat his misconduct. (*In the Matter of Layton* (Review Dept.1993) 2 Cal. State Bar Ct. Rptr. 366, 380.) Finally, since *Segretti* was decided, the Supreme Court has clarified that criminal punishment may be viewed as a factor in mitigation and is relevant to the determination of appropriate discipline, but "criminal punishment and attorney discipline serve two different purposes. [Citation.]" (*In re Nevill* (1985) 39 Cal.3d 729, 737.) For the purposes of attorney discipline, an attorney's "criminal sentence is of limited import. Therefore, when put in perspective and balanced against the need to protect the public and the profession, [the Court] cannot afford [Respondent's criminal punishment] sufficient weight to preclude disbarment." (*Ibid.*)

This court concludes that disbarment is the appropriate sanction in this matter. Respondent's conviction involved a carefully considered, illicit plan to extort money from his employer, demonstrating Respondent's dishonesty. Moreover, Respondent continues to claim that he was involved in settlement negotiations rather than extortion. An attorney's deceit violates "'the fundamental rules of ethics – that of common honesty – without which the profession is worse than valueless in the place it holds in the administration of justice." (*Alkow v. State Bar* (1952) 38 Cal.2d 257, 264, quoting *Tatlow v. State Bar* (1936) 5 Cal.2d 520, 524.) Anything less than disbarment would undermine the public's confidence in the legal profession given the facts and circumstances surrounding Respondent's serious criminal conviction, the

moral turpitude findings, and his lack of insight into the wrongfulness of his misconduct.  (*In the Matter of Burns* (Review Dept. 1995) 3 Cal. State Bar Ct. Rptr. 406, 416. [discipline system is responsible for preserving integrity of legal profession as well as protection of public].)

Accordingly, this court recommends that Respondent be disbarred.

## RECOMMENDATIONS

### Discipline - Disbarment

It is recommended that Michael Bernard Potere State Bar Number 302569, be disbarred from the practice of law in California and that his name be stricken from the roll of attorneys.

### California Rules of Court, Rule 9.20

It is further recommended that Respondent be ordered to comply with the requirements of California Rules of Court, rule 9.20, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order imposing discipline in this matter.[6]

### Costs

It is further recommended that costs be awarded to the State Bar in accordance with Business and Professions Code section 6086.10, and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.  Unless the time for payment of discipline costs is extended pursuant to subdivision (c) of section 6086.10, costs

---

[6] For purposes of compliance with rule 9.20(a), the operative date for identification of "clients being represented in pending matters" and others to be notified is the filing date of the Supreme Court order, not any later "effective" date of the order.  (*Athearn v. State Bar* (1982) 32 Cal.3d 38, 45.)  Further, Respondent is required to file a rule 9.20(c) affidavit even if Respondent has no clients to notify on the date the Supreme Court filed its order in this proceeding.  (*Powers v. State Bar* (1988) 44 Cal.3d 337, 341.)  In addition to being punished as a crime or contempt, an attorney's failure to comply with rule 9.20 is, inter alia, cause for disbarment, suspension, revocation of any pending disciplinary probation, and denial of an application for reinstatement after disbarment. (Cal. Rules of Court, rule 9.20(d).)

assessed against an attorney who is actually suspended or disbarred must be paid as a condition

of reinstatement or return to active status.

## Order of Involuntary Inactive Enrollment

In accordance with Business and Professions Code, section 6007(c)(4), it is ordered that

Michael Bernard Potere, State Bar Number 302569, be involuntarily enrolled as an inactive

attorney of the State Bar of California, effective three calendar days after service of this decision

and order by mail.  (Rules of Proc. of State Bar, rule 5.111(D)(1).[7]  Respondent's inactive

enrollment will terminate upon (1) the effective date of the Supreme Court's order imposing

discipline;  (2) as provided for by rule 5.111(D)(2) of the Rules of Procedure of the State Bar, or

(3) as otherwise ordered by the Supreme Court pursuant to its plenary jurisdiction.

Dated:  October 28, 2019

*Cynthia Valenzuela*
CYNTHIA VALENZUELA
Judge of the State Bar Court

---

[7] An inactive attorney of the State Bar of California cannot lawfully practice law in this state. (Bus. & Prof. Code, § 6126, subd. (b); see also Bus. & Prof. Code, § 6125.)  It is a crime for an attorney who has been enrolled inactive (or disbarred) to practice law, to attempt to practice law, or to even hold himself or herself out as entitled to practice law.  (*Ibid.*)  Moreover, an attorney who has been enrolled inactive (or disbarred) may not lawfully represent others before any state agency or in any state administrative hearing even if laypersons are otherwise authorized to do so. (*Benninghoff v. Superior Court* (2006) 136 Cal.App.4th 61, 66-73.)

## CERTIFICATE OF SERVICE

[Rules Proc. of State Bar; Rule 5.27(B); Code Civ. Proc., § 1013a(4)]

I am a Court Specialist of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, in the City and County of Los Angeles, on October 28, 2019, I deposited a true copy of the following document(s):

DECISION AND ORDER OF INVOLUNTARY INACTIVE ENROLLMENT

in a sealed envelope for collection and mailing on that date as follows:

☒     by first-class mail, with postage thereon fully prepaid, through the United States Postal Service at Los Angeles, California, addressed as follows:

MICHAEL BERNARD POTERE
18 INIS CIR
WEST NEWTON, MA  02465-2408

☒     by interoffice mail through a facility regularly maintained by the State Bar of California addressed as follows:

JOSEPH A. SILVOSO III, Enforcement, Los Angeles

I hereby certify that the foregoing is true and correct. Executed in Los Angeles, California, on October 28, 2019.

Paul Barona
Court Specialist
State Bar Court

# EXHIBIT 7

PUBLIC MATTER—NOT DESIGNATED FOR PUBLICATION

**FILED**

OCT 16 2020

**STATE BAR COURT OF CALIFORNIA**

**STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES**

**REVIEW DEPARTMENT**

| | | |
|---|---|---|
| In the Matter of | ) | 17-C-03795 |
| | ) | |
| MICHAEL BERNARD POTERE, | ) | OPINION AND ORDER |
| | ) | |
| State Bar No. 302569. | ) | |
| | ) | |

In 2017, Michael Bernard Potere demanded over $200,000 from a law firm where he worked by threatening the release of confidential firm information, including financial documents, client billing rates, and associate reviews and salary offers.  He was prosecuted by the United States Attorney's Office (USAO) for the Central District of California.  Potere ultimately pleaded guilty to a federal misdemeanor violation of unauthorized access to a computer to obtain information.  The hearing judge found the facts and circumstances surrounding his conviction involved moral turpitude and a "complete disregard for honesty."  The judge recommended disbarment.

Potere appeals, arguing the proceedings in the Hearing Department were constitutionally defective because he had to establish by expert testimony any mental disabilities responsible for his misconduct.  He also asserts he should have been provided with a mental examination, and his mitigating evidence should receive more weight and his aggravating evidence less weight than found by the hearing judge.  Potere contends disbarment is not necessary and, instead, a period of actual suspension is appropriate.  The Office of Chief Trial Counsel of the State Bar (OCTC) did not appeal but requests in its response that we affirm the disbarment recommendation.

Upon our independent review (Cal. Rules of Court, rule 9.12), we agree with the hearing judge that the circumstances surrounding Potere's conviction involve moral turpitude, and we affirm the judge's culpability finding and discipline recommendation.  We reject Potere's constitutional claims and his argument that he was entitled to a mental examination by the State Bar.  Due to Potere's serious misconduct, disbarment is necessary to protect the public, the courts, and the legal profession.

## I. FACTUAL BACKGROUND[1]

In March 2015, Potere began working as an associate attorney at Dentons, a large international law firm, in its Los Angeles office.  Later in 2015, Potere was assigned to work on one of the firm's cases with Joel Siegel, a senior partner and managing director of Dentons.  In order to prepare discovery responses for the case, Dentons provided Potere with access to Siegel's work email account.  Potere's assignment on that case concluded in June 2016, which should have ended Potere's access to Siegel's account.  However, neither Dentons nor Siegel took action to remove or restrict Potere's access to it.

In March 2017, Potere told Michael Duvall, a partner at Dentons, that he was leaving the firm to pursue a graduate degree in political science.  Potere asked to continue working at Dentons until his graduate program began in the fall of 2017.  As Potere's "practice advisor," Duvall was responsible for discussing Potere's performance reviews with him.  Based on Potere's struggles at Dentons in 2016, and Duvall repeatedly speaking to him about his substandard work performance, including a poor performance review in January 2017, Dentons refused Potere's request to work until the fall.  Instead, the firm informed him that his last day of work would be June 1, 2017.

---

[1] The factual background is based on trial testimony, documentary evidence, the stipulations as to fact, and factual findings by the hearing judge, which are entitled to great weight. (Rules Proc. of State Bar, rule 5.155(A).)

On April 15 and May 14, 2017, without authorization, Potere accessed Siegel's email account and downloaded various documents. By doing so, he knowingly violated Dentons' internal policies, which he acknowledged receiving when he began his employment. He initially searched for information about himself and his performance at the firm. He downloaded an email from May 20, 2016, sent from Siegel to Duvall and Felix Woo, who was also a partner at Dentons and Potere's first practice advisor. Woo later became the "Associate Review Committee Director" and was also responsible for talking to Potere about his performance reviews. Siegel stated in the email Potere had taken a vacation in the middle of an important briefing schedule in a case. Potere considered Siegel's email a false accusation and defamatory.

Potere then searched through Siegel's email account for other confidential and sensitive information pertaining to Dentons and Siegel, which he downloaded to his work computer's hard drive and printed.[2] His work computer was synced to his personal laptop via Dropbox, an internet-based cloud storage platform, so the information was stored in these places as well. Potere also provided copies of these documents to a friend for safekeeping.

Potere arranged a meeting with Duvall and Woo on May 16, 2017, where he disclosed to them he had searched Siegel's email account. He discussed the May 20, 2016 email, describing it as upsetting and defamatory. He also admitted to searching Siegel's email account for other documents and finding evidence for a potential gender discrimination lawsuit against Dentons. Potere refused to provide copies of the documents he had taken, requesting a confidentiality

---

[2] Potere downloaded and printed many law firm documents, including (1) Dentons' quarterly financial reports; (2) documents describing Dentons' determination of its billing rates for clients and specific factors relied on to arrive at those rates; (3) a list of the firm's clients and the dollar amounts charged to each; (4) documents describing how Dentons' partners should approach clients who have outstanding and overdue balances; (5) documents describing issues to be discussed at meetings for Dentons' partners; (6) documents describing voting for full interest partner candidates; (7) confidential reviews of associate attorneys; and (8) detailed analyses describing recruitment of lateral attorneys and offers to those attorneys. Potere also downloaded a mortgage application that had been recently completed by Siegel.

-3-

agreement from Dentons before disclosing the documents.  He told them he planned on bringing

a defamation action, but the statute of limitations for that action would expire on May 19, 2017.

Therefore, he requested a tolling agreement for his defamation claim.

Duvall and Woo relayed the information Potere shared at the meeting to Siegel and

Dentons' management, which included Edward Reich, Dentons' general counsel in its New York

office.  Reich then contacted Potere.  Potere requested confidentiality regarding their

conversations, but Reich declined.  On May 17, 2017, Duvall and Reich had a teleconference

with Potere.  Potere raised the defamation and gender discrimination cases, yet he again refused

to confirm or deny that he had any of Dentons' documents.  He demanded "compensatory

damages" of $210,000, life insurance for six years, and health insurance until he started school.

He also demanded as "punitive damages" a piece of artwork from the office depicting a fire on a

hillside in Malibu, which he claimed represented his legal career.  Potere said he was speaking in

hypotheticals and suggested he had a timer set that could potentially forward any documents he

had to the press, including the legal website "Above the Law."  Reich warned Potere such a

move could be "career-ending" and result in professional and criminal charges, to which Potere

replied that he no longer cared about being a lawyer.  Within a couple of days of this

conversation, Denton retained outside counsel for assistance with the situation.

A second call occurred on May 18, 2017, between Potere and Reich, along with Susan

Mitchell, who was another partner and general counsel at Dentons.  The call covered the same

topics discussed the day before, including Reich again warning Potere of potential criminal

consequences and ethical issues.  Reich also agreed to a tolling agreement to extend the statute of

limitations in the defamation suit for a week.  Mitchell believed the documents contained

confidential firm financial information and, if released to the public, would be damaging to

Dentons.  The next day, Dentons contacted the Federal Bureau of Investigation (FBI).

On May 25, 2017, Potere, Reich, and Mitchell met at Dentons' office in Los Angeles, and the meeting was recorded by the FBI. During the meeting, Potere admitted he received access to Siegel's email account when they worked on a case together and he searched Siegel's emails in April 2017, finding one he considered defamatory. He said he later searched for confidential firm documents and downloaded them. He told Reich and Mitchell he drafted complaints for a defamation lawsuit and a gender discrimination lawsuit, and reiterated his financial demands. Potere again claimed to have an auto-timer set to email the confidential firm documents to Above the Law and also that a friend had a copy of the lawsuits and was instructed to file them if something were to happen to him. He said he understood that publicly releasing the documents would cause substantial harm to Dentons.

During the meeting, Reich gave Potere the opportunity to return the documents, but Potere refused. Reich asked Potere what Dentons would be paying for and Potere responded, "[E]verything goes away, everything I have. Whatever I have is destroyed. Any thoughts I may have had for a lawsuit or any sort of other publicity about this, or any situation related to me, Dentons, or Dentons generally coming from me wouldn't happen." Potere was provided with a flash drive. He uploaded it with documents and returned it to Reich and Mitchell. The documents on the drive referenced Above the Law and also contained confidential firm financial data, Potere's emails from Dentons, and the complaints for his defamation and gender discrimination suits, along with Dentons' documents attached as exhibits.

On June 8, 2017, Reich and Mitchell told Potere that Dentons had agreed to pay him to return the documents. On June 19, Dentons delivered the artwork to Potere. On June 22, Potere met with Reich at Dentons. The meeting was monitored and recorded by the FBI. Potere gave Reich two envelopes and a flash drive, which he said represented the documents he had taken. He also showed Reich that he was deleting the documents from his personal computer and

Dropbox, assuring Reich he no longer had access to any of the documents.  Potere told Reich he

had disabled the program that was timed to send the documents to Above the Law.  Potere and

Reich discussed the release agreement, wherein Dentons would pay Potere in exchange for the

return of the confidential documents.  Reich placed a check on the table payable to Potere in the

amount of $213,650.49, and Reich and Potere signed the release agreement.  Potere also signed a

certification that he had not retained any copies of the documents from Dentons.  The FBI then

entered the meeting room and arrested Potere.  Shortly after his arrest, the FBI interviewed

Potere and asked him whether he still possessed or had access to any of Dentons' documents.  He

admitted to the FBI he would still have access to the documents on Dropbox because Dropbox

saves deleted files for 30 days.  He also admitted he possessed a flash drive at his apartment

containing the exhibits and complaints he drafted, which the FBI retrieved.

On June 20, 2017, the USAO filed a complaint in the Central District of California,

alleging Potere violated 18 United States Code (U.S.C.) section 1951(a) (extortion and attempted

extortion affecting interstate commerce).  (*United States v. Potere*, no. 2:17-cr-00446.)  On

July 18, the USAO filed an indictment charging Potere with violating 18 U.S.C. section 1951(a)

and 18 U.S.C. section 875(d) (transmitting threatening communications with intent to extort).

On October 18, 2017, the USAO filed a first superseding information charging Potere

with a misdemeanor violation of 18 U.S.C. sections 1030(a)(2)(C) and (c)(2)(A) (unauthorized

access to a computer to obtain information), and Potere entered into a plea agreement for that

charge.  As part of the factual basis for the plea, Potere admitted he accessed a Dentons'

"computer without authorization and downloaded confidential information from the [Dentons']

computer that he was not authorized to download and obtain."  He admitted that, on May 17,

2017, he spoke to partners at Dentons and demanded "$210,000 and a piece of artwork, among

other items" in exchange for the return of the firm's confidential documents.  He also admitted

he repeatedly stated that, if Dentons did not meet his demands, he intended to email the confidential documents to a legal blog website.  The district judge accepted and entered the plea.

On January 22, 2018, the district judge sentenced Potere to a term of five months in custody.  During the sentencing hearing, the judge commented that Potere had extorted Dentons because he believed he had been treated unfairly.  Potere's counsel responded Potere was experiencing mental health problems and not thinking clearly.  The judge disagreed and ascribed Potere's actions to his anger management issues, not any problem caused by Potere's mental health.  The judge acknowledged Potere's mental health issues were well documented, but he did not find they were the reason for Potere's actions.  He further stated Potere's extortion was calculated and malicious, and Potere ignored the warnings from Dentons his conduct was unlawful.  In response to Potere's claim that he was simply using an aggressive negotiation strategy, the judge found Potere was actually trying to "extort the law firm into paying him a substantial sum of money for which he had absolutely no entitlement to."  He found Potere's explanation for his conduct "arrogant and pure fantasy, nothing more than his continued refusal to accept and recognize full responsibility for his serious criminal conduct."  The judge found Potere's expression of regret less than sincere but did recognize Potere accepted responsibility by pleading guilty to the first superseding information.

The judge granted the USAO's motion to dismiss the underlying indictment.  Subsequently, Potere surrendered to the custody of the Bureau of Prisons and was released on July 25, 2018.  He was then placed on one year of supervised release.

## II.  STATE BAR COURT PROCEEDINGS

On March 20, 2018, OCTC transmitted evidence to us that Potere's conviction was final.  On April 19, we transferred the matter to the Hearing Department for a hearing and decision recommending the discipline to be imposed if it found the facts and circumstances surrounding

the misdemeanor conviction involved moral turpitude or other misconduct warranting discipline. On April 23, 2018, the Hearing Department filed and served on Potere a Notice of Hearing on Conviction.

The parties filed a stipulation as to facts, admission of documents, and conclusions of law on April 30, 2019. A supplemental stipulation as to facts and admission of documents was filed on July 16. Trial was held on July 18, 19, and 30. After the filing of posttrial briefs, the hearing judge issued her decision on October 28, 2019.

### III. POTERE'S STIPULATION ESTABLISHES THAT THE FACTS AND CIRCUMSTANCES SURROUNDING HIS CONVICTION INVOLVED MORAL TURPITUDE

In attorney disciplinary proceedings, "the record of [an attorney's] conviction [is] conclusive evidence of guilt of the crime of which he or she has been convicted." (Bus. & Prof. Code, § 6101, subd. (a); *In re Gross* (1983) 33 Cal.3d 561, 567.) However, Potere's misdemeanor conviction for violating 18 U.S.C. sections 1030(a)(2)(C) and (c)(2)(A) does not establish moral turpitude per se. Any finding of moral turpitude must be made after considering the facts and circumstances of the criminal conviction. (Bus. & Prof. Code, § 6102, subd. (e).) In determining whether the facts and circumstances surrounding Potere's criminal conviction involve moral turpitude, we are not restricted to examining elements of the crime but must look at the whole course of misconduct. (*In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 935.) The misconduct, not the conviction, warrants discipline. (*In re Gross*, *supra*, 33 Cal.3d at p. 566.)

Potere stipulated in this disciplinary proceeding that he intentionally accessed an email account without authorization and downloaded confidential information from his employer's computer, and that he demanded $210,000 and a piece of artwork, among other items, from his

employer in exchange for the return of the confidential information. He further stipulated that these acts, in addition to others as laid out in the stipulation, constitute moral turpitude.

We accept Potere's stipulation that his acts of misconduct constitute moral turpitude because they fit within the definition of moral turpitude as set forth by the California Supreme Court: "Criminal conduct not committed in the practice of law or against a client reveals moral turpitude if it shows a deficiency in any character trait necessary for the practice of law (such as trustworthiness, honesty, fairness, candor, and fidelity to fiduciary duties) or if it involves such a serious breach of a duty owed to another or to society, or such a flagrant disrespect for the law or for societal norms, that knowledge of the attorney's conduct would be likely to undermine public confidence in and respect for the legal profession." (*In re Lesansky* (2001) 25 Cal.4th 11, 16.) We find that Potere's actions clearly demonstrate deficiencies in his character, including a lack of trustworthiness, honesty, and fidelity to fiduciary duties. First, he knew he did not have authority to access Siegel's emails when he did, months after his work for Siegel had concluded. Additionally, Potere downloaded documents unrelated to the case on which he had been assisting Siegel, including Dentons' sensitive proprietary information, trade secrets, and confidential client information, along with Siegel's personal financial information.

Potere then took calculated steps to use the information in an attempt to financially gain from his dishonest actions. He threatened Dentons under the guise of two lawsuits, unless it paid him over $200,000 and gave him insurance coverage and a piece of artwork. He revealed the true nature of his actions when he stated he could release the law firm's documents publicly, knowing that to do so would cause substantial harm to Dentons. He further lied to Dentons at the final meeting when he stated he had returned all of the documents, when in fact, he still had access to the documents on Dropbox and on a flash drive at his apartment. These facts establish Potere's dishonesty and constitute a breach of fiduciary duties to Dentons. (See *Fowler v. Varian*

*Associates, Inc.* (1987) 196 Cal.App.3d 34, 41 [while employed, employee owes undivided loyalty to employer]; *Stokes v. Dole Nut Co.* (1995) 41 Cal.App.4th 285, 295 [duty of loyalty breached when "employee takes action which is inimical to the best interests of the employer"].) Accordingly, we affirm the hearing judge's finding that the facts and circumstances surrounding Potere's conviction involved moral turpitude.[3]

## IV. POTERE'S CONSTITUTIONAL CHALLENGES HAVE NO MERIT[4]

**A.      Potere Not Entitled to Early Neutral Evaluation Conference (ENEC)**

Potere argues his equal protection rights were violated because he was not provided with an ENEC pursuant to rule 5.30 of the Rules of Procedure of the State Bar.[5] He asserts the absence of an ENEC prejudiced him because he did not have an opportunity to discuss his conviction referral and mental health issues in a neutral setting prior to trial. Pursuant to rule 5.30, an ENEC takes place before disciplinary charges are filed. (See *In the Matter of Respondent AA* (Review Dept. 2004) 4 Cal. State Bar Ct. Rptr. 721, 727 [ENEC serves to provide objective view to both sides of consequences of filing formal charges].) Disciplinary charges are not filed in conviction proceedings. Instead, OCTC files a certified copy of the record of conviction in the Review

---

[3] On review, Potere disagrees with the hearing judge's finding that he intentionally tried to extort money from Dentons. In finding that the facts and circumstances involved moral turpitude, we need not determine whether Potere committed the crime of extortion because his actions otherwise demonstrate moral turpitude under *Lesansky*. Nonetheless, his conduct meets the definition of extortion as defined under both California and federal law. (See Pen. Code § 518 & 18 U.S.C. § 1951(b)(2) [extortion defined as wrongful use of force or fear to obtain property from another with his or her consent].) Both the hearing judge and the district judge agreed that Potere wrongfully threatened to go public with confidential documents for his own financial gain. We reject his argument that his drafted lawsuits had merit and that his demand for $200,000 and more was just a settlement of his claims. His point that the federal extortion charges were dismissed has no relevance as we consider all of the facts and circumstances surrounding the conviction. (*In re Leansky*, *supra*, 25 Cal.4th at p. 16.) Potere's additional argument that his actions did not amount to extortion because his "depression was the root cause of his misconduct" is discussed below in the mitigation section.

[4] Potere's constitutional arguments regarding mitigation for his mental condition are addressed below in the mitigation section.

[5] All further references to rules are to this source unless otherwise noted.

Department.  (Rule 5.341.)  Because this matter is a conviction proceeding, Potere is not entitled

to an ENEC under rule 5.30.

**B.**      **Lack of Mental Examination Did Not Violate Due Process**

Potere also claims his constitutional rights were violated when he was not provided a

mental examination under rule 5.68 by the State Bar after he raised the issue of his mental

condition.  He asserts that, without this examination, he was deprived of a fair hearing in

violation of his constitutional right to due process.  We disagree.  "The fundamental requirement

of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'

[Citations.]"  (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333.)  Potere had the opportunity to

present evidence regarding his mental condition at the hearing in this matter.  He was not

prejudiced due to the conclusion of the State Bar and the hearing judge that a rule 5.68 mental

examination was not necessary to proceed to trial.  Potere received ample due process and we

reject his arguments because he failed to establish he was specifically prejudiced.  (*Van Sloten v.*

*State Bar* (1989) 48 Cal.3d 921, 928 [due process challenge must make showing of specific

prejudice].)  We find Potere received a fair trial and was treated justly throughout these

proceedings.

## V.  AGGRAVATION AND MITIGATION

Standard 1.5 of the Standards for Attorney Sanctions for Professional Misconduct[6] requires

OCTC to establish aggravating circumstances by clear and convincing evidence.[7]  Standard 1.6

requires Potere to meet the same burden to prove mitigation.

---

[6] All further references to standards are to the Rules of Procedure of the State Bar,
title IV, Standards for Attorney Sanctions for Professional Misconduct.

[7] Clear and convincing evidence leaves no substantial doubt and is sufficiently strong to
command the unhesitating assent of every reasonable mind.  (*Conservatorship of Wendland*
(2001) 26 Cal.4th 519, 552.)

A.      **Aggravation**

   **1.  Significant Harm to Client, Public, or Administration of Justice (Std. 1.5(j))**

   The hearing judge found Potere's misconduct caused significant harm to Dentons but did

not assign any weight.  OCTC requests significant weight.  Potere admits on review that his

conduct caused Dentons significant harm.[8]  We find that Potere's threats of publicly releasing

confidential information caused significant harm because Dentons had to hire outside counsel to

assist the firm.  Moreover, after Potere's arrest and conviction were publicized, Dentons was

forced to take action to protect its public image and address concerns from clients about

confidentiality at the firm.  We assign moderate aggravating weight under standard 1.5(j).

   **2.  Indifference (Std. 1.5(k))**

   Potere challenges the hearing judge's determination that he lacks insight into the

wrongfulness of his misconduct.  Potere argues his attitude is based on an honest, but mistaken,

belief in his innocence and, therefore, it cannot be used in aggravation.  (See *Van Sloten v. State*

*Bar*, *supra*, 48 Cal.3d at pp. 932–933.)  First, Potere's argument is without merit as the record

does not give any support for such a belief.  The hearing judge found Potere lacked credibility and

agreed with the district judge that Potere's depiction of the events as only his attempt at an

aggressive negotiating strategy was unbelievable.  The hearing judge determined Potere was

insincere and refused to accept full responsibility for his misconduct.  Such findings are entitled to

great weight.  (Rule 5.155(A); *McKnight v. State Bar* (1991) 53 Cal.3d 1025, 1032 [hearing judge

---

   [8] Potere challenges the hearing judge's finding to the extent that he caused significant harm
to Dentons because he purchased a firearm and, thereafter, Dentons took precautionary measures
and hired additional security guards for the office.  We agree with Potere that his ownership of a
firearm does not bear on aggravation for significant harm.  The judge also found Potere's actions
caused significant harm to Siegel.  Potere had access to Siegel's emails, which contained at least
one document regarding Siegel's personal financial information.  Siegel reported to the FBI that
he "felt violated" because Potere searched his emails, the incident "disrupted" his life, and he had
to change the passwords connected to his financial accounts.  We find OCTC did not present clear
and convincing evidence that Potere's actions significantly harmed Siegel.

best suited to resolve credibility having observed and assessed witnesses' demeanor and veracity firsthand].)

Second, Potere continues to deny that his actions were dishonest, even when he admits in his stipulation that his acts constituted moral turpitude.  He cannot have it both ways, which leads us to conclude that he does not truly understand the wrongfulness of his course of misconduct, and instills great concern that he would commit future misconduct.  (See *In the Matter of Layton* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 366, 380 [lack of insight into misconduct causes concern that attorney will repeat his misdeeds and is substantial factor in discipline recommendation].)  This indifference clearly warrants substantial aggravation under standard 1.5(k).  (See *In the Matter of Katz* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 502, 511 [while law does not require false penitence, it does require attorney to accept responsibility for his or her misconduct and come to grips with his or her culpability].)

**B.     Mitigation**

**1.  No Mitigation for Lack of Prior Record of Discipline (Std. 1.6(a))**

Absence of a prior record of discipline over many years, coupled with present misconduct that is not likely to recur, is a mitigating circumstance under standard 1.6(a).  (*Cooper v. State Bar* (1987) 43 Cal.3d 1016, 1029 [discipline-free record most relevant where misconduct is aberrational and unlikely to recur].)  Potere was admitted to practice law in California on February 18, 2015.  Because he had only two years of discipline-free practice in California before his misconduct began in April 2017, the hearing judge declined to assign mitigation under standard 1.6(a).  Potere asserts, because he was admitted to practice in Illinois in 2012, he should receive mitigation for five years of practice without discipline, but five years does not satisfy the "many years" requirement of standard 1.6(a).  (*In the Matter of Duxbury* (Review Dept. 1999)

4 Cal. State Bar Ct. Rptr. 61,66.)[9]  In addition, Potere has not proven his misconduct is not likely

to recur, as the standard requires.  We affirm the judge's determination that no mitigation is

warranted for lack of a prior record of discipline.[10]

### 2. No Mitigation for Mental Disabilities (Std. 1.6(d))

Standard 1.6(d) provides that mitigation may be assigned for any mental disabilities

where (1) the attorney suffered from them at the time of the misconduct; (2) they are established

by expert testimony as being directly responsible for the misconduct; and (3) they no longer pose

a risk that the attorney will commit future misconduct.  The hearing judge found Potere failed to

establish the second and third factors and thus did not afford any mitigation under

standard 1.6(d).  We agree.

At trial, the hearing judge admitted Potere's medical records, which documented

counseling sessions in 2012 and psychotherapy sessions in 2016 and 2017.  Potere did not call an

expert to testify regarding his mental illness, but he submitted a psychiatric evaluation performed

on January 7, 2019, by Stephen H. Dinwiddie, M.D.  Dr. Dinwiddie's evaluation was requested by

the Illinois Attorney Registration and Disciplinary Commission (ARDC) as part of Potere's

disciplinary proceeding in Illinois for the same conviction underlying this matter.  The evaluation

details the facts underlying Potere's conviction and the allegations made by the ARDC that he

violated rule 8.4(b) of the Illinois Rules of Professional Conduct[11] by (1) committing and being

---

[9] We also reject Potere's argument for mitigation based on *Arden v. State Bar* (1959)
52 Cal.2d 310, which is a pre-standards case.

[10] Potere also argues that giving mitigation to attorneys with "many years of practice"
under standard 1.6(a) violates equal protection as it treats less experienced attorneys differently.
Potere offers no legal support for his argument.  Further, this circumstance is proper to consider
in mitigation.  (*Cooper v. State Bar*, *supra*, 43 Cal.3d at p. 1029.)  Accordingly, we reject his
argument.

[11] On our own motion, we take judicial notice of rule 8.4(b) of the Illinois Rules of
Professional Conduct, which states, "It is professional misconduct for a lawyer to . . . (b) commit

convicted of unauthorized access to a computer to obtain information, (2) committing the crime of

attempted extortion, and (3) committing the crime of transmitting threatening communications

with intent to extort.  Dr. Dinwiddie noted that Potere's "long-standing feelings of being poorly

treated, recurrent difficulties in his jobs, other interpersonal difficulties, and feelings of being

entitled to some form of compensation can be traced, ultimately, to his personality disorder."

Dr. Dinwiddie concluded no causal connection existed between his mental illness and the

misconduct in question.  Based on this determination, the hearing judge found Potere did not

provide any evidence that his mental disability was directly responsible for his misconduct, as

required by the standard.

Potere finds fault in the hearing judge's reliance on Dr. Dinwiddie's conclusion that "No

causal connection . . . [was] identified" between Potere's depression and his misconduct.  Potere

argues Dr. Dinwiddie failed to define the misconduct and, therefore, the evaluation cannot be used

to determine mitigation under standard 1.6(d).  Potere believes Dr. Dinwiddie's understanding of

the misconduct is solely his actions comprising the misdemeanor conviction.  Potere's belief is

without merit.  Dr. Dinwiddie's evaluation explicitly discusses all of Potere's actions relevant to

this disciplinary proceeding, including his accessing and obtaining of Siegel's emails and

Dentons' private information, his statements to Dentons' partners leading up to his arrest, and

statements in his plea agreement.

Potere also argues his equal protection rights were violated because he was required to

prove his mental disability by hiring an expert, which is the only mitigating factor that requires

expert testimony; therefore, persons with disabilities are treated differently.  The Supreme Court

has upheld the requirement of establishing a nexus through expert testimony.  (*Bercovich v. State

Bar* (1990) 50 Cal.3d 116, 128 [lay opinion insufficient to support mitigation under former

———————————————————————————————

a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a
lawyer . . . ."

std. 1.2(e)(iv)].)  Requiring expert testimony under the standard does not treat persons with

disabilities differently, but provides a means for the court to evaluate the weight of mitigation

credit an attorney should receive.  Contrary to Potere's argument, some mitigation is available

under standard 1.6(d) even without expert witness testimony.  (See *In re Brown* (1995) 12 Cal.4th

205, 222 [some mitigation weight for illness even though no expert testimony established illness

directly responsible for misconduct]; *In the Matter of Ward* (Review Dept. 1992) 2 Cal. State Bar

Ct. Rptr. 47, 60 [some mitigation assigned to personal stress factors established by lay

testimony].)  Here, Potere's only evidence in support of mitigation under standard 1.6(d) is his

testimony that he was experiencing symptoms of depression around the same time as his

misconduct and his lay testimony that the depression caused his misconduct.  His arguments

directly contradict Dr. Dinwiddie's conclusion.  Potere's disputed lay testimony is not enough to

establish his depression was directly responsible for his misconduct.  Therefore, we find that even

*some* mitigation is not warranted under standard 1.6(d).[12]

   Additionally, Potere challenges the constitutionality of standard 1.6(d) because he argues it

requires an attorney to show that he or she is "recovered" from his mental disability before the

hearing judge decides the matter, which violates his equal protection rights.  He argues, if an

attorney does not show "recovery," then no mitigation under standard 1.6(d) can be found, and

that attorney is disciplined as if he or she had no disability at all, even if the attorney has otherwise

proven a mental disability.  Therefore, Potere argues, the disability itself then becomes the basis

for the disciplinary action and the attorney is being punished for having a disability.  Potere

---

[12] Potere also argues he was denied due process because he was required to use expert testimony to prove his mental disability.  Because he could not afford an expert witness, he states he was unable to put on a "defense" under standard 1.6(d) and, therefore, he was disciplined as if he were mentally healthy.  He asserts, if an attorney establishes that a disability caused the misconduct in question, then that could "undermine a finding of intent or moral turpitude."  We reject this argument.  Potere had the opportunity to present evidence in mitigation, which he did by offering Dr. Dinwiddie's report into evidence.

misreads the language within standard 1.6(d), which requires him to establish that the mental

disability "no longer poses a risk that the lawyer will commit misconduct."  An attorney does not

have to show that a mental illness no longer exists; rather, the attorney must show the disorder is

unlikely to cause further misconduct.  (See *In re Naney* (1990) 51 Cal.3d 186, 197 [attorney must

show psychological disorder that contributed to misconduct is controlled].)  This aligns with the

purposes of attorney discipline, including protection of the public from attorney misconduct.[13]

As a result of the alleged constitutional violations, Potere argues he was substantially

prejudiced because he could not establish that his anger was a symptom of depression and the

hearing judge cited to Potere's anger issues in her decision.  He asserts if he were able to do so,

any intent would be negated and he would not be disbarred.  We reject Potere's arguments that

he was actually prejudiced in these proceedings.  His arguments boil down to speculation as to

what another expert might say about Potere's mental state related to the misconduct in this

matter.  The hearing judge properly considered the evidence and concluded Potere did not

establish any mitigation under standard 1.6(d).  For the same reasons, we also deny Potere's

request to remand the matter for a new hearing under rule 5.155(B).

---

[13] Potere cites *In the Matter of Amponsah* (Review Dept. 2019) 5 Cal. State Bar Ct. Rptr. 646, arguing he must show recovery to receive mitigation under standard 1.6(d).  We did not hold in *Amponsah* that every attorney must show recovery.  In that case, Amponsah presented expert testimony that he was in continued therapy for his emotional difficulties and his stress and anxiety levels had normalized.  As such, we found the evidence showed Amponsah had recovered, but did not state it was a requirement under standard 1.6(d).  We also found expert testimony established that his extreme emotional distress was directly responsible for his misconduct.  Accordingly, the attorney was entitled to substantial mitigation under standard 1.6(d).  Potere also misapplies our decision from *In the Matter of Peters* (Review Dept. 2018) 5 Cal. State Bar Ct. Rptr. 536.  Peters received some mitigation for her depression and prescription drug abuse problem that led to a fatal car collision.  We held she was not entitled to full mitigation because she had not shown "complete, sustained recovery and rehabilitation."  Such a showing is required when substance abuse problems cause the misconduct.  (See *Slavkin v. State Bar* (1989) 49 Cal.3d 894, 905 [attorney suffering from drug or alcohol dependence generally must establish that addiction is permanently under control].)  Because Potere does not argue his misconduct was caused by substance abuse, *Peters* is not relevant precedent here.

### 3. Cooperation with the State Bar (Std. 1.6(e))

Under standard 1.6(e), Potere is entitled to mitigation for entering into the stipulations. The hearing judge assigned moderate weight in mitigation. Potere argues he is entitled to substantial mitigation because he stipulated to facts and circumstances related to his conviction that equated to moral turpitude and were not easily provable. We agree and assign substantial mitigation for Potere's cooperation. (See *In the Matter of Johnson* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179, 190 [more extensive mitigation for admission of culpability and facts].)

### 4. Extraordinary Good Character (Std. 1.6(f))

Potere may obtain mitigation for "extraordinary good character attested to by a wide range of references in the legal and general communities, who are aware of the full extent of the misconduct." (Std. 1.6(f).) The hearing judge gave limited mitigating credit to Potere's good character evidence, which OCTC does not challenge. Potere requests additional weight for this circumstance. Potere presented letters from 13 declaratory witnesses, including eight attorneys. (*In the Matter of Brown* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 309, 319 [testimony of attorneys entitled to great consideration].) However, as OCTC correctly points out, these letters were written in December 2017 and submitted in Potere's underlying criminal matter before sentencing.[14] Therefore, they do not mention this disciplinary proceeding, and a number of the witnesses do not indicate a full awareness of the extent of Potere's misconduct. We agree with the hearing judge and assign limited weight.

### 5. Pro Bono Work and Community Service

Pro bono work and community service are mitigating circumstances. (*Calvert v. State Bar* (1991) 54 Cal.3d 765, 785.) Potere requests mitigation, arguing he testified at trial regarding his pro bono and community service activities; however, the hearing judge did not address them in her

---

[14] Potere later amended some of the letters with certifications that they were written under penalty of perjury.

decision.  OCTC does not object to this request.  Potere testified about pro bono cases he worked

on as a summer associate, a fellowship he received after law school to work at Northwestern

University's Center on Wrongful Convictions of Youth, and pro bono cases he worked on as an

associate at both Dentons and the law firm where he worked prior to Dentons, Kirkland & Ellis.

He stated that he won a "volunteer of the year award" for his work on a Social Security pro bono

case from the Legal Assistance Foundation of Metropolitan Chicago.  After working at Dentons,

Potere volunteered for Public Counsel at the bankruptcy self-help desk.  However, he did not

describe the amount or extent of his work there.

Potere's pro bono and community service work is commendable but does not qualify for

full mitigation credit.  His testimony lacked specificity, including dates and length of service, and

it was uncorroborated.  Potere did not provide clear and convincing evidence that would show the

extent of his dedication and zeal brought to his pro bono and community service activities.  (See

*Rose v. State Bar* (1989) 49 Cal.3d 646, 667 [mitigation for legal abilities, dedication, and zeal in

pro bono work].)  Therefore, we assign limited weight in mitigation to this circumstance.  (See *In

the Matter of Shalant* (Review Dept. 2005) 4 Cal. State Bar Ct. Rptr. 829, 840 [limited weight

given for community service where evidence based solely on attorney's testimony making extent

of service unclear].)

### VI.  DISBARMENT IS THE NECESSARY DISCIPLINE

Our role is not to punish Potere for his crimes—the federal court has done so by sentencing

him in the criminal proceeding.  Instead, our purpose is to recommend appropriate professional

discipline, considering the goals of the discipline system.  (Std. 1.1; *In re Brown*, *supra*, 12 Cal.4th

at p. 217 ["the aim of attorney discipline is not punishment or retribution; rather, attorney

discipline is imposed to protect the public, to promote confidence in the legal system, and to

maintain high professional standards"].)  Our disciplinary analysis begins with the standards,

which are entitled to great weight.  (*In re Silverton* (2005) 36 Cal.4th 81, 92.)  We also look to

comparable case law for guidance.  (See *Snyder v. State Bar* (1990) 49 Cal.3d 1302, 1310–1311.)

Ultimately, we balance all relevant factors, including mitigating and aggravating circumstances,

on a case-by-case basis to ensure the discipline imposed is consistent with its purpose.  (*In re*

*Young* (1989) 49 Cal.3d 257, 266.)  The hearing judge recommended disbarment, which OCTC

supports.  In his appeal, Potere argues actual suspension is appropriate.

Standard 2.15(b) is applicable and provides for disbarment or actual suspension for a

misdemeanor conviction involving moral turpitude.  The hearing judge properly relied on this

standard because she found that the facts and circumstances surrounding Potere's conviction

evidenced moral turpitude.  The judge noted that acts of dishonesty such as his often warrant

disbarment.  (*In re Bogart* (1973) 9 Cal.3d 743, 748 [disbarments are rule rather than exception in

cases of serious crimes involving moral turpitude].)

We agree with the hearing judge's finding that Potere's misconduct "involved a carefully

considered, illicit plan to extort money from his employer, demonstrating [his] dishonesty."  He

demonstrated disloyalty to Dentons when he improperly accessed confidential firm documents,

then threatened lawsuits and the public release of the documents unless he was paid over $200,000

plus other items.  He also lied about his use of an email program that would automatically release

the documents to escalate the threat.  After negotiating payment from Dentons, he certified that he

had returned all of the documents when he still maintained access to them.  His dishonesty and

violation of fiduciary duties goes directly to his fitness to practice.  Honesty is absolutely

fundamental in the practice of law.  Without it, "the profession is worse than valueless in the place

it holds in the administration of justice."  (*Tatlow v. State Bar* (1936) 5 Cal.2d 520, 524; see *Kim*

*v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 292 ["It is critical to both the bench and

the bar that we be able to rely on the honesty of counsel"]; *In the Matter of Ike* (Review Dept.

1996) 3 Cal. State Bar Ct. Rptr. 483, 489 [observance of fiduciary responsibilities central to

practice of law].)  Further, his lack of insight into the wrongfulness of his misconduct confirms

that his proven dishonesty presents a real and ongoing danger to the public.  We have held "in a

conviction referral matter, the discipline must be imposed commensurate with the gravity of the

crime and the circumstances surrounding the crime."  (*In the Matter of Kreitenberg* (Review Dept.

2002) 4 Cal. State Bar Ct. Rptr. 469, 478 [disbarment for criminal acts involving moral turpitude

including tax fraud and deceitful acts for personal gain where mitigation not sufficiently

compelling].)  Potere's manifest dishonesty justifies the judge's disbarment recommendation.

Potere argues that disbarment is not warranted based on Supreme Court precedent

involving extortion.  He cites three pre-standards cases where extortive conduct resulted in actual

suspension, not disbarment.[15]  The magnitude of Potere's misconduct far exceeds the misconduct

in those three cases.  Potere's plan to demand money from Dentons involved repeated deceptions

and egregious threats that stood to cause Dentons considerable harm.  Potere's misconduct stands

on a level of its own and no past case law directly compares to Potere's case.

Potere also argues his case is distinguishable from *Barton v. State Bar* (1935) 2 Cal.2d

294, a case the hearing judge used as guidance.  Barton had accused an oil company of putting its

gas into another company's tanks, known as "dumping."  He contacted the oil company and

demanded money in return for not filing a suit or going public.  He falsely stated he had proof of

---

[15] In *Bluestein v. State Bar* (1974) 13 Cal.3d 162, an attorney agreed to "drop" criminal assault and battery charges against his client's husband if the husband would pay the client's $1,000 attorney fee in a divorce action.  The court held that Bluestein's actions constituted an oppressive method of attempting to collect a fee and involved moral turpitude.  (*Id.* at p. 170.) The court affirmed the State Bar Disciplinary Board's recommendation of a six-month suspension.  In *Librarian v. State Bar* (1952) 38 Cal.2d 328, an attorney threatened to file a criminal complaint for perjury against a witness in a wage lawsuit if he did not receive $41.50 from him.  The court determined the attorney's threats amounted to extortion, which involved moral turpitude.  (*Id.* at p. 330.)  The court ordered Librarian suspended for six months.  In *Lindenbaum v. State Bar* (1945) 26 Cal.2d 565, in an attempt to recover a fee that a client sought to discharge in bankruptcy, an attorney threatened to, and did, report his client's wife to immigration officials.  He was suspended for six months due to his attempted extortion.

the dumping and affidavits attesting to the practice. The court found Barton's actions amounted to attempted extortion. (*Id.* at p. 297.) The court ordered Barton's disbarment, noting he had been disciplined twice before. The hearing judge determined Potere's extortion plot was similar to Barton's. Potere argues *Barton* is distinguishable because (1) he does not have a prior record of discipline and (2) his misconduct was not directly related to his practice as an attorney. Though true that Potere does not have a prior record of discipline, he has serious aggravation clearly outweighing the mitigation in this matter, demonstrating that a "greater sanction is needed to fulfill the primary purposes of discipline." (Std. 1.7(b).) Further, both Barton and Potere committed similar and significant misconduct involving moral turpitude.

In additional support for his argument that disbarment is not warranted, Potere cites *Segretti v. State Bar* (1976) 15 Cal.3d 878, contending his misconduct is not worse than Segretti's, who received a two-year actual suspension. Segretti pleaded guilty to two federal offenses related to his work on former President Richard Nixon's reelection campaign. The court found Segretti's actions involved moral turpitude as he "repeatedly committed acts of deceit designed to subvert the free electoral process." (*Id.* at p. 887.) While both cases involve dishonesty, Segretti, unlike Potere, received mitigation for recognizing the wrongfulness of his misconduct, a key distinction. Further, *Segretti* was decided pre-standards and lacks the serious aggravation present here.

In considering all of Potere's arguments on review, we find no basis to recommend a more lenient sanction than disbarment given Potere's multiple acts of moral turpitude and dishonesty, the significant harm caused, and his indifference. His lack of insight is particularly troubling as there are no assurances his misconduct will not recur. (Std. 1.7(b) [greater sanction appropriate if serious harm present along with unwillingness to conform to ethical responsibilities].) Further, Potere's mitigation for cooperation, good character, and pro bono and community service activities is not compelling when compared to his aggravation. In light of his serious misconduct,

a discipline at the high end of the spectrum provided under standard 2.15(b) is justified.  Based on the entire record, we conclude that anything short of disbarment would fail to protect the public and would cast serious doubt on the public's confidence in the legal profession.  Following disbarment, Potere will be required to demonstrate in a reinstatement proceeding that he is rehabilitated before he is entitled to resume practicing law.

## VII.  RECOMMENDATION

For the foregoing reasons, we recommend Michael Bernard Potere be disbarred from the practice of law and his name be stricken from the roll of attorneys admitted to practice law in California.

We further recommend he comply with rule 9.20 of the California Rules of Court and perform the acts specified in subdivisions (a) and (c) of that rule, within 30 and 40 days, respectively, after the effective date of the Supreme Court order in this matter.

We further recommend costs be awarded to the State Bar in accordance with section 6086.10, such costs being enforceable as provided in section 6140.7 and as a money judgment.  Unless the time for payment of discipline costs is extended pursuant to subdivision (c) of section 6086.10, costs assessed against a member who is actually suspended or disbarred must be paid as a condition of reinstatement or return to active status.

## VIII.  MONETARY SANCTIONS

The court does not recommend the imposition of monetary sanctions as all the misconduct in this matter occurred prior to April 1, 2020, the effective date of rule 5.137, which implements Business and Professions Code section 6086.13.  (See *In the Matter of Wu* (Review Dept. 2001) 4 Cal. State Bar Ct. Rptr. 263, 267 [rules of statutory construction apply when interpreting Rules Proc. of State Bar]; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208–1209 [absent express retroactivity provision in statute or clear extrinsic sources of intended

retroactive application, statute should not be retroactively applied]; *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841 [where retroactive application of statute is ambiguous, statute should be construed to apply prospectively]; *Fox v. Alexis* (1985) 38 Cal.3d 621, 630–631 [date of offense controls issue of retroactivity].)

## IX.  ORDER

The order that Michael Bernard Potere be involuntarily enrolled as an inactive attorney of the State Bar pursuant to section 6007, subdivision (c)(4), effective October 31, 2019, will remain in effect pending consideration and decision of the Supreme Court on this recommendation.

McGILL, J.

WE CONCUR:

PURCELL, P. J.

HONN, J.

-24-

## CERTIFICATE OF ELECTRONIC SERVICE

[Gen. Order 20-04; Code Civ. Proc., § 1013b, subds. (a)-(b)]

I, the undersigned, certify that I am a Court Specialist of the State Bar Court of California. I am over the age of eighteen and not a party to the within proceeding. Pursuant to standard court practice, on October 16, 2020, I electronically served a true copy of the following document(s):

OPINION AND ORDER FILED OCTOBER 16, 2020

by electronic transmission on that date to the following:

MICHAEL BERNARD POTERE
mpotere@gmail.com

ALEX J. HACKERT
Alex.Hackert@calbar.ca.gov

I hereby certify that the foregoing is true and correct.

Date: October 16, 2020

*Julieta E. Gonzales*

Julieta E. Gonzales
Court Specialist
State Bar Court of California
Julie.Gonzales@calbar.ca.gov

# EXHIBIT 8

SUPREME COURT NO. S266618

## IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In the Matter of:

    MICHAEL BERNARD POTERE,

        No. 302569

An Involuntary Inactive Member of the State Bar.

State Bar Case No. 17-C-3795

## PETITION FOR REVIEW AFTER THE UNPUBLISHED DECISION OF THE REVIEW DEPARTMENT OF THE CALIFORNIA STATE BAR COURT, AFFIRMING THE RECOMMENDATION OF DISBARMENT

APPELLANT'S PETITION FOR REVIEW

**Michael Bernard Potere**
**18 Inis Circle**
**West Newton, MA 02465**

**Appellant**
**Self-Represented**

## Table of Contents

Table of Contents ................................................................................. 2

Table of Authorities ............................................................................ 3

I.   Issues Presented ........................................................................... 5

II.   Why Review Should Be Granted .................................................. 6

III.   Statement of Facts ....................................................................... 13

IV.   Argument ..................................................................................... 15

  A.   Mr. Potere should have received notice of his right to a Rule 5.30 ENEC. ............................................................................................. 15

  B.   Standard 1.6(d)'s expert witness requirement is constitutionally defective. ......................................................................................... 18

    1.   Is an expert witness required to prove disability in mitigation under Standard 1.6(d) and, if so, is the respondent required to provide their own witness? ................................................................................... 20

    2.   Standard 1.6(d)'s application violated Mr. Potere's constitutional right to equal protection. ............................................................................ 21

    3.   Standard 1.6(d)'s application violated Mr. Potere's constitutional right to due process. ............................................................................... 24

    4.   The constitutional issues plaguing his matter substantially prejudiced Mr. Potere. .......................................................................... 28

    5.   The Review Department improperly relied on the ARDC Report to defeat Mr. Potere's constitutional claims. .................................... 33

  C.   What must a disabled respondent prove to satisfy Standard 1.6(d)'s "no longer pose a risk" language, and when should that evidence be considered? ....................................................................................... 35

V.   Conclusion ................................................................................... 37

Certificate of Compliance .................................................................. 39

APPENDIX A ..................................................................................... 40

AFFIDAVIT OF SERVICE .............................................................. 41

## <u>Table of Authorities</u>

**CASES**

*Bercovich v. State Bar*, 50 Cal.3d 116, 128 (1990) ............................................. 19

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 447, 450 (1985) ...................................................................................................................... 20

*Craig v. Boren*, 429 U.S. 190, 197 (1976) .......................................................... 21

*D'amico v. Board of Medical Examiners*, 11 Cal.3d 1, 16–17 (1974) ................ 16

*Emslie v. State Bar*, 11 Cal.3d 210, 226, 228 (1974) .......................................... 23

*Hyland v. State Bar*, 59 Cal. 2d 765, 774 (1963) ................................................ 23

*In re Brown*, 12 Cal.4th 205, 222 (1995) ............................................................ 19

*In re Naney*, 51 Cal.3d 186, 197 (1990) ......................................................... 5, 33

*In the Matter of Braun*, 18-N-16608; 18-O-17277, *10-12 (Pub. Slip. Op., Sept. 18, 2020) ................................................................................................... 5, 19, 33

*In the Matter of Respondent AA*, 2004 Calif. Op. LEXIS 7, *15 (2004) ............. 16

*In the Matter of Song*, 5 Cal. State Bar Ct. Rptr. 273, 281 (2013) ...................... 33

*In the Matter of Ward*, 2 Cal. State Bar Ct. Rptr. 47, 60 (Review Dept. 1992) 5, 19

*In the Matter of Weyhrich*, 339 N.W.2d 274, 278–79 (1983) .............................. 34

*People v. Hesslink*, 167 Cal. App. 3d 781, 789 (1985) ....................................... 27

*People v. McKee*, 47 Cal.4th 1172, 1207 (2010) ................................................ 16

*Rosenthal v. State Bar*, 43 Cal.3d 612, 634 (1987) ............................................ 23

*Silva-Vidor v. State Bar*, 49 Cal.3d 1071, 1079 (1989) ..................................... 26

*U.S. v. Aguon*, 851 F. 2d 1158, 1168 (9th Cir. 1988) ........................................ 27

*Van Sloten v. State Bar*, 48 Cal.3d 921, 92 (1989) ....................................... 23, 30

*Warden v. State Bar*, 21 Cal.4th 628 (1988) ...................................................... 20

*Woodard v. State Bar*, 16 Cal.2d 755, 757 (1940) ............................................. 23

**STATUTES**

18 U.S.C. § 1030(a)(2)(C)/(c)(2)(A) .................................................................... 13

18 U.S.C. § 1951(a) ....................................................................................... 13, 27

18 U.S.C. § 875(d) ............................................................................................... 13

42 U.S.C. § 12102(2) ........................................................................................... 20

42 U.S.C. §§ 12101-12213 (2000) ....................................................................... 20

BPC § 6007(b)(3) .................................................................................................. 24

BPC § 6053 ........................................................................................... 18, 22, 24, 25

BPC § 6086.10 ...................................................................................................... 18

Cal. Code of Evidence § 1341 ................................................................................ 8

Cal. Evidence Code § 722(b) .................................................................................. 8

California Penal Code § 518 ................................................................................. 27

CCP §§ 2034.410–2034.470 .................................................................................. 9

**OTHER AUTHORITIES**

ABA Standard 9.32(i) ........................................................................................... 21

**RULES**

CRC Rule 9.16(1), (3)-(5)........................................................................ 6
Rule 5.155(A) ......................................................................................... 10
Rule 5.30 ........................................................................................ 5, 6, 15
Rule 5.30(A) ........................................................................................... 15
Rule 5.341 ............................................................................................... 15
Rule 5.345(A) ......................................................................................... 14
Rule 5.346(B) ......................................................................................... 16
Rule 5.347(A) ......................................................................................... 15
Rule 5.41 ................................................................................................. 15
Rule 5.65.1 ............................................................................................... 9
Rule 5.65.1(C) .......................................................................................... 9
Rule 5.68 ........................................................................................ passim
Rule 5.68(A) ........................................................................................... 24
Rule 5.68(B) ........................................................................................... 24
Rule 5.68(D) ........................................................................................... 25
Standard 1.5(k)....................................................................................... 25

**REGULATIONS**

29 C.F.R. § 1630.2(h)(2)....................................................................... 20

I.      **Issues Presented**

1.      Are respondents in conviction referral proceedings entitled to an Early Neutral Evaluation Conference pursuant to Rule 5.30?

2.      Is a disabled respondent required to prove their disability with an expert witness to receive mitigation based on their disability under Standard 1.6(d)?  There is currently a Review Department split: some cases require an expert witness, *e.g.*, *In the Matter of Braun*, 18-N-16608; 18-O-17277, *10-12 (Pub. Slip. Op., Sept. 18, 2020); others do not, *e.g.*, *In the Matter of Ward*, 2 Cal. State Bar Ct. Rptr. 47, 60 (Review Dept. 1992).

3.      Is a disabled respondent required to provide their own expert witness, at their own upfront expense, to receive mitigation based on their disability under Standard 1.6(d)?

4.      Is it an abuse of discretion for the State Bar and Hearing Department to fail to conduct a Rule 5.68 mental evaluation when a respondent asserts that their mental disability is a significant mitigating factor and therefore "at issue" in their case?

5.      Does requiring a disabled respondent to prove their disability with an expert witness and provide that witness at their own upfront expense violate their constitutional rights to equal protection and due process?

6.      Is adherence to Cal. Evidence Code § 721 and Rule 5.65.1 required for the Review Department to rely on evidence as "expert testimony"?

7.      Is the law enforcement charging and sentencing decision "irrelevant" in analyzing the facts and circumstances surrounding the respondent's conduct in a conviction referral?

8.      What does "no longer pose a risk" require a disabled respondent to prove to receive mitigation under Standard 1.6(d)?  There is currently a Review Department split: some cases require a respondent to prove "recovery," *e.g.*, *In the Matter of Braun*, 18-N-16608; 18-O-17277, *13 (Pub. Slip. Op., Sept. 18, 2020); whereas the Review Department cites *In re Naney*, 51 Cal.3d 186, 197 (1990) to state instead that "the attorney must show the disorder is unlikely to cause further misconduct."  (RD 16–17.)

II.     **Why Review Should Be Granted**

        Mr. Potere is asking the Court to review three overarching questions of

law: (1) whether conviction referral respondents are entitled to a Rule 5.30 Early

Neutral Evaluation Conference ("ENEC"); (2) whether an expert witness is required to prove a disability in mitigation under Standard 1.6(d) and, if so, whether the respondent must provide that witness at their own upfront expense; and (3) what a disabled respondent must show to satisfy Standard 1.6(d)'s "no longer pose a risk" requirement.  Resolving the first question appears to be a matter of first impression; the second and third would resolve splits of law in published Review Department ("RD") decisions.  The other questions of law presented above, numbered 4 through 7, are directly related to those issues, bear on their future application and analysis, and should also be reviewed and resolved. Review here is "[n]ecessary to settle important questions of law" and should be granted because Mr. Potere "did not receive a fair hearing;" the State Bar Court ("SBC") decision is, therefore, "not supported by the weight of the evidence;" and the recommended SBC discipline is, furthermore, "not appropriate in light of the record as a whole."  CRC Rule 9.16(1), (3)-(5).

The way the State Bar ("SB" or "OCTC") handled Mr. Potere's matter is illustrative of the reasons the Court should grant review, and applies to—and will apply to—thousands of respondents who are or will be before the SBC for conviction referrals, those who seek to prove a disability in mitigation, or both. Mr. Potere first raised the issue of his mental illness in his answer to the State Bar's Notice of Hearing ("NOH").  Thereafter, however, the SB failed to provide Mr. Potere with proper notice of his right to request an ENEC pursuant to Rule 5.30, which deprived him of an opportunity to consult with representatives from OCTC and a neutral SBC hearing judge regarding his conviction referral and

mental health issues.  Nor did OCTC or the Hearing Department ("HD") request a mental examination of Mr. Potere pursuant to Rule 5.68 after he repeatedly raised the issue of his mental condition, an issue that could have been identified and resolved by an SBC hearing judge during an ENEC.  Mr. Potere would have willingly taken part in such an evaluation, just as he did with the Illinois Attorney Registration and Disciplinary Commission ("ARDC" or, in reference to Ex. 1051, the "ARDC Report").

At his hearing, Mr. Potere attempted to argue for mitigation based on his mental disability pursuant to Standard 1.6(d), which provides that, "Mitigating circumstances may include: . . . (d) extreme emotional difficulties or physical or mental disabilities suffered by the lawyer at the time of the misconduct and *established by expert testimony* as directly responsible for the misconduct, . . . and the lawyer established by clear and convincing evidence that the difficulties or disabilities *no longer pose a risk* that the lawyer will commit misconduct" (emphasis added).  Mr. Potere raised his Standard 1.6(d) defense, his concerns regarding his inability to pay for an expert, and that he would be unable to prove mental disability as a mitigating factor *ad nauseam* during his hearing.  (*E.g.*, TR1 169:5-6, 171:21-25, 173:1-20, 175:7-15.)[1]  OCTC responded in substance to Mr. Potere's objections by stating that he should have "saved up" to hire an expert during "his incarceration" because "this [was] a train he's seen a-coming for quite some time."  (TR1 174:18-25.)  While incarcerated, Mr. Potere earned 12 cents an hour cleaning the kitchen in the mornings; to hire the ARDC Report's author, for

---

[1] All references to the trial transcript or "TR" are to the Reporter's Transcript and "page:line(s)" where: "TR1" refers to the hearing on July 18, 2019; "TR2" refers to July 19, 2019; and "TR3" refers to July 30, 2019.

example, who billed the ARDC $9,700 for his time (Ex. 1053; Cal. Evidence Code § 722(b)), Mr. Potere would have needed to work for 80,833 hours, or 24 hours per day for about 9 years and 3 months.

Because he could not afford to hire an expert witness, Mr. Potere sought to satisfy Standard 1.6(d) by offering his mental health medical records into evidence, (TR1 167:5-10, 172:22-25, 173:1-20), which included letters and medical records from six of his most recent therapists and psychiatrists. (Northwestern CAPS, 2012 (Ex. 1003); Dr. Nishi Bhopal, 2014 (Ex. 1004); Amber Glavor, LMFT, 2016 (Exs. 1005; 1050); Dr. Holly Schwartz, 2016-2017 (Exs. 1006; 1066); Dr. John Cusack, 2017-present (Exs. 1047; 1048), and Dr. Laura Warren, 2017-2018 (Ex. 1049).)  Dr. Schwartz, Dr. Warren, and Dr. Cusack have all independently diagnosed Mr. Potere with depression; both Dr. Schwartz and Dr. Warren prescribed Mr. Potere with antidepressant medications. (Exs. 1049; 1066.)

In conjunction, Mr. Potere sought to admit scholarly articles that would have allowed the HD to analyze that evidence and connect his symptoms to his conduct.  (TR1 187:8-15)  The force of the State Bar's objection to all of this was that Mr. Potere was "attempting to essentially back-door an expert opinion into this case" because "he has not called any experts to testify" and has not himself gone to "medical school."  (TR1 171:8-12, 18-19.)  The Hearing Department denied the admission of the scholarly articles, (TR1 188:15-16),[2] and although it admitted Mr. Potere's medical records over objection, (*e.g.*, TR1 179:8-9), it

---

[2] In either event, this was in error.  These exhibits (1024-1034, 1036-1040) should have been admitted as relevant under Rule 5.104(C) and Standard 1.6(d), and as permissible hearsay under Rule 5.104(D) and Cal. Evidence § 1341.

assigned them no weight.  (HD 24.)  Therefore, because Mr. Potere "failed to provide any evidence from an expert," the HD rejected Mr. Potere's entire mental disability defense, (*id.* 25), which the RD affirmed.  (RD 14–17.)  Notably, as discussed below, this could not have happened anywhere else: California is the *only* state that requires expert witness testimony to prove a respondent's mental disability.[3]

But even if the SBC favorably considered Mr. Potere's medical records, recently enacted Rule 5.65.1(C) would have served to reinforce the impossibility of Mr. Potere proving his mental disability under Standard 1.6(d).  Rule 5.65.1(C) provides that, "All parties are authorized to take the deposition of any disclosed expert witness pursuant to the provisions of CCP §§ 2034.410–2034.470."  Standard 1.6(d) requires expert testimony to prove mental disability, Mr. Potere could not afford to compensate an expert witness to testify at his hearing, therefore Mr. Potere failed to prove his mental disability; Mr. Potere attempted to prove his mental disability using medical records from his mental health providers, presumably such providers must be labeled "experts" to satisfy Standard 1.6(d), Rule 5.65.1 requires that experts be available for depositions, Mr. Potere could not afford to compensate his mental health providers (of which there were six) to appear for depositions, therefore Mr. Potere failed to prove mental disability.  It is therefore legally impossible for *any* respondent who cannot afford to compensate an expert witness to argue their disability in mitigation.

---

[3] *See* Leslie C. Levin, *The Emperor's Clothes and Other Tales About the Standards for Imposing Lawyer Discipline Sanctions*, 48 AM. U. L. REV. 1, 33–38 and nn.153–174 (1998) (conducting a comprehensive analysis of disciplinary standards throughout the United States and specifically noting on p. 35 n.160 that, "[o]nly California has adopted detailed guidelines for imposing sanctions on lawyers that differ from the ABA Standards").

And so it was for Mr. Potere, who spent more than a day testifying to his personal history, his journey to become an attorney, his history with depression, and the reasons for his conduct. But, without the expert witness required by Standard 1.6(d), all that evidence was disregarded. Indeed, the full extent of the HD's analysis, which is "entitled to great weight," Rule 5.155(A), was to say that Mr. Potere "previously sought treatment for depression" and, with no further discussion, to simply list the number of treatment "sessions" he had between 2012 and 2017. (HD 24; RD 14 (affirming).)

Finally, even if Mr. Potere were able to overcome Standard 1.6(d)'s obstacles and prove that his mental disability caused his misconduct or undermined a finding of specific intent, the SBC could have nevertheless afforded him no mitigating credit whatsoever. This is because Standard 1.6(d) also requires that, to receive *any* mitigation, "the lawyer establish[] by clear and convincing evidence that the difficulties or disabilities no longer pose a risk that the lawyer will commit misconduct." Under Standard 1.6(d) as written and applied, if a respondent can prove that their misconduct was caused by their mental disability, or that it undermines a finding of specific intent, but cannot also show that they have effectively "recovered" during the arbitrary amount of time between when the misconduct occurred and when the judge makes a ruling, then that attorney is afforded *no mitigating credit* for their disability. This means that the respondent, who has already proven that they have a mental disability and that it caused their misconduct, is nevertheless being disciplined as if they had no disability at all.

At this point, because they have already established that their misconduct would not have taken place (or taken place to a less culpable degree) *but for* their disability, the respondent's disability *itself* becomes the basis for the disciplinary action, and the respondent is therefore being punished for having a disability.  The Court should grant review to resolve a split among published Review Department decisions regarding what, precisely, a disabled respondent is required to prove to satisfy the "no longer pose a risk" language.  It should further grant review and remove this inquiry from the Standard 1.6(d) mitigation analysis and instead place it in the disciplinary recommendation analysis.

Public policy also strongly favors granting review in this matter.  In 2017, the American Bar Association's National Task Force on Lawyer Well-Being issued a widely cited report entitled, "The Path to Lawyer Well-Being: Practical Recommendations for Positive Change" (hereinafter, the "ABA").  (Ex. 1035.)  The ABA emphasized that mental illness is a genuine issue among lawyers, criticizing the stigma that "[m]any [stakeholders] also appear to believe that lawyers' health problems are solely attributable to their own personal failings for which they are solely responsible."  (Ex. 1035-12.)  The ABA specifically addressed attorney misconduct stemming from mental illness, reporting that, "*40 to 70 percent of disciplinary proceedings . . . involve substance use or depression, and often both.*"  (Ex. 1035-8 (emphasis added).)

The ABA further explained that such an increased risk of exposure to attorney discipline for those suffering from depression is because "major depression is associated with impaired executive functioning, including

diminished memory, attention, and problem-solving[, and] [w]ell-functioning executive capacities[, which] are needed to make good decisions and evaluate risks . . . and cope with new situations." (Ex. 1035-8.) As such, the ABA recommends that regulators, including bar disciplinary commissions, become more mindful of the mental health issues attorneys face and "transform the profession's perception of regulators from police to partner." (Ex. 1035-25.) For example, regulators should "adopt [disciplinary alternatives] . . . that rehabilitate lawyers with impairments" because "[d]iscipline does not make an ill lawyer well." (Ex. 1035-29.) Such a rehabilitative disciplinary sanction could allow the attorney to return (or continue) to practice based on "specified conditions that include training, testing, monitoring, and treatment," which would "place[] a lawyer facing a mental health . . . crisis on the path to better client service and a lifetime of greater well-being" and "can change [that] lawyer's life." (Ex. 1035-30.) Taking action to improve attorney well-being by and through its disciplinary mechanisms "will send a clear message that [California] prioritizes lawyer well-being, which *influences competent legal services*" and can, in turn, "*boost public confidence in the administration of justice*." (Ex. 1035-26 (emphasis added).)

        At the end of the day, it simply should not be so difficult for an attorney to prove that their misconduct was the result of a mental disability and to obtain a rehabilitative disciplinary recommendation, particularly for their first disciplinary offense. Such hurdles perpetuate the negative stigma around mental illness (i.e., "deal with it"), or worse, imply that an attorney might be "faking it" (invalidating the illness), which will continue to discourage attorneys from seeking the help

12

they need.  In fact, none of the benefits outlined by the ABA can come to fruition if an attorney is prevented from putting forth the evidence required to prove their mental disability in the first place.  As such, and due to serious constitutional deficiencies discussed below, there is simply no downside to granting review and affording *every* current and future disabled respondent an opportunity to have their disability fully and fairly considered in their disciplinary proceedings.

### III.   <u>Statement of Facts</u>

On June 20, 2017, the United States Attorney's Office (USAO) filed a complaint against Mr. Potere in the United States District Court for the Central District of California (Case no. 1:17-cr-00446-JFW-1) alleging a violation of 18 U.S.C. § 1951(a) (Extortion and Attempted Extortion Affecting Interstate Commerce).  (Ex. 006.)  On July 18, 2017, the USAO filed an indictment alleging two violations of federal law, 18 U.S.C. § 1951(a) (Extortion and Attempted Extortion Affecting Interstate Commerce) and 18 U.S.C. § 875(d) (Transmitting Threatening Communications with Intent to Extort).  (Ex. 008.)

On October 18, 2017, the U.S. Attorney's office filed a First Superseding Information alleging a misdemeanor violation of 18 U.S.C. § 1030(a)(2)(C)/(c)(2)(A) (Unauthorized Access to a Computer to Obtain Information), and a corresponding plea agreement in which Mr. Potere pleaded guilty to that Class A misdemeanor, which the District Court entered on that day. (Exs. 005, 013, 014.)

Mr. Potere was sentenced on January 22, 2018, at which time the United States Attorney moved to dismiss the underlying indictment alleging two counts of extortion; the District Court then granted the motion, dismissed all charges

sounding in extortion, and sentenced Mr. Potere to five months imprisonment, followed by one year of supervised release.  (Exs. 005, 018, 019.)  Mr. Potere completed his custodial sentence on July 25, 2018 and his supervised release on July 25, 2019 without incident.  (Stip. I.)

On April 19, 2018, the Review Department filed an order referring this matter to the Hearing Department for a hearing and decision recommending the discipline to be imposed. On April 23, 2018, the Hearing Department filed and served on Mr. Potere a Rule 5.345(A) Notice of Hearing on Conviction ("NOH"); Mr. Potere filed his response, in which he asserted his mental disability defense, on November 2, 2018.

On April 30, 2019, the parties filed a stipulation of facts, admission of exhibits, and the conclusion of law that the misdemeanor to which Mr. Potere pleaded guilty constitutes moral turpitude.  (Stip I.)  On July 16, 2019, the parties filed a supplemental stipulation of facts and admission of documents.  (Stip. II.)

Because Mr. Potere stipulated to moral turpitude, a hearing was held on July 18, 19, and 30, 2019 to determine his level of discipline.  On October 28, 2019, the Hearing Department ("HD") issued its Decision recommending Mr. Potere's disbarment and ordering his inactive enrollment.

On December 2, 2019, Mr. Potere filed a request for review to the Review Department ("RD"), and post-briefing oral arguments took place on August 19, 2020.  The RD issued its decision, affirming the HD's disbarment recommendation, on October 16, 2020.  Mr. Potere filed a motion for

reconsideration on November 2, 2020, which was denied on November 13, 2020.

On November 25, 2020, Mr. Potere's matter was transmitted to this Court.

### IV.    <u>Argument</u>

#### A.    **Mr. Potere should have received notice of his right to a Rule 5.30 ENEC.**

Mr. Potere was never notified of his right to an ENEC.  Rule 5.30(A)

provides that, "Prior to the filing of disciplinary charges, the Office of Chief Trial

Counsel *will notify the attorney in writing* of the right to request an Early Neutral

Evaluation Conference" (emphasis added).  In a conviction referral, Rule

5.347(A) provides that, "*All* rules of procedure apply" to conviction proceedings

"except" for "[r]ules that *by their terms* apply *only* to other *specific* proceedings"

(emphasis added).  The plain language of Rule 5.30 does not specifically *limit* its

application to a Notice of Disciplinary Charges ("NDC") under Rule 5.41.

In a conviction referral, certain crimes by their very nature involve moral

turpitude and are therefore not entitled to further proceedings because summary

disbarment is mandatory.  Rules 5.343, 5.344(A).  As such, an ENEC becomes

relevant in a conviction referral not when it is *initiated* under Rule 5.341, as

insisted by the RD (10-11), but rather when it is *referred* to the Hearing

Department for further proceedings under on a Notice of Hearing on Conviction

("NOH") pursuant to Rules 5.344(A) and 5.345.  At this point, because the

respondent's level of discipline is not mandatory and a factual inquiry will take

place, an ENEC notice should be issued pursuant to Rule 5.30 to afford them a

chance to "avoid the extra work and expense of drafting and defending,

respectively, the [NOH]; and . . . save the State Bar Court time otherwise needed

to conduct a series of status and pretrial conferences and oversee discovery and related matters." *In the Matter of Respondent AA*, 2004 Calif. Op. LEXIS 7, *15 (2004).

The intended functional equivalence of an NDC and an NOH is reflected in Rule 5.346(B) (discussing default), which directs them to be treated interchangeably. Moreover, Rule of Practice 1206, as adopted on November 1, 2020, provides that, "Pursuant to rule 5.30 of the Rules of Procedure, the Office of Chief Trial Counsel must submit a copy of the draft notice of disciplinary charges, *or other written summary* to the judge at least three court days prior to the Early Neutral Evaluation Conference" (emphasis added). If an ENEC is only intended for NDC respondents, no catchall for other procedures would have been required.

Depriving conviction referral respondents of an ENEC is a constitutional equal protection violation. Equal protection "safeguards against the arbitrary denial of benefits to a certain defined class of individuals," *People v. McKee*, 47 Cal.4th 1172, 1207 (2010), and its fundamental principle is that, "persons *similarly situated* with respect to the legitimate purpose of the law receive like treatment." *Brown v. Merlo*, 8 Cal.3d 855, 861 (1973) (emphasis added). When a law creates a distinction among groups of similarly situated persons in the professional licensing setting, there must be a showing of a rational relationship between that distinction and a legitimate state interest. *D'amico v. Board of Medical Examiners*, 11 Cal.3d 1, 16–17 (1974).

Mr. Potere's lack of an ENEC was a constitutional violation because NDC respondents have *two* opportunities for pre-hearing negotiations with the State Bar, whereas the OCTC/SBC urges that NOH convictional referrals should only have one, a distinction for which no rational basis exists. As discussed above, conviction referral respondents who receive an NOH and are entitled to a hearing and are therefore *similarly situated* to NDC respondents, who are also entitled to a hearing. *See Brown*, 8 Cal.3d at 861. In 2019, there were 513 matters filed in the SBC, 159 of which—comprising 31% of the total cases—were conviction referrals.[4] As such, the OCTC and the SBC would like to arbitrarily deprive roughly a third of all respondents of the chance to have their matter discussed in a neutral manner in the early stages of their proceeding. Review should be granted to correct this inequity.

### B.  Standard 1.6(d)'s expert witness requirement is constitutionally defective.

The expert witness prong of Standard 1.6(d) violates a disabled respondent's constitutional rights to equal protection and due process. It is an equal protection violation because disabled respondents are burdened with two additional evidentiary hurdles—(1) expert testimony to prove their disability and then (2) to provide that expert themselves—to satisfy an element of mitigation, whereas all other respondents are not. It is a due process violation because a disabled respondent's hearing cannot be "fair" if they are required to prove their disability with expert witness testimony but are unable to do so for the irrelevant

---

[4] Donna S. Hershkowitz, *2019 Annual Discipline Report*, THE STATE BAR OF CALIFORNIA, *SR-21 (April 30, 2020), *available at* http://www.calbar.ca.gov/Portals/0/documents/reports/2020/2019-Annual-Discipline-Report.pdf.

factor of financial status.  In both cases, Standard 1.6(d) will be (and historically has been) invoked to defeat their entire mental disability defense, and allow the SBC to proceed in disciplining that respondent without fair consideration of their disability, and as if they had none at all.

The Court should grant review and could address these issues of constitutionality in two ways.  First, it could find that no expert is required for a disabled respondent to prove their disability in mitigation, which would allow a respondent to introduce a wider range of evidence to prove their disability, and could include, for example, their medical records and pertinent scholarly research. This would resolve the equal protection issue because one class of respondents (with disabilities) would no longer have a higher evidentiary burden to prove an element of mitigation than another class of respondents (without disabilities).

Or, if it holds that an expert witness is required, then a mental health evaluation should be provided to every respondent who puts their disability at issue at the outset of the proceedings, and at no up-front cost.  Then, and this bears emphasis, the cost of that evaluation *could be assigned to the appropriate party based on the disciplinary outcome*, which is already done for other costs in every other case.  BPC § 6086.10; Rules 5.129, 5.130.  Then, if the OCTC and/or the HD fail to conduct such an evaluation, they will be held to have abused their discretion under BPC § 6053 and Rule 5.68.  This solves the due process violations because respondents with disabilities will not be deprived of an opportunity to put forth what is likely to be their strongest defense under Standard 1.6(d), and their hearing would not be considered unfair.

> **1.      Is an expert witness required to prove disability in mitigation under Standard 1.6(d) and, if so, is the respondent required to provide their own witness?**

Although the plain language seems to make clear that expert witness testimony is, in fact, required to prove disability in mitigation under Standard 1.6(d), the RD also states that, "some mitigation" could be established with lay testimony.  (RD 16 (citing *In re Brown*, 12 Cal.4th 205, 222 (1995); *In the Matter of Ward*, 2 Cal. State Bar Ct. Rptr. 47, 60 (Review Dept. 1992).)  Recently, however, the RD decided *In the Matter of Braun*, 18-N-16608; 18-O-17277, *10-12 (Pub. Slip. Op., Sept. 18, 2020), wherein it unequivocally restated its belief that an expert witness is required to prove mitigation under Standard 1.6(d).  *See also Bercovich v. State Bar*, 50 Cal.3d 116, 128 (1990).  As the Court considers review, it should note that the oral argument in *Braun* actually took place on the very same day as Mr. Potere's—mere hours earlier—and yet that opinion makes no mention of a respondent's ability to receive "some mitigation" based on lay testimony, even though doing so could have benefitted that respondent.  Which is it, and how and when should a judge choose between these vastly divergent evidentiary hurdles, the outcome of which could sharply influence the entire proceeding?

Second, if an expert witness is required to prove mental disability, should the respondent be required to pay upfront costs to provide that expert witness?  Although the RD did not address the issue, the OCTC argued on appeal that doing so "would be expected." (p. 18.)  This Court should grant review and resolve these important questions.

2.    **Standard 1.6(d)'s application violated Mr. Potere's constitutional right to equal protection.**

Discrimination on the basis of disability is prohibited by the Equal Protection Clause, *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 447, 450 (1985), and the Americans with Disabilities Act ("ADA").  42 U.S.C. §§ 12101-12213 (2000).  The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual in question, 42 U.S.C. § 12102(2) (2000), and "mental impairment" includes "[a]ny mental or psychological disorder, such as . . . emotional or mental illness," 29 C.F.R. § 1630.2(h)(2) (1996), which, in turn, includes depression.[5] "To withstand equal protection review, legislation that distinguishes between the mentally [disabled] and others must be rationally related to a legitimate governmental purpose."  *Cleburne*, 473 U.S. at 446.

Be that as it may, Mr. Potere's understanding is that Standard 1.6(d) is not legislation, but rather a court rule developed by the State Bar Board of Trustees and approved by this Court.  As such, the Court is not limited to the traditional "rational basis" test and can and should apply a more rigid standard to protect the rights of respondents with disabilities.  *See Warden v. State Bar*, 21 Cal.4th 628 (1988) (Kennard, J., dissenting) ("This court . . . has a particular responsibility to ensure that classifications we impose by court rule do not discriminate arbitrarily.")  More appropriate for Standard 1.6(d), which distinguishes between respondents based on their status as disabled, would be review under

---

[5] EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, Number 915.002, March 25, 1997, *available at* https://www.eeoc.gov/policy/docs/psych.html.

"intermediate scrutiny," which requires that a law (or court rule) be "substantially related to an important governmental purpose," *see Cleburne*, 473 U.S. at 444, and allows the Court to ask if it "furthers an important government interest and is substantially related to the achievement of that interest." *See Craig v. Boren*, 429 U.S. 190, 197 (1976).[6]  Requiring a heightened evidentiary burden for disabled respondents to prove mitigation in a disciplinary proceeding furthers no conceivable government interest, let alone an important one.

But Standard 1.6(d) fails even the "rational basis" test.  As currently written and enforced in his matter, Standard 1.6(d) violated Mr. Potere's equal protection rights because it provides for mitigation in a disciplinary proceeding only when "established by expert testimony."  This is the only mitigating factor that requires expert witness testimony, *see* Standards 1.6(a)-(c), (e)-(j), and therefore persons with disabilities are singled out as requiring expert testimony to establish a mitigating circumstance, and are *further* required to provide their own expert witnesses.  The RD's conclusion that this does not treat disabled respondents differently is a perplexing *non sequitur.*  (RD 16.)

As noted above, California is the only state that requires an expert to prove a respondent's disability.[7]  Every other state either models ABA Standard 9.32(i), which requires only "medical evidence," or else has no evidentiary hurdle whatsoever,[8] making it unlikely that a rational basis exists to require an *expert*

---

[6] *See also* Jayne Ponder, Note, *The Irrational Rationality of Rational Basis Review for People with Disabilities: A Call for Intermediate Scrutiny*, 53 HARV. CIV. RIGHTS-CIV. LIB. L. REV. 710, 714, 727–43 (2018) (comprehensive argument for applying intermediate scrutiny for disabled persons in all contexts).
[7] *See* Levin, *supra* note 3, at 33–38 and nn.153–174.
[8] *See id.*

witness to put forth a medical opinion to prove mental disability.  The RD states that Standard 1.6(d)'s expert witness requirement is important because it "provides a means for the court to evaluate the weight of mitigation credit an attorney should receive."  (RD 16.)  If that is truly the case, it further underscores the importance of having an expert evaluation available to disabled respondents at no upfront cost.

In either event, no rational basis exists to require the person with a disability to go through the additional step of providing the expert to prove their disability, a burden not imposed on any other respondents that adds an additional—and irrelevant—element to Standard 1.6(d): financial status.  If accepted, this will allow the OCTC to exploit a mentally disabled respondent's financial situation by, for example, failing to request a mental health evaluation under BPC § 6053 and Rule 5.68, and then subsequently objecting to the introduction of any other evidence of that respondent's mental disability throughout their disciplinary proceeding.  It could then employ Standard 1.6(d) to effectively preclude the SBC from considering *any* evidence of that respondent's mental state or disability whatsoever.  Such gamesmanship can only serve to undermine the public's confidence in the legal profession.

### 3.    Standard 1.6(d)'s application violated Mr. Potere's constitutional right to due process.

"The right to practice one's profession is sufficiently precious to surround it with a panoply of legal protection," and because it may not be taken away "arbitrarily," the "holder is entitled to procedural due process in any disciplinary proceedings relating thereto."  *Emslie v. State Bar*, 11 Cal.3d 210, 226, 228

22

(1974).  In disciplinary proceedings, an attorney has a due process right to a "fair hearing," *Rosenthal v. State Bar*, 43 Cal.3d 612, 634 (1987), and their license may be revoked "*only* on charges alleged and proved and as to which [a] *full . . . opportunity to defend* ha[s] been accorded." *Woodard v. State Bar*, 16 Cal.2d 755, 757 (1940) (emphasis added).  To establish a due process violation, an attorney must show that they suffered actual prejudice resulting from the deficiency. *Van Sloten v. State Bar*, 48 Cal.3d 921, 92 (1989).  The RD skirts the complete California rule statement to conclude that all due process requires is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  (RD 11.)

In either event, a hearing is neither "fair" *nor* "meaningful" when a respondent is prevented from putting forth a legally permissible defense for an irrelevant reason (e.g., financial status).  If a respondent suffers from mental illness, Standard 1.6(d) is arguably the most important mitigating factor in their case because a finding that disability caused their misconduct can undermine a finding of specific intent or moral turpitude.  This Court has held that when a respondent's mental illness prevents them from forming the intent required to engage in the alleged misconduct, "then [they] should not be disciplined for the offenses, but should be prohibited from practicing law during the continuance of [their] mental incompetence." *Hyland v. State Bar*, 59 Cal. 2d 765, 774 (1963).  But where, as here, a respondent cannot afford to hire an expert, their mental disability defense can be quickly disposed of or ignored, and their discipline imposed as if they were mentally healthy.  (*E.g.*, HD 24–25.)

23

Furthermore, the OCTC and HD abused their discretion under BPC § 6053 and Rule 5.68 when they failed to order a mental health evaluation for Mr. Potere after he asserted his mental disability as his primary defense.  BPC § 6053 provides that, "*Whenever* in an investigation or proceeding provided for or authorized by this chapter, the mental or physical condition of the licensee of the State Bar *is a material issue*, the board or the committee having jurisdiction *may* order the licensee to be examined by one or more physicians or psychiatrists designated by it" (emphasis added).  This authority is, in turn, expressly granted to the OCTC in Rule 5.68(A) and the HD in Rule 5.68(B).  Section 6053 applies to *whenever* a respondent's mental condition is a *material issue*, and neither the plain language of section 6053 nor Rule 5.68 limits their applicability to evaluating a respondent regarding whether they may "proceed to trial," (RD 11), or to proceedings under BPC § 6007(b)(3), as OCTC argued on appeal (19–20). Because Mr. Potere raised the issue of his mental disability as his primary defense from the very beginning of these proceedings, making it a material issue, the failure of both the OCTC and HD to use their authority to properly investigate it by conducting an evaluation constitutes an abuse of discretion.

This abuse holds doubly true if this Court holds that an expert witness is required under Standard 1.6(d), where it would then become not only an abuse of discretion, but also compound the constitutional due process violation.  That said, even if this Court grants review and decides that an expert witness is not required to prove a respondent's disability under Standard 1.6(d), failure to conduct a Rule 5.68 in similar circumstances would still be an abuse of discretion based on the

plain language of the Rule as written.  This amounts to nothing more than a failure to fully investigate a respondent's matter, which is inexcusable and does little to command the public's respect for the legal profession.

And although it is true that both BPC § 6053 and Rule 5.68 state that OCTC/HD "may" conduct such an evaluation, this discretion should be interpreted as narrowly as possible, and possibly apply, for example, to when a respondent first raises the issue of their mental disability late in their proceedings.[9]  Rule 5.68 should not be available for the OCTC to neglect when a respondent raises the issue early on, particularly when, as here, the defense is supported by credible pre-litigation evidence.  For Mr. Potere, the OCTC used its discretion and declined to conduct a mental health evaluation for expediency, not merit—it knew it would have an easier time disbarring Mr. Potere in the absence of a mental disability defense.  And so it proved.

### 4.    The constitutional issues plaguing his matter substantially prejudiced Mr. Potere.

Mr. Potere was substantially prejudiced throughout his proceedings by being unable to prove his mental disability in mitigation under Standard 1.6(d) because he was: (1) unable to show that he could not form the specific intent necessary to be disciplined for "extortion;" (2) saw the federal government's charging and sentencing decisions, which were themselves mitigated by Mr. Potere's mental disability, labeled "irrelevant;" and (3) was found to "lack insight" into his misconduct under Standard 1.5(k).

---

[9] A respondent could object to the evaluation and be heard at a Rule 5.68(D) hearing.

First, because Mr. Potere was not able to present expert testimony, he was unable to establish that he suffered from depression.  With the required expert, Mr. Potere would have put forth evidence that his symptoms before and during the misconduct in question constituted depression, and that this depression caused the facts and circumstances surrounding his misdemeanor conviction.  This is not mere conjecture: Mr. Potere's treating psychiatrist at the time, Dr. Holly Schwartz, added "Moderate major depression, single episode F32.1: Major depressive disorder, single episode, moderate" to his diagnosis on May 12, 2017, which is exactly in the middle of when the misconduct took place, (Ex. 1066-19); Mr. Potere then accessed Siegel's email and drafted the complaints on May 14, 2017 (Stip. II ¶21); requested a meeting with Woo and Duvall on May 15, 2017 (¶28); and met with them on May 16, 2017 (¶29).  This Court has historically afforded sympathy and "significant" mitigating weight to a respondent's mental disability.  *E.g.*, *Silva-Vidor v. State Bar*, 49 Cal.3d 1071, 1079 (1989) (financial and emotional problems "*should constitute a significant mitigating factor*" in considering the appropriate level of discipline (emphasis added)).

Additionally, anger is a prominent feature of depression[10] and it is at least as prevalent as more commonly understood symptoms such as lethargy and feeling down.[11]  People suffering from depression with anger and irritability have "difficulty with modulation and management of angry feelings and fantasies" and

---

[10] Fredric N. Busch, *Anger and depression*, 15 ADVANCES IN PSYCHIATRIC TREATMENT J. OF CONT. PROFESSIONAL DEV. 271, 272 (2009), *available at* https://www.cambridge.org/core/journals/advances-in-psychiatric-treatment/article/anger-and-depression/E8606D1796679107A5F3037466C1DDA8.

[11] Maurizio Fava, M.D., et. al., *The Importance of Irritability as a Symptom of Major Depressive Disorder: Results from the National Comorbidity Survey Replication*, 15 MOLECULAR PSYCHIATRY 856, 8 (2010), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3012558/.

a "sensitivity to disappointments and rejection, reacting to relatively minor disappointments with intense feelings of inadequacy and anger."[12]  This can lead to significantly increased depressive severity and poorer impulse control and make a person more likely to engage in irresponsible, antisocial, or reckless behavior.[13]

This is crucial here because extortion is a *specific intent* crime under both the Hobbs Act and California Penal Code § 518, and therefore requires proof that a person specifically intended to commit that "precise criminal act."  *U.S. v. Aguon*, 851 F. 2d 1158, 1168 (9th Cir. 1988) (18 U.S.C. § 1951(a), (b)(2)); *People v. Hesslink*, 167 Cal. App. 3d 781, 789 (1985) (section 518).[14]  Mr. Potere's primary defense in mitigation, which Standard 1.6(d) prevented him from arguing, is that his conduct was caused by a depressive episode, and as such, he was unable to form the requisite *mens rea* to support that felony conviction.  Indeed, the evidence in Mr. Potere's matter supports a conclusion that he did not intend to extort Dentons.  (*E.g.*, Ex. 050 (Duvall FBI interview).)  Instead, Mr. Potere's purported "extortion" took the form of responses to leading questions posed by Dentons representatives and recorded by the FBI.  During his hearing, Mr. Potere repeatedly questioned the validity of relying exclusively upon his responses to leading questions as evidence of his intent to commit "extortion."

---

[12] Busch, *supra* note 10, at 271–72.

[13] Lewis L. Judd, et. al., *Overt Irritability/Anger in Unipolar Major Depressive Episodes[:] Past and Current Characteristics and Implications for Long-term Course*, 70 JAMA PSYCHIATRY 1171, 1171, 1173–74 (2013), *available at* https://pdfs.semanticscholar.org/376b/e25975889bc73f276c2250a68683c40051f8.pdf.

[14] "Specific intent" means "the intent to accomplish the precise criminal act that one is later charged with."  BLACK'S LAW DICTIONARY, 369 (Third Pocket Ed. 2006).

(*E.g.*, TR3 65:18-20.)  This was because he did not intend to extort Dentons, and absent leading questions, these statements would not have been made.

Rather, the evidence shows that Mr. Potere's meeting with Dentons on May 25, 2017 was an interrogation coordinated by the FBI.  (*E.g.*, Ex. 1045 (Dentons representatives met with FBI agents for two hours prior).)  "The ultimate goal of interrogating suspected criminals is to gain a confession,"[15] which "becomes particularly important when there is no other evidence against the suspect."[16]  "[I]ndividuals differ in their ability to withstand interrogation pressure"[17] and research has found that a "*depressed mood* is linked to a susceptibility to provide false [statements] to police"[18] and can make a person "more susceptible to confessing in response to [interrogation] techniques than persons without."[19]  As such, evidence of Mr. Potere's mental disability, properly presented, could have undermined a finding of specific intent to commit extortion, and therefore rendered untenable a conclusion that disbarment was warranted.  Yet without evidence of his mental disability, both the HD and RD found him "guilty" of "extortion," and therefore worthy of "the ultimate discipline."  (HD 21, 28; RD 10 n.3, 20.)

---

[15] Allison D. Redlich, *Mental Illness, Police Interrogations, and the Potential for False Confession*, 55 PSYCHIATRIC SERVICES 19, 20 (2004), *available at* https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.55.1.19.
[16] Richard A. Leo, *False Confessions: Causes, Consequences, and Implications*, 37 JOURNAL OF THE AMERICAN ACADEMY OF PSYCHIATRY AND THE LAW 332, 334 (2009) *available at* http://jaapl.org/content/37/3/332.
[17] *Id.* at 335.
[18] Saul M. Kassin, et. al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 LAW AND HUMAN BEHAVIOR 3, 22 (2010), *available at* https://web.williams.edu/Psychology/Faculty/Kassin/files/White%20Paper%20-%20LHB%20(2010).pdf (emphasis added).
[19] Redlich, *supra* note 15, at 20.

The prejudice Mr. Potere suffered in being unable to challenge a finding of intent to commit extortion with evidence of his mental disability is crystallized in the federal government's charging and sentencing decisions, which the RD derided as having "no relevance."  (RD 10 n.3.)  In determining how to proceed with Mr. Potere's criminal case and in considering the appropriate punishment, the government took the position that Mr. Potere's "long documented history of mental health issues *is a significant factor in this case*."  (Ex. 1001-5 (emphasis added).)  This was based on a detailed analysis of Mr. Potere's history with depression, which included the very same mental health records currently before this Court on review.  (*Id.* 6–7.)  On conclusion, the government's opinion was that Mr. Potere's mental health issues are "treatable" and that he is a "low risk for reoffending, so long as he continues with therapy."  (*Id.* 5, 8.)

Based on this, Mr. Potere did not plead guilty to extortion or attempted extortion, and was not asked to plead guilty to extortion, attempted extortion, or any other felony.  Because Mr. Potere is before this Court on a conviction referral, the government's investigation and subsequent charging and sentencing decisions *form the very basis* for his State Bar discipline.  This Court should grant review and determine whether discipline for an uncharged crime serves the purpose of protecting the public, or is instead inherently punitive.

Finally, Mr. Potere was prejudiced because the SBC found that he lacked insight into his misconduct under Standard 1.5(k).  (RD 12–13.)  On review, he argued that "lack of insight" may not be used in aggravation if a respondent's "attitude is based on an honest, although mistaken, belief in [their] innocence."

*Van Sloten v. State Bar*, 48 Cal.3d 921, 932–933 (1989).  Mr. Potere has always had the honest and unwavering belief that the conduct surrounding his misdemeanor conviction was the product of a major depressive episode, and that as a result of his disability, he was unable to form the intent necessary to commit "extortion."  But Standard 1.6(d) prevented him from proving his disability, and the RD therefore held that, "the record does not give any support for such a belief."  (RD 12.)

Astonishingly, the RD emphasized that Mr. Potere stipulated to moral turpitude and sufficient facts such that, in doing so, he (allegedly) established that disbarment is necessary, but then also finds that Mr. Potere lacked insight into his misconduct.  (RD 13.)  The Review Department cannot have it both ways.  Mr. Potere stipulated to moral turpitude because he believes a period of actual suspension is warranted in his case based on his misdemeanor conviction.  But he does not lack insight into his misconduct, and the SBC's holding to the contrary vividly demonstrates the prejudice he has endured.

**5.    The Review Department improperly relied on the ARDC Report to defeat Mr. Potere's constitutional claims.**

Apparently without any sense of self-awareness, the RD relies upon the Illinois ARDC Report, which was conducted at the direction of the ARDC and without any upfront costs to Mr. Potere, to conclude that, in California, Mr. Potere suffered no constitutional violations by not being provided with an evaluation by an expert without any upfront costs.  (RD 16 n.12.)  In so doing, the RD is effectively conceding that such an evaluation can, in fact, make a proceeding fair.

This alone should undermine its conclusion that Mr. Potere suffered no prejudice as a result of his matter's constitutional deficiencies.

But in rejecting Mr. Potere's constitutional claims, the RD improperly relies upon the ARDC Report as "expert" testimony.  (RD 17.)  Mr. Potere introduced the ARDC Report into evidence to demonstrate his candor with the OCTC and the SBC, and for which the RD awarded him "substantial" mitigation under Standard 1.6(e).  (RD 18.)  But at no point was the ARDC Report referred to as "expert" testimony during his hearing, nor did the judge did label it as such when it was admitted.  (TR1 175:21-25; 176:1-17, 23-25.)  This is because it could not have been: the author's only qualifications were his title, "Dr.," and his position a faculty member of a medical school.  (RD 14; HD 24.)  Baldly, this does not satisfy California Evidence Code § 720, and because the author was not available for questioning during the hearing, Mr. Potere was deprived of his right to conduct a cross-examination under section 721.

The ARDC Report also fails to comply with any of Rule 5.65.1's requirements, such as that the author be available for a deposition.  As such, for example, Mr. Potere had no opportunity to question—and the report does not explain—precisely *why* it disagrees with every other of Mr. Potere's treating professionals, or the author's familiarity with current research on depression and anger and that, in such cases, people are often *misdiagnosed* as having a "personality disorder."[20]  The RD effectively treated the ARDC Report as a completely unimpeachable document.

---

[20] *E.g.*, Nell Greenfieldboyce, *If You're Often Angry Or Irritable, You May Be Depressed*, NPR.ORG (Feb. 4, 2019), https://www.npr.org/sections/health-shots/2019/02/04/689747637/if-

The RD then relies on the ARDC Report as "expert" testimony to conclude that Mr. Potere's constitutional rights were not violated because, in light thereof, the conclusions of "another expert" would be "speculati[ve]."  (RD 17.) But how would it have ruled if the ARDC did not conduct a mental health evaluation or if Mr. Potere declined to introduce it into evidence?  And, even if a mental health evaluation in California agreed with the ARDC Report, Mr. Potere would have at least been able to test those conclusions, first at a deposition, and then through cross-examination during his hearing.

Finally, even if the ARDC Report were properly before the Court as "expert" testimony, it fails in substance to undermine his constitutional arguments on appeal.  This is because it eschews analysis or consideration of whether or not Mr. Potere was capable of *forming the specific intent* necessary to be found guilty of committing the crime of extortion.  As such, its probative value is negligible in evaluating whether Mr. Potere's rights were violated in California.  The Court should grant review and reverse the RD's faulty evidentiary analysis.

  C. **What must a disabled respondent prove to satisfy Standard 1.6(d)'s "no longer pose a risk" language, and when should that evidence be considered?**

Finally, the Court should grant review to resolve substantial confusion among published RD decisions regarding what, precisely, a disabled respondent is required to prove to satisfy Standard 1.6(d)'s "no longer pose a risk" language.  It should further grant review to consider removing this inquiry from the Standard

---

youre-often-angry-or-irritable-you-may-be-depressed (quoting Dr. Maurizio Fava, a psychiatrist at Massachusetts General Hospital and a professor at Harvard Medical School).

1.6(d) mitigation analysis, and instead placing it in the disciplinary

recommendation analysis.

As originally drafted in 1986, then-labeled Standard 1.2(e)(iv) did require

respondents to provide evidence that he or she "no longer suffers from such

difficulties or disabilities."  However, it was amended in 2013 to replace that

language with "no longer pose a risk."  But Standard 1.2(e)(iv)'s "recovery"

legacy lives on.  Here, for example, in its opinion in Mr. Potere's matter, the HD

cited *In the Matter of Song*, 5 Cal. State Bar Ct. Rptr. 273, 281 (2013), which, in

turn, cites to the 1986 version of the Standard, for the proposition that Mr. Potere

failed to prove that he, "no longer suffers from such difficulties."  (HD 25.)  More

recent cases follow suit.  In *In the Matter of Braun*, 18-N-16608; 18-O-17277,

*13 (Pub. Slip. Op., Sept. 18, 2020), which, again, was argued on the same day

and mere hours before Mr. Potere's matter, the court declined to award any

mitigation to the respondent under Standard 1.6(d) in part because "he has not

shown adequate *recovery* from that condition" (emphasis added).  But apparently

for Mr. Potere on review, "recovery" is actually not the standard; instead it is that

"the attorney must show the disorder is unlikely to cause further misconduct."

(RD 16–17 (citing *In re Naney*, 51 Cal.3d 186, 197 (1990).)  The Court should

resolve this split.

Whatever the words, Mr. Potere could find no evidence that the SBC

enforces anything other than "recovery," and thus the second important issue for

this Court to resolve is whether the respondent must make this showing *at the

time of their hearing* to receive any mitigating credit for their mental disability.

This is problematic because a respondent's mental disability was already proven to have caused their misconduct, but because they may still "pose a risk" *at the time of their hearing* if they are still treating their illness, that respondent would then receive no mitigating credit whatsoever under Standard 1.6(d). This is disciplining an attorney because of their disability.

Instead, Standard 1.6(d) mitigation analysis should end at the "causation" inquiry; recovery or "no longer pose a risk" should be considered in the disciplinary recommendation. Failing that, application of Standard 1.6(d)'s "no longer pose a risk" language should be expanded to allow for a credible showing of improvement from the disability. For example, the Minnesota Supreme Court allows for mitigation on a showing of clear and convincing evidence—and, notably, an expert is *not* required—that the respondent is "*undergoing treatment* and *is making progress to recover* from the psychological problem which caused or contributed to the misconduct, *that the recovery has arrested the misconduct*, and that the *misconduct is not apt to recur*."[21] When such a showing is made, it often results in the disciplinary sanction of "indefinite suspension,"[22] which ends on a showing of rehabilitation. In such a context, "conditioning [a disciplinary sanction] on treatment for an underlying mental health disorder . . . can change a lawyer's life." (ABA, Ex. 1034-30.) But, as it stands, Standard 1.6(d)'s "recovery" requirement creates an unconstitutional Catch-22: to receive rehabilitative discipline, an attorney must first prove rehabilitation.

---

[21] In the Matter of Weyrich, 339 N.W.2d 274, 278–79 (1983) (emphasis added).
[22] *Id.* at 278 (emphasis added).

V.    **Conclusion**

All Mr. Potere is asking for is a fair opportunity to have his mental disability considered in mitigation under Standard 1.6(d), which both the United States government and the sentencing judge viewed as a significant mitigating factor in his criminal matter.  (Exs. 1001-5–8 (AUSA); 142-32 (Judge Walter).) Yet from the very beginning, the State Bar has actively and successfully sought to prevent its consideration here.  Because the Court cannot possibly analyze the full "facts and circumstances" surrounding Mr. Potere's misdemeanor conviction without this evidence, let alone find that he had the requisite *mens rea* to commit a felony, how can it—or the public—be confident in the disciplinary recommendation of disbarment?

These issues are of massive importance to the significant portion of the California legal community who themselves suffer from mental disabilities and may one day make a regrettable mistake as a result.  Indeed, the Court need look no further than the countless pages of Hearing and Review Department opinions to find respondents practically begging to have their mental disability considered in mitigation, only to be stifled by a rigid application of Standard 1.6(d).  Review should be granted to address these issues and make the disciplinary process fairer for all respondents.

Respectfully submitted,

Dated: January 25, 2021                    MICHAEL B. POTERE


By:   /s/ Michael Potere
      MICHAEL B. POTERE

Appellant

## **Certificate of Compliance**

Pursuant to rule 8.504(d) of the California Rules of Court, I hereby certify that this brief contains 8,597 words, including footnotes.  In making this certification, I have relied on the word count of the computer program used to prepare the brief.


                                        _____/s/ Michael Potere_____

## CERTIFICATE OF ELECTRONIC SERVICE

[Gen. Order 20-04; Code Civ. Proc., § 1013b, subds. (a)-(b)]

I, the undersigned, certify that I am a Court Specialist of the State Bar Court of California.  I am over the age of eighteen and not a party to the within proceeding.  Pursuant to standard court practice, on October 16, 2020, I electronically served a true copy of the following document(s):

OPINION AND ORDER FILED OCTOBER 16, 2020

by electronic transmission on that date to the following:

MICHAEL BERNARD POTERE
mpotere@gmail.com

ALEX J. HACKERT
Alex.Hackert@calbar.ca.gov

I hereby certify that the foregoing is true and correct.

Date: October 16, 2020

Julieta E. Gonzales
Court Specialist
State Bar Court of California
Julie.Gonzales@calbar.ca.gov

## <u>AFFIDAVIT OF SERVICE</u>

[Cal. Rule of Court 8.78; Supreme Court Rules Regarding Electronic Filing, Rule 2, as amended March 18, 2020]

I am over the age of eighteen and a resident of Middlesex County, Massachusetts.  Pursuant to standard court practice, in the City and County of West Newton in Middlesex County, Massachusetts, on January 25, 2021, Mr. Potere deposited a true copy of the following document(s):

APPELLANT'S PETITION FOR REVIEW

REQUEST TO WAIVE COURT FEES, FORM FW-001

in an e-mail on that date addressed as follows:

ALEX HACKERT
Alex.Hackert@calbar.ca.gov

I hereby certify that the foregoing is true and correct.  Executed in West Newton, Massachusetts, on January 25, 2021.

 /s/ Michael Potere
Michael Potere
18 Inis Circle
West Newton, Massachusetts 02465

# EXHIBIT 9

SUPREME COURT
FILED

MAR 3 0 2021

Jorge Navarrete Clerk

_____

Deputy

State Bar Court No. 17-C-03795

**S266618**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re MICHAEL BERNARD POTERE on Discipline.

The petition for review is denied.

The court orders that Michael Bernard Potere, State Bar Number 302569, is disbarred from the practice of law in California and that his name is stricken from the roll of attorneys.

Michael Bernard Potere must also comply with California Rules of Court, rule 9.20, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of this order.

Costs are awarded to the State Bar in accordance with Business and Professions Code section 6086.10 and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment.

CANTIL-SAKAUYE
_____
*Chief Justice*